IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

GARY FRANKLIN ROBINSON,

                Plaintiff,          Civil Action No.
     v.                       9:11-CV-0758 (TJM/DEP)

W. BROWN, Superintendent, *et al.,*

                Defendants.

---

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

Gary Franklin Robinson, *Pro Se*
95-B-2335
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    CATHY Y. SHEEHAN, ESQ.
Attorney General of the            Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S.MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Gary Franklin Robinson, a New York State prison inmate, has commenced this action against four employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. Though difficult to decipher, his complaint, as amended, appears to assert a procedural due process claim arising out of the issuance of a misbehavior report, an ensuing disciplinary hearing, and a resulting penalty that included six months of disciplinary special housing unit ("SHU") confinement.

In response to plaintiff's complaint, as amended, defendants have moved seeking its dismissal for failure to state a claim upon which relief may be granted. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

DOCCS.  *See generally* Amended Complaint (Dkt. No. 13).  While he is

now confined elsewhere, at the times relevant to his claims plaintiff was

designated to the Eastern Correctional Facility ("Eastern"), located in

Naponock, New York.  *Id.* at ¶¶ 1-3.

On February 24, 2011, while plaintiff was incarcerated at Eastern,

Corrections Officer J. Mundorff confiscated Uniform Commercial Code

("UCC") documents from him and thereafter issued a misbehavior report

accusing him of violating prison rules, including failure to obey a direct

order, lying or providing incomplete, misleading or false information, and

possessing UCC materials.  *See* Complaint (Dkt. No. 2), Attachment at p.

18 of 23.[2]  A Tier III disciplinary hearing was conducted on March 2, 2011,

by G. Turbush, the Assistant Deputy Superintendent for Programs at

Eastern, to address those charges.[3]  *Id.* at p. 17 of 23.  At the conclusion

_____

[2]     While annexed to plaintiff's original complaint, Murdorff's misbehavior report, dated February 24, 2011, and other documents relating to the proceedings that followed, are not included as attachments to his amended complaint.  *See generally* Dkt. No. 13.  Because those documents, while not incorporated by reference, are "integral" to plaintiff's claims, the court may properly consider them for purposes of the pending dismissal motion. *See Int' Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks omitted).

[3]     The DOCCS conducts three types of inmate disciplinary hearings.  7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor

of that proceeding, defendant Turbush found plaintiff guilty on all three counts and sentenced him to a six-month period of disciplinary SHU confinement, with a corresponding loss of recreation, packages, commissary, and telephone privileges, additionally recommending the loss of six months of good time credits. *Id.*

II.    PROCEDURAL HISTORY

This action was commenced by the plaintiff in the United States District for the Southern District of New York on or about May 12, 2011, but was subsequently transferred to this district in light of the fact that the events giving rise to plaintiff's claims occurred here.  Dkt. Nos. 2, 4. Plaintiff thereafter filed an amended complaint, as a matter of right, on October 14, 2011.  Dkt. No. 13.  Named as defendants in plaintiff's amended complaint are J. Mundorff, a Corrections Officer at Eastern; W. Brown, the Superintendent at Eastern; Assistant Deputy Superintendent G. Turbush; and A. Prack, DOCCS Director of Special Housing/Inmate Disciplinary Program.  *Id.*

---

punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include a period of SHU confinement.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

On December 16, 2011, Senior District Judge Thomas J. McAvoy granted plaintiff's request for leave to proceed *in forma pauperis* and, after reviewing his complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1), (1) dismissed all claims against defendant Mundorff, without prejudice; (2) dismissed plaintiff's claims related to the alleged issuance of a false misbehavior report and of unlawful retaliation growing out of the issuance of that report; and (3) pursuant to *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006), directed Robinson to advise the court as to whether he was relinquishing all claims related to the disciplinary hearing affecting the duration of his confinement, including based upon the recommended loss of good time credits. Dkt. No. 15. Following the receipt of a notice from the plaintiff concerning the latter issue, Dkt. No. 16, the court issued a second decision and order, dated February 6, 2012, dismissing any claim within plaintiff's amended complaint deemed to relate to disciplinary sanctions that could affect the duration of his confinement, but otherwise ordering the action to proceed. Dkt. No. 17.

On May 10, 2012, the remaining three defendants moved for dismissal of plaintiff's amended complaint. Dkt. No. 32. In their motion, defendants argue that (1) plaintiff's conspiracy claim, to the extent such a

cause of action may be contained in his amended complaint, is legally deficient on its face and also barred by the intra-corporate conspiracy doctrine; (2) plaintiff has failed to set forth facts reflecting the existence of a plausible due process cause of action; (3) plaintiff's claims against the defendants in their official capacities are precluded by the Eleventh Amendment; and (4) defendant Brown is entitled to dismissal of all claims against him based upon plaintiff's failure to allege his personal involvement in the offending conduct. *Id.* Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 35.

Defendants' dismissal motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more

than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, 1964-65 (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also id.* While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. 679, 129 S.Ct. at 1950.

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 556

U.S. at 678, 129 S. Ct. at 1949-50.  To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson v. Pardus*, 551 U.S. 89,  127 S. Ct. 2197, 2200 (2007) ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citations omitted); *Kaminski v. Comm'r of Oneida Cnty. Dep't of*

8

*Social Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011)

B. Eleventh Amendment

Plaintiff's complaint in this action, as amended, names four DOCCS employees, three of whom remain as defendants in the action, both individually and in their official capacities. Defendants' motion requests dismissal of plaintiff's claims against them to the extent they are sued in their official capacities as DOCCS employees.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). This absolute immunity, which states enjoy under the Eleventh Amendment, extends both to state agencies and state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[4] *Richards v. State of New York Appellate Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102

---

[4]   In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[5]  *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985);  *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

Plaintiff's damage claims against the three remaining defendants in their official capacities are, in reality, claims against the State of New York.  Accordingly, they represent the type of claims against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damage claims against the defendants in their roles as state employees be dismissed.

C.    Procedural Due Process

At the heart of this action is plaintiff's claim that his procedural due process rights were violated during the course of proceedings leading to a finding that he violated prison rules and a corresponding period of

---

[5]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer v. Melo*, 502 U.S. 21, 30-31, 112 S.Ct. 358, 364-65 (1991).

disciplinary SHU confinement.  Plaintiff maintains that his possession of the confiscated UCC documents was legitimate and that (1) Hearing Officer Turbush violated plaintiff's due process rights by failing to investigate the charges against him; (2) A. Prack contributed to the due process violation by not reviewing the record in its entirety when deciding Robinson's appeal of the hearing determination; and (3) Superintendent Brown "colluded" with defendants to deprive him of his rights.  In their motion, defendants challenge the legal sufficiency of this cause of action.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  In their motion, defendants appear to concede that plaintiff's six-month sentence of disciplinary SHU confinement could suffice to implicate a protected liberty interest under the Fourteenth Amendment, and focus instead upon the contention that plaintiff was afforded the required procedural due process in connection with that deprivation.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest were addressed by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated protections include the right (1) to receive written notice of the charges; (2) to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) to receive a written statement by the hearing officer explaining his or her decision and the reasons for the disciplinary action being taken; and (4) in some circumstances, to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  Additionally, in order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence."  *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 105 S. Ct. 2768, 2773 (1985).

Even when liberally construed, plaintiff's amended complaint does not allege the denial of any of the safeguards set out by the Supreme Court in *Wolff* as being guaranteed to inmates facing liberty interest

deprivations in the context of disciplinary proceedings.  Instead, Robinson appears to challenge the sufficiency of the evidence supporting the hearing officer's finding of guilt, although no specifics are offered.  *See generally* Dkt. No. 13.

The misbehavior report issued by Corrections Officer J. Mundorff accuses Robinson of possessing UCC materials in violation of prison rules, and after having received a letter from a Deputy Superintendent of Security at the Greenhaven Correctional Facility ordering that he not use "redemption documents."  Dkt. No. 2 at 19.  Also referenced in that misbehavior report is a letter from the plaintiff to a senior corrections counselor alleged to contain misleading or false statements.  *Id.*

Plaintiff does not refute these allegations.  For example, he seemingly does not find fault with the hearing officer's determination that he possessed UCC documents in violation of prison rules.  *See* Dkt. Nos. 13, 35.  Instead, he appears to assert a right to possess such documents, despite the existence of a DOCCS policy prohibiting inmates from possessing them, and argues that they relate both to his efforts to collaterally challenge his underlying conviction and to a "contract between the Creditor/Plaintiff Gary Franklin and the Trade Name/Debtor GARY

FRANKLIN ROBINSON, filed in the STATE OF WASHINGTON Commercial Registry as a Transmitting Utility File #2007-267-5393-2."[6] Dkt. No. 13 at ¶ 9. Plaintiff's contention in this regard is unsupported; the DOCCS' policies addressing inmate possession of UCC materials have withstood challenge under the First Amendment. *See, e.g., Neree v. O'Hara*, No. 9:09-CV-802, 2011 WL 3841551, at *7-9 (N.D.N.Y., July 20, 2011) (Baxter, J.), adopted, 2011 WL 3841553, at *2 n.2 (N.D.N.Y. Aug. 29, 2011) (D'Agostino, J.) (concluding that such regulations are reasonably related to legitimate penological interests).[7]

To be sure, plaintiff's suggestion that the UCC materials in issue could also relate to his efforts to collaterally challenge a criminal conviction give room for pause. The confiscation of an inmate's legal papers related to a legitimate, non-frivolous legal proceeding can give rise to a claim under the First Amendment for interference with access to the courts, provided that the inmate can establish that he or she has suffered prejudice as a result of the actions of corrections officials in the pursuit of

---

[6] In his response to defendants' motion, Robinson describes the UCC documents at issue as containing "a contract and security interest in all property of GARY FRANKLIN ROBINSON." *See* Robinson Aff. (Dkt. No. 35) ¶ 4.

[7] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

his or her legal claims.  *See Pacheco v. Pataki*, 07-CV-850, 2010 WL 3635673, at *3 (N.D.N.Y. Sept. 9, 2010) (Scullin, J.) ("A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents. . . .[f]or the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury.").[8]   In this instance, however, the documents at issue have no bearing upon any attempts by plaintiff to collaterally challenge his criminal conviction.  *See Osborne v. Hill*, No. 05-CV-641, 2006 WL 1215084, at *5 (D. Ore. May 1, 2006) ("There is nothing in the Uniform Commercial Code which would help  plaintiff[s] challenge the legality of [their] conviction[s] or the conditions of [their] confinement");  *see also Rouse v. Caruso*, No. 06-CV-10961, 2011 WL 918327 at *17 (E.D. Mich. Feb. 18, 2011).

Among the bases for plaintiff's due process cause of action is his contention that Hearing Officer G. Turbush failed to properly investigate the charges against him.  The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge.  *Allen v. Cuomo*, 100 F.3d 253, 259 (2d

---

[8]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Cir.1996); *see also Davidson v. Capuano*, No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N.Y. June 16, 1988) (citing *McCann v. Coughlin*, 698 F.2d 112, 122 n.10 (2d Cir. 1983)).  An impartial hearing officer is one who "does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen."  *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990).  The allegation that defendant Turbush failed to investigate the claims against Lewis does not suggest bias on his part.  Indeed, had he conducted an investigation into the allegations against Robinson and then presided over the ensuing hearing, that dual role could have been viewed as running afoul of the Fourteenth Amendment's procedural due process guaranty.  *Cf. Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987).  Simply stated, there is no requirement, as plaintiff apparently now argues, that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer.

In sum, plaintiff's amended complaint fails to set forth facts demonstrating the existence of a plausible procedural due process claim, and should therefore be dismissed on this basis.

D.  <u>Conspiracy</u>

The oblique reference to "collusion" in plaintiff's amended complaint could potentially be regarded as alleging the existence of a conspiracy among the named defendants. In their motion, defendants also seek dismissal of any such conspiracy claim deemed to be included within Robinson's complaint, as amended.

To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts."; *Duff v. Coughlin*, 794 F. Supp. 521, 525 (S.D.N.Y. 1992); *accord, Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).

It should be noted that there is no independently cognizable claim of conspiracy under section 1983. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit

will stand only insofar as the plaintiff can prove the *sine qua non* of a §
1983 action: the violation of a federal right."); *see also Graham v. City of
Albany,* 08-CV-0892, 2009 WL 4263510, at *12 (N.D.N.Y. Nov. 23, 2009)
(Treece, M.J.) (dismissing the plaintiff's conspiracy claim because "she
identifies no underlying constitutional violation or injury"). In this instance,
since I have already concluded that plaintiff's procedural due process
cause of action is deficient and no other constitutional claim is set forth in
his complaint, there is no longer any civil rights deprivation in the case to
support a conspiracy cause of action.[9],[10]

E.     Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se*
litigant "without granting leave to amend *at least* once" if there is any
indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d

---

[9]    Plaintiff's amended complaint asserts a claim that he was issued a false
misbehavior report, with retaliatory motives. As was noted earlier, that claim was
dismissed by the court *sua sponte*. *See* Decision and Order Dated December 16, 2011
(Dkt. No. 15) at pp. 4-7, 10.

[10]    As defendants argue, plaintiff's conspiracy claim would likely be precluded in
any event by the intra-agency conspiracy doctrine. *See Little v. City of New York*, 487
F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) ("under the 'intracorporate conspiracy'
doctrine, the officers, agents, and employees of a single corporate entity, each acting
within the scope of her employment, are legally incapable of conspiring together.")
(quoting *Salgado v. City of New York*; No. 00 Civ. 3667, 2001 WL 290051, at *8-9,
(S.D.N.Y. March 26, 2011); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 469-70
(N.D.N.Y. 2009) (Suddaby, J.) (holding that the intra-agency conspiracy doctrine
applies "to cases in which the entity is the State").

698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (granting leave to replead where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

While plaintiff's damage claim against defendants in their official capacities is hopelessly fatal, as is his conspiracy cause of action based upon the intra-corporate conspiracy doctrine, it is conceivable that he could state facts demonstrating the existence of a plausible due process claim against all or some of the defendants in their individual capacities. I therefore recommend that he be afforded an opportunity to file a second amended complaint, if desired, to include facts that could support such cause of action. He should be advised, however, that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd*, 895 F. Supp. 35, 38

(N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 23, 1995) (Pooler, D.J.). In his second amended complaint, plaintiff therefore must clearly set forth the facts that give rise to the claim, including the dates, times and places of the alleged underlying acts. In addition, the revised pleading should specifically allege facts demonstrating the specific involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). Any such second amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. Fed. R. Civ. P. 10(a); *see Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

## IV. SUMMARY AND RECOMMENDATION

The primary thrust of plaintiff's complaint in this action, as amended and narrowed by an earlier court decision dismissing his false misbehavior

report and retaliation claims, concerns the claim that his due process rights were violated when he was disciplined, following a hearing, for violating prison rules.  Because plaintiff's amended complaint is lacking in facts demonstrating the existence of a plausible procedural due process claim, I recommend that it be dismissed, with leave to amend.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 32) be GRANTED, and that plaintiff's amended complaint be DISMISSED, with leave to replead only with respect to plaintiff's procedural due process claim against the defendants in their individual capacities.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     November 1, 2012
           Syracuse, NY

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Reginald NEREE, Plaintiff,
v.
Lucann O'HARA, et al., Defendants.
No. 9:09–CV–802 (MAD/ATB).

July 20, 2011.

Reginald Neree, pro se.

Adele M. Taylor–Scott, Ass't Attorney General for
Defendant.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for Report and
Recommendation on September 24, 2010, pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y.
72.3(c).[FN1] Plaintiff's *pro se* complaint (Dkt. No. 1) seeks
monetary damages and unspecified injunctive relief, under
42 U.S.C. § 1983, for alleged violations of his
constitutional rights while he was confined by the New
York State Department of Correctional Services
("DOCS").[FN2] Although the complaint suggests other
alleged constitutional violations, plaintiff primarily claims
that he was denied due process in connection with three
disciplinary hearings conducted at the Mohawk
Correctional Facility ("Mohawk") in 2009.

> **FN1.** The case was originally assigned to Senior
> District Judge Thomas J. McAvoy; but, on April
> 20, 2011, it was re-assigned to District Judge
> Mae A. D'Agostino.

> **FN2.** On April 1, 2011, DOCS and the New
> York State Division of Parole were merged into
> one agency, named the New York State
> Department of Corrections and Community
> Supervision. Because the events relevant to this

suit occurred before the merger, I will refer to
New York State's corrections agency as
"DOCS."

Presently before this court is defendants' motion for
summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt.
No. 88). Plaintiff filed a response to the defendants'
motion, and what purports to be a cross motion for partial
summary judgment, seeking a finding that the defendants
are liable on the due process claims. (Dkt. No. 89). The
defendants thereafter filed a reply in further support of
their summary judgment motion and in opposition to
plaintiff's cross motion. (Dkt. No. 92). For the reasons set
forth below, this court recommends granting defendants'
summary judgment motion, denying plaintiff's purported
cross motion, and dismissing the complaint.

### I. *Factual Background*

On or about April 16, 2009, DOCS forwarded a
memorandum to all facility superintendents, advising them
of emergency rule changes and new procedures that were
to be effective immediately. The memorandum discussed
a scheme devised by inmates to use the Uniform
Commercial Code ("UCC") to file liens against DOCS
personnel. The UCC liens were fraudulent, but they could
seriously impact the targeted employee's credit, until
successfully removed. (Woughter Decl. ¶¶ 4, 5 & Exh. A,
Dkt. No. 88–10 at 2, 8–10).[FN3] In response to this scheme,
the Commissioner authorized amendments to DOCS
Directive 4421 ("Privileged Correspondence") to require
the monitoring and review of all incoming or outgoing
mail to or from the Secretary of State—the state agency
which generally handles UCC filings. Directive 4422
("Inmate Correspondence Program") was also amended to
prohibit inmates from possessing UCC forms, unless they
had prior written authorization from the facility
superintendent. The amendment to Directive 4422 also
authorized confiscation of UCC forms for review by the
superintendent, in consultation with DOCS counsel. (*Id.* ¶
6 & Exh. A, Dkt. No. 88–10 at 2, 11–12).

> **FN3.** The court will refer to page numbers
> assigned by the courts' Case

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

Management/Electronic Case Filing system to the extent it seems necessary to reference the cited exhibit.

The April 16, 2009 memorandum provided that unauthorized UCC materials "shall be deemed contraband," and directed that they were to be confiscated, so that the superintendent, in consultation with DOCS counsel, could determine whether there was a valid reason to authorize the inmate to have the UCC documents. Superintendents were further directed: "When any unauthorized UCC document is found in the possession of an inmate, that inmate will be issued a written direct order that he or she is not to attempt to file UCC Financing Statements, unless the inmate is given prior approval from the Superintendent." (Woughter Decl. ¶¶ 8–9 & Exh. A, Dkt. No. 88–10 at 2–3, 9–10). Upon receipt of the memorandum, defendant Carol Woughter, then the Superintendent of Mohawk Correctional Facility, directed staff to post a "Notice to Inmate Population," announcing the new rules relating to UCC documents, in housing units and the common areas of the facility that were accessible to inmates. (*Id.* ¶¶ 10, 12 & Exh. B, Dkt. No. 88–10 at 3, 13–14).

**\*2** On or about April 20, 2009, the mail room staff at Mohawk intercepted incoming mail to plaintiff from the Department of State in Albany, returning UCC documents he attempted to file. Mail room personnel requested permission of the superintendent to open those items, which was granted on April 21st. (Woughter Decl. ¶ 14 & Exh. C, Dkt. No. 88–10 at 3–4, 15–16). On April 22, 2009, the mail room intercepted an additional piece of incoming correspondence to plaintiff, from the Pennsylvania Department of State, returning another attempted UCC filing. Mail room personnel requested permission to open that item, which Superintendent Woughter granted. (*Id.* ¶ 15 & Exh. D, Dkt. No. 88–10 at 4, 17–18). In accordance with the April 16, 2009 DOCS memorandum, defendant Woughter forwarded the contents of both pieces of UCC-related correspondence to the Deputy Commissioner and Counsel for DOCS. She directed the Mohawk security staff to advise plaintiff that UCC materials were contraband and to give plaintiff a direct order not to be in possession of such materials without written authorization from the superintendent. (*Id.*

¶¶ 16–18 & Exh. E, Dkt. No. 88–10 at 4, 19–20).

On April 22, 2009, defendant Jeffrey Cianciola advised plaintiff that two pieces of his mail, containing UCC documents, were intercepted and confiscated, and that plaintiff would need to request permission from the superintendent to receive those documents. According to Sgt. Cianciola, he gave plaintiff a direct, oral order not to use or be in possession of UCC forms without permission from the superintendent. (Cianciola Decl. ¶¶ 5–7 & Exh. A, Dkt. No. 88–3). As discussed further below, plaintiff disputes defendant Cianciola's characterization of that "order," and he otherwise claims that he did not have proper notice of the change in the DOCS rules relating to UCC documents.

On May 6, 2009, defendant Lucann O'Hara found plaintiff at a photocopier at Mohawk in possession of multiple copies of two blank UCC forms. (O'Hara Decl. ¶ ¶ 6–12, 19–20, Dkt. No. 88–7). Knowing of the new DOCS rules treating UCC forms as contraband, Counselor O'Hara consulted with her supervisor, defendant Shelley Engresser, and then issued plaintiff a misbehavior report. (*Id.* ¶¶ 13–21 & Exh. A). A Tier III disciplinary hearing on the May 6th misbehavior report was conducted before defendant Jerald T. Steele on May 12, 2009. Defendant Steele found plaintiff guilty of all but one charge of misconduct, and sentenced plaintiff to six months in the Special Housing Unit ("SHU"), with three months suspended, and a corresponding loss of privileges. (Steele Decl. & Exhs. A, B, Dkt. No. 88–8).

On or about May 19, 2009, Counselor O'Hara found, secreted away in the Transitional Services clerk's office, a UCC–11 form with plaintiff's name and DIN number written on the top, in what she recognized as plaintiff's handwriting. At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24–29). Defendant O'Hara issued a second misbehavior report against plaintiff dated May 19, 2009 for being in possession of contraband, and for disobeying Sgt. Cianciola's direct order. (*Id.* ¶¶ 30–33 & Exh. C).

**\*3** On May 28, 2009, defendant Ted Fauss conducted

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

a Tier III hearing with respect to the May 19th misbehavior report against plaintiff. Education Supervisor Fauss found plaintiff guilty of both charges and imposed a penalty of six months in the SHU, with a corresponding loss of privileges. This penalty was enhanced by the reinstatement of the three-month penalty suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months. (Fauss Decl. & Exhs. A, B, Dkt. No. 88–6).

On or about May 26, 2009, plaintiff filed a grievance against Counselor O'Hara, claiming, *inter alia,* that her two misbehavior reports were unfounded and "retalatory [sic]." (O'Hara Decl. ¶¶ 34–35; Woughter Decl., Exh. L, Dkt. No. 88–10 at 36–38). Following an investigation, Superintendent Woughter denied the grievance, finding that Counselor O'Hara acted in good faith and that the disciplinary charges against plaintiff had been sustained. (Woughter Decl. ¶¶ 26–30 & Exh. L, Dkt. No. 88–10 at 35, 39–46). Plaintiff admittedly did not complete the appeal of the denial of his grievance. (Pltf. Dep. at 103, Dkt. No. 88–11 at 106; Woughter Decl. ¶ 31).

On May 19, 2009, following several incidents demonstrating plaintiff's involvement with UCC materials, Superintendent Woughter issued a mail watch memorandum, authorizing the mail room staff at Mohawk to open and read all of plaintiff's incoming and outgoing mail for a period of 30 days. (Ciotti Decl. ¶¶ 4–8 & Exh. B, Dkt. No. 88–4 at 2, 13–14). On or about May 29, 2009, the mail room staff intercepted correspondence from plaintiff that was later opened by defendant Gabriel Ciotti, in accordance with Superintendent Woughter's mail watch authorization. The correspondence, addressed to plaintiff's brother, appeared to Lt. Ciotti to contain directions to forward, to third persons, written instructions for filing UCC statements on plaintiff's behalf. (*Id* .¶¶ 9–14 & Exh. C; St. Louis Decl., Exh. B at 17–18, Dkt. No. 88–9 at 38–39). Upon discovery of the content of this correspondence, Lt. Ciotti confiscated the documents and issued a third misbehavior report against plaintiff. (*Id.* ¶ 16 & Exh. E).

On June 8 and 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to plaintiff's May 29th misbehavior report. Capt. St. Louis

found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU and the related loss of privileges.[FN4] (St. Louis Decl. & Exhs. A, B).

> **FN4.** Plaintiff was also sentenced to a loss of twelve months of good time, which was later reduced to six months. (St. Louis Decl., Exh. A, Dkt. No. 88–9 at 7; Bezio Decl., Exh. C, Dkt. No. 88–2 at 37). In order to avoid dismissal of certain Section 1983 claims pursuant to *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the plaintiff waived any due process claims relating to the loss of good time. (Dkt. No. 22 at 3–6; Dkt. No. 25). Based on that waiver, Judge McAvoy dismissed all claims in the complaint relating to the loss of good time credits. (Dkt. No. 39 at 2).

Plaintiff appealed the results of the three disciplinary hearings, which were affirmed by the DOCS Special Housing and Inmate Disciplinary Programs, directed by Norman Bezio. (Bezio Decl. & Exhs. A–C, Dkt. No. 88–2). However, because of the penalties imposed in connection with the first two disciplinary proceedings, Director Bezio reduced the duration of the penalties on the final misbehavior report from twelve to six months. (*Id.* ¶ 56 & Exh. C, Dkt. No. 88–2 at 12, 37–38). While defendant Bezio calculated the total SHU sentence imposed on plaintiff in connection with the three disciplinary hearings to be 15 months, it appears to the court that the total SHU term imposed, after the reduction on the final misbehavior report, was 18 months—from May 6, 2009 to on or about November 6, 2010. (Steele Decl., Exh. A, Dkt. No. 88–8 at 8; Fauss Decl., Exh. A, Dkt. No. 88–6 at 7; St. Louis Decl., Exh. A, Dkt. No. 88–9 at 7; Bezio Decl., Exh. C, Dkt. No. 88–2 at 37).

## II. *Contentions and Summary of Recommendations*

**\*4** Plaintiff's complaint names nine defendants, apparently both in their individual and official capacities [FN5]—Counselor O'Hara, Director Bezio, former Lt. Ciotti, Educational Supervisor Fauss, Supervising Counselor Engresser, Facility Steward Steele, Capt. St. Louis, Sgt. Cianciola, and former Mohawk Superintendent Woughter. Construed liberally, the plaintiff alleges that he was

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

deprived of due process in connection with the three disciplinary hearings against him because (1) the amended DOCS directives involving UCC materials, which provided the basis for most of the disciplinary charges, violated his First Amendment rights and were not properly promulgated by DOCS; (2) some of the disciplinary charges against him were based on surveillance of his mail that violated his First Amendment rights; (3) he did not have proper notice of the amended rules relating to UCC materials, on which the disciplinary charges were based; (4) the procedures followed during the disciplinary hearings failed to satisfy applicable due process requirements; and (5) there was not adequate evidentiary support for some of the disciplinary charges on which he was found guilty. The complaint may also suggest a claim that the first two misbehavior reports against him were issued by defendant O'Hara in retaliation for plaintiff's exercise of unspecified, protected First Amendment conduct.

FN5. It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87–88 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999). Plaintiff's request for prospective injunctive relief against DOCS officials at Mohawk was largely mooted by his subsequent transfer to another facility. The Second Circuit has held that an inmate's request for prospective injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See, e.g., Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976). In any

event, plaintiff's conclusory claim for injunctive relief would be insufficient to survive summary judgment, particularly because the court has found no violation of plaintiff's constitutional rights.

Defendants argue that plaintiff's claims are barred as a result of plaintiff's failure to exhaust his administrative remedies by filing or appealing grievances related to his claims. They assert that the direct orders given to plaintiff regarding the new restrictions on UCC materials overcome his claim of lack of notice of the amended disciplinary rules. Defendants argue that plaintiff was afforded all of the process due in connection with his disciplinary hearings, and that the alleged technical defects in the proceedings fail to establish valid constitutional claims. The defendants assert that plaintiff's retaliation claim lacks any factual basis. Finally, the defendants claim that they are entitled to qualified immunity from plaintiff's various causes of action.

The court finds that, although plaintiff's failure to pursue grievances may bar certain causes of action (including his retaliation claim), plaintiff exhausted his administrative remedies with respect to due process claims relating to his disciplinary hearings by appealing the results of each hearing. The court concludes that the amended DOCS rules regarding UCC materials did not violate the First Amendment rights of plaintiff or other inmates or, in the alternative, that corrections officials who applied the amended rules are entitled to qualified immunity. Plaintiff may not challenge the outcome of his disciplinary hearings based on objections to the legality of the monitoring and confiscation of his mail. The court finds that there is no material issue of fact with respect to whether plaintiff had adequate actual notice of the effect of the new rules relating to UCC materials or, again, in the alternative, the defendants who applied those rules to him are protected by qualified immunity. Finally, the court concludes that no reasonable fact finder could conclude that there was inadequate evidentiary support for the disciplinary charges against plaintiff or that the procedures followed in connection with the hearing did not meet the applicable due process standards. Accordingly, the court recommends that defendants' motion for summary judgment be granted and the complaint dismissed, in its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

entirety. The court further recommends that plaintiff's purported cross motion for partial summary judgment be denied.

### III. *Summary Judgment*

**\*5** Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56 FN6; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN6. Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(c)(1) (A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). FN7 "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

> FN7. The plaintiff filed at least 15 submissions that purport to "supplement" or support his complaint. (Dkt.Nos.8, 10, 12–20, 27, 31–33). Only one submission was identified as a motion to amend (Dkt. No. 31), and this court ruled that it was not a proper pleading because it sought to add allegations to the complaint, rather than replace it with a complete amended complaint. (Dkt. No. 39 at 5–6). While the court will not treat these various "addendums" as part of the complaint, it will consider them to the extent they clarify allegations in the complaint or are relevant to the determination of whether there are genuine issues of material fact relating to the pending summary judgment motions. The court believes that this approach is consistent with the Second Circuit's standards for construing a *pro se* pleading.

### IV. **Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*6** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g,* *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Defendants allege that plaintiff failed to exhaust his administrative remedies in this case because he filed only one grievance relating to any of the claims in the complaint, and failed to complete the administrative process by appealing the denial of his grievance by the superintendent to the Central Office Review Committee (CORC). The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC. *Id.* § 701.5(d).

Pursuit of a grievance is the appropriate administrative remedy for most complaints by inmates. However, complaints about the handling of a disciplinary hearing by corrections officials are non-grievable under applicable regulations because there is a separate

administrative appeal process for disciplinary actions. *Id.* § 701.3(e)(1); *Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir.2009). Plaintiff properly exhausted his administrative remedies, at least with respect to his due process claims relating to his disciplinary hearings, by appealing the result of each hearing. *Davis v. Barrett,* 576 F.3d at 132–33. However, because plaintiff failed to fully pursue grievances with respect to other claims, such as his allegation that defendant O'Hara retaliated against him by filing the first two misbehavior reports, those claims are barred for failure to exhaust administrative remedies.[FN8]

> **FN8.** In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137. We agree with the defendants that plaintiff's conclusory retaliation claim (7/20/2009 Addendum, Dkt. No. 8 at 1) would not survive summary judgment, even if plaintiff had exhausted his administrative remedies with respect to this claim. Moreover, plaintiff has not identified any protected activity that preceded defendant O'Hara's initiation of the two misbehavior reports. Plaintiff's grievance against defendant O'Hara, which would constitute protected conduct, was filed followed the initiation of both disciplinary charges. As discussed in section V.A. below, plaintiff's activities involving UCC materials are not protected by the First Amendment in the prison setting.

In *Giano v. Goord,* the Second Circuit excused an

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

inmate's failure to file a grievance regarding a complaint that a correction officer initiated a retaliatory and unfounded disciplinary charge against the prisoner. The Court held the plaintiff reasonably misinterpreted DOCS regulations to mean that his only administrative recourse with respect to this complaint was to appeal his disciplinary conviction. *Giano v. Goord,* 380 F.3d at 676, 679 (holding that Giano's failure to exhaust with respect to the retaliation claim was justified).[FN9]

> FN9. At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims). Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter

of some speculation. See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009). Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in several post-*Woodford* cases. *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Davis v. State of New York,* 311 Fed. Appx. 397, 399 (2d Cir.2009).

**\*7** The plaintiff in this case, unlike Giano, actually filed a grievance with respect to his complaint of retaliation by defendant O'Hara, indicating that he understood that this was the proper administrative process to pursue with respect to that complaint. The Superintendent's denial of the grievance, included a notice of plaintiff's right to appeal to CORC. (Woughter Decl., Exh. L, Dkt. No. 88–10 at 35). In later admitting that he did not appeal the denial of his grievance, plaintiff did not claim any confusion about the appropriate administrative remedies or any other special circumstances; he merely stated that the DOCS grievance system is "fruitless." (Pltf. Dep. at 106). In similar circumstances, the Second Circuit has held that an inmate could not rely on *Giano* to excuse his failure to exhaust the grievance process with respect to a claim that a claim of retaliation against an officer for filing an unfounded disciplinary charge. *Reynoso v. Swezey,* 238 Fed. Appx. 660, 663 (2d Cir.2007) (where plaintiff filed a grievance with respect to the retaliation claim, but failed to appeal the denial to CORC, his failure to exhaust was not excused in light of evidence of his awareness that the grievance process was the appropriate administrative remedy).

## V. Challenges to Amended DOCS Rules Re: UCC Materials

### A. First Amendment Challenge

Plaintiff claims that the restrictions on UCC materials adopted by DOCS in 2009, on which many of the disciplinary charges against him were based, were invalid because they infringed on his First Amendment rights and those of other inmates. "The [Supreme] Court has counseled judicial restraint in the federal courts' review of

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Plaintiff's claims that DOCS' policies regarding UCC materials are invalid on First Amendment grounds must fail because they are reasonably related to legitimate penological interests. *Turner v. Safely,* 482 U.S. at 89.

The Supreme Court in *Turner* articulated several factors to guide judicial review of the validity of prison regulations. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, courts should assess the challenged regulation in relation to proposed alternatives. *Id.* "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.* However, prison administrators are not required to use the least restrictive means possible to further legitimate penological interests. *See Thornburgh v. Abbott,* 490 U.S. 401, 411, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

**\*8** In 2008, the Third Circuit rejected First Amendment and other constitutional challenges to Pennsylvania Department of Corrections ("DOC") regulations, similar to the New York DOCS rules involved here, which restricted inmates' possession and use of UCC materials. *Monroe v. Beard,* 536 F.3d 198, 207–209 (3d Cir.2008); *Edmonds v. Sobina,* 296 Fed. Appx. 214, 217–18 (3d Cir.2008). These cases persuasively documented that such regulations satisfied the *Turner* standards. *Id. Edmonds* dismissed a Section 1983 due process claim relating to prison disciplinary charges brought under the DOC UCC rules. *Edmonds,* 296 Fed. Appx. at 216.

The DOCS restrictions on inmate possession of UCC materials, like those Pennsylvania regulations upheld by the Third Circuit, are "reasonably related to the [corrections agency's] interest in protecting government officials from fraudulent liens." *Edmonds,* 296 Fed. Appx. at 217 (quoting *Monroe,* 536 F.3d at 208). Courts, including some in this Circuit, have recognized the serious problem of prison inmates filing fraudulent and abusive UCC liens against government officials. *See Monroe,* 536 F.3d at 202 n. 2 (citing, *inter alia, United States v. Speight,* 75 Fed. Appx. 802 (2d Cir.2003) (affirming judgment of conviction against defendant-inmates claiming that government officials owed them multi-million dollar debts and filing fraudulent liens to obtain those "debts")); *Bartz v. Van de Graaf,* 1:07–CV–219, 2008 WL 2704882, at *2 (D.Vt. July 8, 2008) ("[t]he abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented") (citations omitted).

The DOCS rules relating to UCC materials, like the Pennsylvania regulations upheld in *Monroe* and *Edmonds,* do provide inmates like plaintiff with alternate means of exercising First Amendment rights. The DOCS rules and the Pennsylvania regulations both provided inmates with an opportunity to persuade prison officials that they had a valid and legitimate interest in possessing or using UCC materials. *Monroe,* 536 F.3d at 204, 209. Given that New York inmates are legitimately restricted in engaging in business activities from prison,[FN10] substantially limiting the circumstances under which the possession of UCC forms would be allowed is reasonable and appropriate.

> FN10. The Second Circuit found a "valid, rational connection" between DOCS Directive 4422, which allows prior inspection of inmates' commercial mail, and the legitimate governmental interests that the directive was designed to promote. *See Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987). The Second Circuit concluded that Directive 4422 served "to prevent inmates from committing fraud on businesses or from obligating funds beyond their

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

means." *Id.* As such, the regulation promoted the penological objectives of "security, order, and rehabilitation." *Id.* Other courts in this Circuit have similarly rejected a First Amendment challenge to DOCS Rule 103.20, which prohibits inmates from soliciting goods or services from any business without the approval of the superintendent. *Jordan v. Garvin,* 01CIV4393, 2004 WL 302361, at *3–4 (S.D.N.Y. Feb.17, 2004).

As the Third Circuit recognized, accommodating the plaintiff's asserted right to use UCC documents would have a substantial negative impact on prison administration and security. "[A]ccommodating the plaintiffs' right to possess these materials may encourage them to harass, intimidate or threaten prison officials ... by threatening to file liens." *Monroe,* 536 F.3d at 209.

As to alternatives to the DOCS rules, plaintiff suggests that confiscation of his UCC materials was unreasonable unless there was evidence that he was in fact, filing fraudulent liens. (Pltf. Dep. at 88). Like the Third Circuit in *Monroe,* this court rejects this alternative. Given the difficulty of removing a fraudulent UCC lien and the very disruptive effect that can have on a government official, DOCS should not be required to wait until a prisoner actually files a fraudulent lien. *Monroe,* 356 F.3d at 209 ("requiring the DOC to accommodate plaintiffs right by adopting a 'wait and see' approach, rather than by the pre-emptive measures they employed in this case, would impose more than a *'de minimis'* cost to prison officials.") There are clear indications that plaintiff's UCC materials were consistent with the fraudulent UCC schemes employed by other inmates,[FN11] and no reasonable fact finder would credit his patently incredible claims of innocent intentions. (Pltf. Dep. at 66–68, 73–75). Given that prison regulations are not required to employ the "least restrictive means" to further penological purposes, the DOCS regulations are valid under *Turner v. Safely* and were properly relied upon in bringing disciplinary charges against the plaintiff.

FN11. Plaintiff admitted creating a UCC document which listed the names of various law enforcement or corrections officials, including

the Commissioner of DOCS and Superintendent Woughter. (Pltf. Dep. at 53–54; Fauss Decl. ¶ 17). Moreover, in one of his "supplemental" submissions, plaintiff attached copies of UCC documents that were seized in the Mohawk mail room in April 2009. (9/3/09 Addendum, Dkt. No. 32). These documents would clearly serve no legitimate business or other purpose, and, as plaintiff acknowledged (Pltf. Dep. at 67–68), were part of the "redemption" process. Plaintiff's use of straw names in the UCC forms, and his apparent efforts to copyright those names, are consistent with the fraudulent "redemptionist" scheme common among inmates around the country. *See Monroe,* 536 F.3d at 203 n. 4.

**\*9** The Sixth Circuit, in reviewing a preliminary injunction issued against a Michigan prison regulation prohibiting receipt of mail involving certain UCC materials, found that the plaintiff was likely to succeed on his First Amendment challenge to the regulation. *Jones v. Caruso,* 569 F.3d 258, 266–75 (6th Cir.2009). The *Jones* panel found that the UCC materials did not constitute "legal mail" to which heightened First Amendment scrutiny applied. However, over a strong dissent, Judge Cole found that the Michigan regulation was unlikely to withstand scrutiny under the *Turner v. Safely* standards.

This court is more persuaded by the reasoning of the Third Circuit in *Monroe* and *Edmonds* than by the contrary ruling of the Sixth Circuit. In any event, because of the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed this particular area, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment. Accordingly, as discussed further below, the defendants who applied these rules in the context of the disciplinary actions against plaintiff, would be entitled to qualified immunity, even if it were eventually determined that the rules were constitutionally infirm.

**B. Challenge Based on State's Alleged Delay in Filing Amended Rules**

The plaintiff has claimed that the changes in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

DOCS Directives, on which the disciplinary charges against him were largely based, were not filed with the New York Secretary of State until May 16, 2009. (Complaint, Dkt. No. 1–3 at 7; 8/4/09 Addendum, Dkt. No. 16 at 4, Dkt. No. 16–3 at 6). He has argued, based on New York state authority which holds that a DOCS rule must be filed with the Secretary of State before it can be relied upon to support disciplinary charges against an inmate, that the amended rules regarding UCC filings could not have been applied against him for any conduct before May 16, 2009. (8/4/09 Addendum; Dkt. No. 16 at 2–3, citing *Jones v. Smith,* 64 N.Y.2d 1003, 489 N.Y.S.2d 50, 478 N.E.2d 191 (N.Y.1985) (the filing of rules and regulations serves to fulfill the notice component of due process)). Some of the documents submitted or seen by plaintiff indicate that the disciplinary rules applied to plaintiff were, in fact, filed on **April** 16, 2009, before he was disciplined under them. (8/25/09 Addendum, Dkt. No. 27 at 7; Pltf. Dep. at 48–49). In any event, after the New York Court of Appeals decided *Jones v. Smith,* the Second Circuit held that the procedural failure to file a rule or regulation, in violation of New York State law, is not alone sufficient to establish a federal due process violation when an inmate is disciplined under the unfiled rule or regulation. *LaBoy v. Coughlin,* 822 F.2d 3, 4–5 (2d Cir.1987).[FN12]

> FN12. Due process does require proper notice to an inmate of disciplinary rules in some fashion. *See, e.g., Frazier v. Coughlin,* 850 F.2d 129, 130 (2d Cir.1988). As discussed below, plaintiff did receive ample actual notice of the disciplinary rules applied to him.

**C. Imputed Vagueness Challenge**

Although it is debatable whether plaintiff even alluded to the issue, Second Circuit authority suggests a possible vagueness challenge to the change in DOCS disciplinary policies relating to UCC filings. DOCS implemented the changes by enacting emergency amendments to two DOCS Directives and issuing memoranda/ notices to DOCS staff and inmates about the impact of the amendments. Plaintiff was disciplined under general DOCS disciplinary rules involving contraband and ignoring direct orders, which had not been amended, but whose scope had been purportedly altered by the changes

in the DOCS directives and explanatory memoranda.

**\*10** In *Chatin v. Coombe,* the Second Circuit considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent" was unconstitutionally vague as applied to silent, individual prayer. 186 F.3d 82, 84 (2d Cir.1999) (quoting DOCS Rule 105.11). The panel found that the rule was vague, rejecting DOCS' argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule. *Id.* at 87–89, 91. *Chatin* held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct. *Id.* at 88–89.

In *Farid v. Ellen,* an inmate was charged with violating, *inter alia,* the prison's general ban on contraband (DOCS Rule 113.23) as a result of his possession of a pamphlet criticizing New York's parole policies. 593 F.3d 233, 237–38 (2d Cir.2010). DOCS argued that the pamphlet constituted contraband because it violated the bylaws of the prison-approved organization, which included the plaintiff as a member, and which produced the pamphlet. The Second Circuit agreed with the District Court "that these rules were unconstitutionally vague as applied to Farid, both because they failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them." *Farid v. Ellen,* 593 F.3d at 241. Relying heavily on *Chatin,* the *Farid* panel reasoned:

> There is nothing in the rule indicating that materials which violate a prison organization's internal by-laws are contraband in violation of the prison's rules .... Accordingly, unless [Farid] had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

> *Id.* at 241–42 (emphasis in the original).

*Young v. Goord,* distinguishes *Chatin* and would undermine a vagueness or due process challenge to the application of the amended DOCS policies on UCC materials to the plaintiff under the facts of this case. *Young v. Goord,* 192 Fed. Appx. 31, 33–34 (2d Cir.2006). In

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

1997, pursuant to the current version of a DOCS directive, Young applied for and received an exemption from DOCS' beard-length policy based on his documented affiliation with the Rastafarian Church. On August 28, 2000, correctional officer Crum gave Young a memorandum indicating that DOCS directives had been revised to reflect a change in federal law, and then ordered Young to trim his beard. When Young refused, he was issued a misbehavior report; but no discipline was imposed because, prior to the encounter with Officer Crum, Young did not know that he was now required to take other steps to become exempt from the beard-length policy. After this hearing, Young twice disobeyed direct orders to trim his beard, and was disciplined under the revised rules. *Id.* at 33.

**\*11** While the panel did not decide whether the subsequent discipline of Young satisfied the notice requirement of due process, it ruled that the defendants involved with disciplining the inmate after the first misbehavior report was dismissed, were protected by qualified immunity.

Defendants would have been further justified in believing that the first hearing provided Young more than "fair warning of what was proscribed" before he was disciplined, ... because its disposition informed Young personally that DOCS considered his beard length no longer permissible. These officials could reasonably believe that their actions comported with our decision in *Chatin* because they personally notified Young, before he was disciplined, of the change effected by the revised Directive and an implementing Memorandum; they did not expect Young himself to "reconcil[e] the text" of these different documents. *Chatin,* 186 F.3d at 89.

If Young was entitled to any further process of law before discipline was justified—and on that issue we express no opinion—that right was certainly not "clearly established" by the time of the challenged actions. That being so, the defendant officials are entitled to qualified immunity from suit.

*Young v. Goord,* 192 Fed. Appx. at 34. As discussed further below, no reasonable juror could conclude that the

plaintiff in this case did not receive ample actual notice that his possession and use of UCC materials violated prison disciplinary rules, as modified. Accordingly, either the application of these rules to discipline plaintiff would not violate his due process rights; or, at a minimum, the defendants who applied the rules reasonably believed they were not violating any of plaintiff's clearly established rights, and were entitled to qualified immunity.[FN13]

> FN13. In *Farid v. Ellen,* the Second Circuit reversed the district court's grant of summary judgment, rejecting the finding of the lower court that the defendants in that case were clearly entitled to qualified immunity. 593 F.3d at 246–47. In doing so, the panel ruled that, "in light of *Chatin,* a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules." *Id.* However, in this case, as in *Young v. Goord,* the plaintiff inmate had actual, personal notice that provided "other reasons to know that what he did was against *prison* rules...." *Farid v. Ellen,* 593 F.3d at 242. Hence, *Farid* and *Chatin* are distinguishable and the defendants in this case are entitled to a grant of summary judgment based on qualified immunity.

## VI. Challenge to DOCS' Confiscation and Use of Plaintiff's Mail

The plaintiff has argued that some of the disciplinary charges against him were unlawfully based on mail that was improperly opened and confiscated by DOCS. (Pltf. Cross Motion, Dkt. No. 89–1 at 2–3.) However, even if the confiscation of plaintiff's mail was contrary to DOCS Directives or unconstitutional, plaintiff's letters would not be subject to suppression, and could be considered in the context of a prison disciplinary hearing. *See, e.g., Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at \*15 (N.D.N.Y. Dec. 15, 2009) (the "fruit of the poisonous tree doctrine," which applies to evidence that is unconstitutionally obtained during a criminal investigation, has no applicability to prison disciplinary hearings) (citing *Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at \*7 (N.D.N.Y. Apr.24, 1998) (Pooler,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

J.)). *See also United States v. Green,* No. 92–CR–159C, 1994 WL 178139, at *5–6 (W.D.N.Y. Feb.10, 1994) (Curtin, J.) (in the context of a criminal case, evidence from a mail watch may be introduced even though it was implemented in violation of DOCS Directive 4422).

**\*12** Plaintiff's complaint could be construed as raising a separate First Amendment challenge to the confiscation of his mail by prison officials, pursuant to the amended UCC policies and/or the mail watch subsequently ordered by former Superintendent Woughter. For the reasons discussed above, plaintiff failed to exhaust his administrative remedies with respect to any such claim by failing to pursue a grievance. A general First Amendment challenge to the validity or application of mail policies, as opposed to a due process challenge to the use of confiscated mail in a disciplinary hearing, would not be exhausted by an appeal of the disciplinary hearing.

In any event, as discussed above, the DOCS rules relating to UCC materials, including the provisions relating to the confiscation and review of mail to or from a Secretary of State, do not violate the First Amendment. Moreover, the 30–day mail watch ordered by defendant Woughter would withstand First Amendment scrutiny.

An inmate's right "to the free flow of incoming and outgoing mail" under the First Amendment [FN14] must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. The Second Circuit has held that " 'where good cause is shown, [even] outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), rev'd in part on other grounds sub nom., *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Given the several documented incidents involving plaintiff's possession and mailing of highly suspect UCC

materials, the imposition of a mail watch for a limited time was clearly justified under the First Amendment. *See, e.g., Jackson v. Portuondo,* 9:01–CV–00379 (GLS/DEP), 2007 WL 607342, at *6–7, 13 (N .D.N.Y. Feb. 20, 2007) (granting summary judgment on claim challenging mail watch, which was supported by prior evidence that inmate was engaged in mail violations and activities involving contraband) (citing, *inter alia, United States v. Felipe,* 148 F.3d 101, 107–108 (2d Cir.1998) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence)).

> FN14. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y.2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)).

## VII. Due Process Claims Relating to Plaintiff's Disciplinary Hearing

### A. Legal Standards

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest [FN15] include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

> FN15. In order to begin a due process analysis, the court must determine, *inter alia,* that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection,

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

unless the conditions 'impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998). The defendants have assumed, *arguendo,* that the penalties imposed as a result of the three disciplinary hearings—at least 15 months in SHU—were sufficiently substantial to entitle him to due process. (Deft.s' Memorandum of Law at 15, Dkt. No. 88–12 at 15). *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) ( "Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." )*

**\*13** Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is, *e.g.,* confined in SHU, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able. *Id. See also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases).

**B. The First Disciplinary Hearing**

On May 6, 2009, defendant O'Hara observed plaintiff photocopying documents from a folder at the copier for the Transitional Services office at Mohawk, where plaintiff worked. A week before, Counselor O'Hara had been advised by her supervisor, defendant Engresser, to oversee plaintiff's use of the office copy machine more closely. (O'Hara Decl. ¶¶ 4–7, Dkt. No. 88–7). When Counselor O'Hara asked plaintiff what he was copying, he reportedly told her that he was making copies for Transitional Services. Counselor O'Hara looked at the materials in plaintiff's possession and noticed that they appeared to be UCC materials that she did not recognize as part of the Transitional Services curriculum. Counselor O'Hara challenged plaintiff about copying unauthorized materials and confiscated the folder and the documents on the copier. At that point, plaintiff admitted to defendant O'Hara that the UCC forms were his, and that he was replacing his supply because his UCC materials had been confiscated by the superintendent. (*Id.* ¶¶ 8–12).

Counselor O'Hara issued a misbehavior report, endorsed by defendant Engresser, charging plaintiff with disobeying a direct order, in violation of DOCS Rule 106.10; lying, in violation of Rule 107.20; being in possession of documents not authorized by the superintendent, in violation of Rule 113.23; and misuse of state property for making unauthorized photocopies, in violation of Rule 116.10. (O'Hara Decl. ¶ 21 & Exh. A). On May 12, 2009, defendant Steele presided over a Tier III disciplinary hearing relating to the May 6th misbehavior report. (Steele Decl. ¶¶ 10–27 & Exh. B, Dkt. No. 88–8).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

**\*14** Prior to the hearing, plaintiff waived his right to inmate assistance, which was offered to him. (Steele Decl. ¶¶ 7, 29, Exh. A, Exh. B at 2, Dkt. No. 88–8 at 3, 6, 10, 23). When plaintiff objected to Sgt. Cianciola's April 22, 2009 memorandum documenting that, on that day, he had been given plaintiff a direct order not to be in possession of UCC documents, defendant Cianciola was called to testify about the oral order. (*Id.* ¶¶ 17–20 & Exh. B at 3, 9–10). Also testifying (by telephone) at the hearing were defendants O'Hara and Engresser. (*Id.* ¶¶ 13, 21–22 & Exh. B at 10–17).

At the hearing, plaintiff admitted possessing UCC documents, without authorization from the superintendent, and intending to make photocopies of them. (Steele Decl. ¶ 15 & Exh. B at 5, 7). However, plaintiff testified that he never actually made copies of the UCC forms, and Counselor O'Hara acknowledged that she did not actually observe plaintiff copying the UCC documents. (*Id.* ¶¶ 15, 21 & Exh. B at 5, 7, 11–12).

Defendant Steele convicted plaintiff of all charges except the misuse of state property charge involving the allegation that he copied UCC forms. (Steele Decl. ¶¶ 25–26). Facility Steward Steele made written findings supporting his rulings and read them in the record at the hearing. (*Id.,* Exh. A & Exh. B at 18, Dkt. No. 88–8 at 9, 39). He sentenced plaintiff to six months in SHU and a corresponding loss of privileges, with three months of the penalty suspended. (*Id.* ¶¶ 27–28 & Exh. A, Dkt. No. 88–8 at 5–6, 8).

As discussed above, plaintiff made several general objections to the three disciplinary actions against him, which are without factual support or legal merit. Plaintiff also asserts that his due process rights were violated, specifically in connection with the first disciplinary hearing against him, because (1) he did not have proper, prior notice of the amendment of the disciplinary rules relating to UCC materials; (2) the misbehavior report did not reference the alleged April 22, 2009 order from defendant Cianciola that plaintiff not possess UCC forms, although that was the order he was convicted of disobeying; and (3) that the evidence at trial, presumably the UCC forms that were seized from plaintiff, were not

properly introduced at the hearing. (Complaint, Dkt. No. 1 at 5, 10–14; 7/30/09 Addendum, Dkt. No. 13 at 2–4; 8/6/09 Addendum, Dkt. No. 17 at 2–3).[FN16] In the absence of any evidence of other due process issues with the first disciplinary hearing, the court will address only the specific objections raised by the plaintiff.

> [FN16.] Plaintiff also asserted, with respect to each of the three disciplinary hearings, that defendant Bezio, the Director of the DOCS Special Housing and Inmate Disciplinary Programs, violated his due process rights by not correcting the alleged errors committed during the hearing. Having found no due process violations in connection with any of the hearings, no further discussion of this allegation is required.

**1. Notice of the Change in Rules Relating to UCC Materials**

Although plaintiff claims that he did not receive proper notice about the change in the DOCS disciplinary rules relating to UCC materials, no reasonable juror could conclude that plaintiff did not have ample, actual notice before the first misbehavior report was issued against him. Sgt. Cianciola testified at the disciplinary hearing that he gave plaintiff a direct, oral order on April 22, 2009 that he was not allowed to possess UCC documents without the permission of the superintendent. (Steele Decl., Exh. B at 9–10). Sgt. Cianciola documented his April 22nd order to plaintiff with a contemporaneous memorandum to his supervisor. (Cianciola Decl. ¶¶ 6–8 & Exh. A, Dkt. No. 88–3). Although plaintiff claimed at the hearing that he had not previously seen Sgt. Cianciola's memorandum, he admitted being advised by defendant Cianciola that the mail room had confiscated documents from the Secretaries of State of New York and Pennsylvania that plaintiff "can't have." (Steele Decl., Exh. B at 3, 8). Plaintiff also admitted writing the superintendent shortly thereafter, seeking permission to correspond with the Secretary of State, which further indicates that he had been advised of the impact of the new DOCS UCC rules. (*Id.* at 8).

**\*15** During his deposition, plaintiff testified inconsistently about what Sgt. Cianciola said on April 22, 2011. At first, plaintiff admitted recalling "Sergeant Cianciola giving [him] a direct order, not to be

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

in possession of UCC forms" on or about that date. (Pltf. Dep. at 32, Dkt. No. 88–11). Plaintiff later stated that defendant Cianciola gave him no direct order; he only told plaintiff he could not have his UCC materials that were confiscated from the mail room. (*Id.* at 38, 45).

Superintendent Woughter produced two written requests from plaintiff, dated April 20 and 22, 2009, referencing the memorandum that announced the change in policies regarding UCC materials, and requesting permission to possess such documents. (Woughter Decl, Exh. G, Dkt. No. 88–10 at 23–25). Plaintiff's requests show that he clearly had notice of the amendment of the rules prohibiting possession of UCC documents without the superintendent's permission. Plaintiff acknowledged, in his deposition, that he asked for, but never received, permission from the superintendent to have UCC forms, and that he wasn't "supposed to have them in [his] possession." (Pltf. Dep. at 44).

Based on the defendant Cianciola's sworn declaration and testimony, corroborated by his contemporaneous memorandum and other documentary evidence, plaintiff's utterly inconsistent testimony about what Sgt. Cianciola told him on April 22, 2009 would not, in this court's view, create an issue of fact. *See, e.g., Cooke v. Stern,* 9:07–CV–1292 (GLS/ATB), 2010 WL 3418393, at *5 (N.D.N.Y. Aug. 2, 2010) (in light of the overwhelming contrary evidence from a sworn affidavit and supporting documents, plaintiff's conclusory allegations of defendant's personal involvement in his job assignment are not sufficient to create a material issue of fact) (Report–Recommendation), adopted, 2010 WL 3418399 (N.D.N.Y. Aug.26, 2010); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")). *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where

the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*16** Sgt. Cianciola's April 22, 2009 order is not the only notice plaintiff received of the changes in the DOCS rules regarding UCC materials before he was disciplined. Plaintiff admitted that, on April 28, 2009, he reviewed the April 16th notice regarding the amendment of DOCS Directive 4422, which stated that "inmates should not be in possession of UCC materials." (Pltf. Dep. at 47–49; Complaint, Dkt. No. 1–3 at 13; Woughter Decl., Exh A, Dkt. No. 88–10 at 12). On May 1, 2009, Superintendent Woughter sent plaintiff a memorandum confirming that "UCC correspondence to and form the Department of State is deemed contraband" subject to confiscation. She advised plaintiff she was reviewing, with DOCS counsel, whether he had a valid reason to possess such materials. (Woughter Decl., Exh. H). Based on the foregoing, this court concludes that no reasonable fact finder could conclude that plaintiff was not given more-than-adequate actual notice of the amended DOCS rules regarding UCC documents and the direct order(s) that he was not to possess such materials without the prior permission of the superintendent.[FN17]

> **FN17.** Plaintiff received further notifications of the import of the revised DOCS rules relating to UCC materials on and after May 6, 2009, but his primary claim is that he was not given proper notice prior to May 6th. On May 6, 2009 (Woughter Decl., Exh. K) and May 19, 2009 (Ciotti Decl., Exh. D, Dkt. No. 88–4), plaintiff was given written orders not to possess or file UCC documents without the prior approval of the superintendent.

**2. Adequacy of the Misbehavior Report**

Plaintiff alleges that defendant O'Hara's misbehavior report provided inadequate notice of the charges because it did not specifically reference the April 22, 2009 order of

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

Sgt. Cianciola as the predicate for the charge of failing to obey a direct order. The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor's O'Hara's misbehavior report contained considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). While the disciplinary charge did not specifically reference Sgt. Cianciola's April 22, 2009 order, it did note plaintiff's admission that he was trying to replace UCC forms confiscated by the superintendent. The charging document gave plaintiff adequate notice that he was accused of disobeying orders regarding the relatively recent prohibition on possession of UCC documents. At the hearing, when plaintiff claimed that he had not received a copy of Sgt. Cianciola's memorandum documenting his direct order to plaintiff, the hearing officer called defendant Cianciola to testify and gave plaintiff an opportunity to ask questions. (Steele Decl. Exh. B at 3, 9–10). Any deficiency in the notice provided by the misbehavior report did not rise to the level of a due process violation, and plaintiff was not prejudiced in defending the charges at the hearing.

**3. Failure to Introduce Contraband UCC Documents**

*17 Plaintiff complains that he was denied due process because the hearing officer did not introduce the UCC documents confiscated from plaintiff by defendant O'Hara, presumably because the UCC forms were treated as contraband that should not be further circulated among inmates. The transcript of the disciplinary hearing does indicate that the hearing officer introduced the confiscated UCC documents at the hearing. (Steele Decl., Exh. B at

13). In any event, the misbehavior report specifically referenced the names of the two blank UCC forms that were seized from plaintiff and the number of copies of each form taken. (O'Hara Decl., Exh. A). As noted above, plaintiff possessing these documents and clearly demonstrated that he was aware of the nature of the forms that had been confiscated. Even if the seized UCC documents were not physically introduced at the hearing, that would not rise to the level of a due process violation, would have had no impact on the outcome of the hearing, and would constitute harmless error.

**C. The Second Disciplinary Hearing**

On or about May 19, 2009, while plaintiff was confined in the SHU, Counselor O'Hara conducted a search of the Transitional Services clerk's office for any other contraband UCC materials. She found, secreted away, a UCC–11 form with plaintiff's name and DIN number written on the top, in what she recognized, by comparison to samples in plaintiff's guidance folder, as his handwriting. At the bottom of the UCC form was a request for certified copies of UCC financial statements for the Queens County District Attorney, the DOCS Commissioner, and Superintendent Woughter. (O'Hara Decl. ¶¶ 24–29). Upon confirming that the plaintiff did not have the superintendent's permission to possess the UCC document, and that Sgt. Cianciola had earlier ordered plaintiff not to possess UCC materials, Counselor O'Hara issued a second misbehavior report against plaintiff, dated May 19, 2009, for being in possession of contraband (DOCS Rule 113.23), and for disobeying Sgt. Cianciola's direct order (DOCS Rule 106.10). (O'Hara Decl. ¶¶ 30–33 & Exh. C).

On May 28, 2009, Education Supervisor Ted Fauss conducted the Tier III disciplinary hearing with respect to the May 19th misbehavior report. (Fauss Decl., Exh. B, Dkt. No. 88–6). Prior to the hearing, plaintiff was offered inmate assistance, and he requested only that Counselor O'Hara be called as a witness. (Fauss Decl. ¶ 8 & Exh. A, Dkt. No. 88–6 at 2–3, 9). During the hearing, plaintiff claimed ignorance of who created the confiscated UCC document and objected to Counselor O'Hara's testimony that the document contained plaintiff's handwriting. (*Id.,* Exh. B at 5–6, 8, 11). The hearing officer, as the Education Supervisor, was also familiar with plaintiff's handwriting, and stated, on the record, that he agreed with Counselor O'Hara's assessment of plaintiff's authorship of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

the seized document. (*Id.* ¶ 13 & Exh. B at 8).

**\*18** Plaintiff objected that document was discovered in the Transitional Services office at a time when he was confined in the SHU. He also argued that the document could have been created before April 17, 2009, when the DOCS rules prohibiting UCC materials came into effect. (Fauss Decl., Exh. B at 5–6, 8). The hearing officer, however, found that there was sufficient evidence on the record to find that the documents belonged to plaintiff, and that he failed to surrender them to prison officials after he was ordered, on April 22, 2009, not to possess UCC materials. (*Id.,* Exh. B at 13–14, 16). Plaintiff was found guilty of both charges, and written reasons for the hearing officer's findings and the evidence relied upon were placed upon the record. (*Id.,* Exh. A, Dkt. No. 88–6 at 8 & Exh. B at 17). Defendant Fauss imposed a penalty of six months in SHU and a corresponding loss of privileges. This penalty was, enhanced by the reinstatement of the three months suspended in connection with the May 12, 2009 disciplinary hearing, bringing the total penalty period up to nine months. (*Id.,* Exh. A, Dkt. No. 88–6 at 7).

In addition to the general objections to all three disciplinary proceedings, plaintiff has claimed that the second disciplinary hearing violated his due process rights because (1) the hearing officer was not impartial, because "his mind was made up" (Complaint, Dkt. No. 1–3 at 17); (2) the second misbehavior report issued by defendant O'Hara related to the same conduct as her first disciplinary charge and subjected plaintiff to double jeopardy; (3) the confiscated document was created before the change in DOCS rules relating to UCC materials, so plaintiff was not given notice that his conduct violated disciplinary rules;[FN18] (4) there was insufficient evidence to establish that plaintiff possessed the confiscated UCC document; and (5) that the hearing officer failed to make a written statement of the evidence supporting his guilty finding. (Complaint, Dkt. No. 1–3 at 14–17; 8/3/09 Addendum, Dkt. No. 14 at 2–4; 8/4/09 Addendum, Dkt. No. 16–2 at 2–3 & Dkt. No. 16–3 at 2–6).

> **FN18.** At the second hearing, plaintiff did not contest the allegation that Sgt. Cianciola gave him a direct order not to possess UCC documents

without the superintendent's permission. (Fauss Decl., Exh. B at 14–15).

**1. Sufficiency of the Evidence**

Plaintiff claims that there was not "substantial evidence" supporting defendant Fauss's finding that plaintiff possessed the confiscated UCC document, contrary to direct orders. (Complaint, Dkt. No. 1–3 at 15). Plaintiff misstates the applicable due process standard—that the hearing officer's findings be supported by "some" or "a modicum" of "reliable evidence." Defendant O'Hara's identification of plaintiff's handwriting on the confiscated UCC document, based on a comparison of known samples from his guidance file, was adequate evidence to establish that plaintiff created the document, particularly since her lay opinion was corroborated by that of the hearing officer, who was personally familiar with plaintiff's handwriting. *See, e.g., Lewis v. Johnson,* 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*11 (N.D.N.Y. Aug. 5, 2010) (the testimony of the complaining officer regarding the similarities that he observed in the handwriting of several threat letters and known samples of plaintiff's writing, even when not independently verified by the hearing officer, constituted "some evidence" that plaintiff authored those letters) (Report–Recommendation), adopted, 2010 WL 3762016 (N.D.N.Y. Sept.20, 2010).[FN19]

> **FN19.** *See also Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at \*2 (M.D.Pa. Dec.21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at \*3 (W.D.N.C. Apr.2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* 554 U.S. 922, 128 S.Ct. 2960, 171 L.Ed.2d 892 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson, 2:06CV019, 2006 WL 618124, at \*2 (E.D.Ark. Mar.9, 2006)* (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

**\*19** The handwriting evidence, indicating that plaintiff created the UCC document, was corroborated by the fact that his name and inmate number were written on the document. Moreover, the document was found concealed in an area where plaintiff worked, shortly after he was found to be actively involved in the use and possession of other UCC forms. Given the discretion of the hearing officer to make credibility determinations, there was at least a "modicum" of evidence supporting his finding that plaintiff constructively possessed the confiscated UCC document. Plaintiff's disingenuous arguments that it was possible that other inmates created and possessed this document,[FN20] do not alter the fact that defendant Fauss's findings were supported by "some evidence." *See Superintendent v. Hill,* 472 U.S. at 457 ("The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary hearing.").

> FN20. At his deposition in May 2010, plaintiff contradicted his testimony at the disciplinary hearing by admitting that he filled out the seized UCC document. (Pltf. Dep. at 53–56).

## 2. Other Due Process Objections to the Second Hearing

The plaintiff's other claims do not require extended discussion. His conclusory allegation that defendant Fauss had "his mind made up" is insufficient to create an issue of fact that the hearing officer was not impartial, given that the transcript establishes that plaintiff received a full and fair hearing.[FN21] The first and second misbehavior reports involved plaintiff's possession of different UCC documents in different places at different times; in any event, double jeopardy protection does not apply to prison

disciplinary proceedings.[FN22]

> FN21. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989)).

> FN22. *See, e.g., Porter v. Coughlin,* 421 F.3d 141, 142 (2d Cir.2005) ( *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), does not affect this Circuit's pre-*Hudson* conclusion in *United States v. Hernandez–Fundora,* 58 F.3d 802 (2d Cir.1995), that criminal prosecutions and prison disciplinary proceedings based on the same conduct do not implicate double jeopardy concerns.); *Lisbon v. Goord,* 02 Civ. 3567, 2003 WL 1990291, at \*2 (S.D.N.Y. Apr.29, 2003) (holding that double jeopardy protection does not apply in the context of two successive disciplinary hearings allegedly involving some of the same conduct).

The hearing officer correctly determined that it was irrelevant when the confiscated UCC document was filled out because the plaintiff was charged and found guilty of continuing to have constructive possession of the document after the DOCS rules on UCC materials were changed and after plaintiff was given a direct order not to possess those documents. Plaintiff's conclusory claim notwithstanding, the hearing officer clearly made a written statement of his findings and the supporting evidence, which were also recited on the record during the hearing. (Fauss Decl., Exh. A, Dkt. No. 88–6 at 8 & Exh. B at 17).

## D. The Third Disciplinary Hearing

As discussed above, a piece of plaintiff's mail was opened by defendant Ciotti on May 29, 2009, pursuant to a mail watch order previously issued by Superintendent Woughter. The envelope was addressed to plaintiff's brother, but contained letters for forwarding to others, one of which appeared, to Lt. Ciotti, to include written instructions for filing UCC statements on plaintiff's behalf. (Ciotti Decl. ¶¶ 9–14 & Exh. C, Dkt. No. 88–4; St. Louis

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

Decl., Exh. B at 17–18, Dkt. No. 88–9 at 38–39).[FN23] Based on this correspondence, Lt. Ciotti issued a third misbehavior report against plaintiff, charging him with "kiting" correspondence,[FN24] in violation of DOCS Rule 180.11; "soliciting" goods and services in violation of Rule 103.20; and failure to obey the Superintendent's May 19, 2009 written order not to possess or attempt to file UCC documents, in violation of Rule 106.10. (Ciotti Decl. ¶ 16 & Exhs. D, E).

> **FN23.** The copy of plaintiff's mail, attached as Exhibit C to the Ciotti Declaration, does not appear to include anything resembling written instructions regarding UCC forms. However, during the disciplinary hearing, Lt. Ciotti read from the correspondence and quoted additional statements, not reflected in Exhibit C, which do appear to be instructions regarding UCC forms. Plaintiff made did not object to the recitation of the content of his letters at the disciplinary hearing. (St. Louis Decl., Exh. B at 17–18). The court concludes that the copies of the letters provided with defendants' motion are incomplete, and will rely on the transcript of the hearing with respect to the full content of the seized correspondence.

> **FN24.** "Kiting" mail refers to attempting to surreptitiously forward prohibited correspondence to someone other than the addressee on the envelope, through third parties. (St. Louis Decl. ¶ 6).

**\*20** On June 8 and June 15, 2009, defendant St. Louis conducted the Tier III disciplinary hearing with respect to the May 29th misbehavior report. At the hearing, plaintiff acknowledged prior receipt of inmate assistance, but asked for three witnesses not previously requested—the hearing officer, Capt. St. Louis; Superintendent Woughter; and Lt. Ciotti. The latter two witnesses were called to testify. Capt. St. Louis declined to call himself as a witness, because he had no firsthand knowledge of the relevant events; however, he agreed to answer any questions plaintiff had of him, as the hearing officer. (St. Louis Decl. ¶ 12 & Exh. B at 2–3, 20).

During the hearing, plaintiff denied his guilt.

However, he acknowledged writing the confiscated correspondence and possessing and using various UCC materials for what he claimed were innocent business purposes. (St. Louis Decl., Exh. B at 7–9). Plaintiff admitted receiving the May 19, 2009 memorandum from the superintendent, ordering him not to possess or file UCC documents without prior authorization, and acknowledged seeking, but not receiving, the superintendent's permission to use UCC materials. (St. Louis Decl., Exh. B at 9–10). Plaintiff claimed that he did not require authorization from the superintendent for activities involving the UCC, and he challenged the legitimacy of the revised DOCS rules on UCC materials. The hearing officer advised that he would apply the DOCS rules that were in force, and that, if plaintiff wanted to challenge the rules, he needed to do so outside of the hearing process. (St. Louis Decl., Exh. B at 10–11, 19). At the conclusion of the hearing, Capt. St. Louis found plaintiff guilty of all charges and imposed a penalty of twelve more months in the SHU, with a related loss of privileges, and the loss of 12 months of good time. (St. Louis Decl. ¶¶ 17–18 & Exh. A, Dkt. No. 88–9 at 4, 7). Those penalties were later reduced, on appeal, to six months. (Bezio Decl. ¶ 56 & Exh. C, Dkt. No. 88–2 at 12, 37–38).

Many of plaintiff's claims involving the third disciplinary hearing relate to the alleged impropriety of the interception of his mail and the use of it against him in support of the charges. (Complaint, Dkt. No. 1–3 at 19). As discussed above, even if the confiscation of plaintiff's mail had violated DOCS regulations or federal constitutional standards, that would not have provided a basis for challenging the use of the mail at the disciplinary proceeding. Plaintiff also has argued that his due process rights were violated in connection with the third disciplinary hearing because (1) the hearing officer was biased and frequently interrupted the plaintiff as he tried to present his defense; (2) the mail clerk, who intercepted the correspondence on which the charges were based, did not testify; (3) plaintiff was not allowed to see, at the hearing, the correspondence that formed the basis of the charges; and (4) the hearing officer did not make a written statement of the evidence supporting his finding of guilt.[FN25] (Complaint, Dkt. No. 1–3 at 18–22, 36–39; 8/3/2009 Addendum, Dkt. No. 15 at 2–5; 8/4/2009

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

Addendum, Dkt. No. 16–2 at 2–3).

FN25. Plaintiff's last, conclusory claim requires little discussion, as it is completely inconsistent with the written statement of reasons prepared by Capt. St. Louis, which he also read into the record. (St. Louis Decl., Exh. A, Dkt. No. 88–9 at 8 & Exh. B at 23–24).

**1. Alleged Bias of Hearing Officer**

*21 After reviewing the transcript of the disciplinary hearing, the court concludes that Capt. St. Louis displayed remarkable patience and gave the plaintiff considerable latitude in presenting his defense. The plaintiff argued, at length, about extraneous matters, such as the merits of the first two misbehavior reports issued against plaintiff and plaintiff's objections to DOCS policies relating to the UCC, after the hearing officer made clear that he was bound to apply the applicable DOCS policies unless plaintiff was able to challenge them in another forum. (St. Louis Decl., Exh. B at 6–7, 11, 15, 21). Capt. St. Louis appropriately admonished plaintiff when, for example, he claimed bias and threatened to sue after defendant St. Louis explained that plaintiff's questions for witnesses had to be filtered through the hearing officer.FN26 (St. Louis Decl., Exh. B at 15–16, 20).FN27 Plaintiff's conclusory claim that the hearing officer was biased and impeded the plaintiff as he tried to present his defense, is flatly contradicted by the record of the hearing and is not, based on the authority cited above (in note 21), sufficient to create a disputed issue of material fact.

FN26. See Baxter v. Palmigiano, 425 U.S. 308, 322–23 & n. 5, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing and the hearing officer may rely upon evidence not presented at the hearing).

FN27. Capt. St. Louis reasonably admonished plaintiff for being "disrespectful" and "defiant," based on several instances where plaintiff refused to answer questions or interrupted the hearing officer. (St. Louis Decl., Exh. B at 17–18, 19–20, 21–22).

**2. Alleged Failure to Call Witness**

Plaintiff claims that the hearing officer refused to call, as a witness at the disciplinary hearing, the mail clerk who intercepted the correspondence which Lt. Ciotti read into the record when he testified. The court finds no indication in the transcript of the hearing that plaintiff ever asked that this witness be called. (St. Louis Decl., Exh. B at 3). In any event, the only reasons plaintiff alleges for calling the mail clerk relate to his objection that the seizure of his mail was contrary to DOCS policies. (8/3/2009 Addendum, Dkt. No. 15 at 2). As discussed in section VI., above, the alleged impropriety of the confiscation of the mail would not support any defense to the related disciplinary charges, and would not be relevant to the hearing. Nonetheless, the hearing officer allowed questioning of Lt. Ciotti on the subject of the justification for opening plaintiff's mail. (St. Louis Decl., Exh. B at 20). Even if plaintiff had requested that the mail clerk testify, the hearing officer could have refused the request, consistently with due process requirements, because the evidence would be irrelevant and cumulative.FN28

FN28. Although due process includes a right to call witnesses, this right is also not unfettered. Alicia v. Howell, 387 F.Supp.2d 227, 234 (W.D.N.Y.2005). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. Id. (citing, inter alia, Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir.1991)).

**3. Alleged Failure to Allow Plaintiff to Review Confiscated Mail**

Plaintiff claims that he was not allowed to see the confiscated mail that was the basis for the charges against him, and thus, was not able to comment on this evidence. The hearing transcript indicates that plaintiff was shown a copy of the confiscated mail during the hearing and commented on it. (St. Louis Decl., Exh. B at 8–9). When Lt. Ciotti testified, he quoted extensively from the letters, and plaintiff commented further on them. (St. Louis Decl., Exh. B at 17–19). The court finds no indication in the record that plaintiff objected to the manner in which the confiscated letters were introduced at the hearing.

*22 In any event, if plaintiff had not been shown the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

letters and objected, the hearing officer could have reasonably declined to provide the actual contraband to plaintiff for security reasons.[FN29] Given that plaintiff was the admitted author of the confiscated correspondence, reading the letters to him gave him an adequate opportunity to confront the evidence.[FN30]

> FN29. An inmate has a right to call witnesses and present evidence in his defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. at 566.

> FN30. Plaintiff has also claimed that he requested and was denied a copy of the mail watch order, pursuant to which his mail was seized. (Complaint, Dkt. No. 1–3 at 19). Again, the court finds no indication that plaintiff requested this document at the hearing. (St. Louis Decl., Exh. B at 20). If the document had been requested, it could have been reasonably withheld for security reasons. Moreover, as indicated above, because plaintiff had no legal basis for objecting to evidence at the hearing even if it had been seized pursuant to an invalid mail watch, the mail watch order could have been excluded as irrelevant and unnecessary.

**VIII. Plaintiff's Cross Motion**

To the extent plaintiff has moved for summary judgment on his due process claims, that motion must be denied. For all the reasons outlined above, no reasonable fact finder could conclude, on the basis of the record presented, that the defendants violated plaintiff's due process rights in connection with the three disciplinary hearings.

**IX. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly

established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 812, 818, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to most of plaintiff's claims, as to which the court concluded that plaintiff's constitutional rights were not violated.

The court finds that the defendants who applied the amended DOCS policies with respect to UCC materials in connection with the three disciplinary hearings against plaintiff are entitled to qualified immunity, to the extent plaintiff claims those policies were invalid under the First Amendment. As discussed in section V.A. above, in the absence of controlling Supreme Court or Second Circuit authority, and in light of the split among the other circuits which have addressed the issue, it was not clearly established, as of 2009, whether prisons rules restricting possession and use of UCC materials by inmates were invalid under the First Amendment.

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)

(Cite as: 2011 WL 3841551 (N.D.N.Y.))

**\*23** Moreover, the defendants who applied the amended DOCS rules to plaintiff would also be entitled to qualified immunity, to the extent plaintiff claims the amendment process denied him adequate notice of what conduct would be subject to discipline, because of the direct, personal notice plaintiff received that his continued possession of UCC materials would be prohibited. Per section V.C. above, it was not clearly established as of 2009, whether direct personal notice of the effect of changes in DOCS disciplinary policies would overcome a vagueness objection to DOCS efforts to revise disciplinary rules by amendments to DOCS directives and the issuance of explanatory memoranda. *Young v. Goord,* 192 Fed. Appx. at 34 (officials who personally notified an inmate, before he was disciplined, of the change effected by a revised directive and an implementing memorandum on a DOCS disciplinary rule, could reasonably believe that their application of the new disciplinary policies was consistent with due process standards articulated by the Second Circuit, because the officials did not expect the inmate himself to reconcile the text of these different documents).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 88) be granted and plaintiff's complaint be dismissed in its entirety; and it is further

**RECOMMENDED,** that plaintiff's cross motion for summary judgment (Dkt. No. 89) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

N.D.N.Y.,2011.

Neree v. O'Hara

Not Reported in F.Supp.2d, 2011 WL 3841551 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841553 (N.D.N.Y.)

(Cite as: 2011 WL 3841553 (N.D.N.Y.))



 Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Reginald NEREE, Plaintiff,
v.
Lucann O'HARA, Correctional Counselor, Mohawk
Correctional Facility; Ted Fauss, Ed. Supervisor;
Shelley Engresser, Senior Counselor; Gerald T. Steel,
Facility Steward; John St. Louis; Carol B. Woughter;
Norman R. Bezio, Director, Shu; J. Cianciola; and G.
Ciotti, Housing Lt., Mohawk Correctional Facility,
Defendants.
No. 9:09–cv–802 (MAD/ATB).

Aug. 29, 2011.

Reginald Neree, pro se.

Office of the New York State Attorney General, Adele M.
Taylor–Scott, AAG, of Counsel, Albany, NY, for
defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff *pro se,* an inmate in the custody of the
New York State Department of Correctional Services
("DOCS"),[FN1] brings this action pursuant to 42 U.S.C. §
1983, alleging that defendants violated his rights under the
Fourteenth Amendment of the United States Constitution.
In his complaint, plaintiff alleges violations of his
Fourteenth Amendment right to due process of law in
relation to three separate Tier III prison disciplinary
proceedings resulting from his possession and attempted
use of Uniform Commercial Code ("UCC") documents in
violation of direct orders issued to plaintiff and DOCS'
policy. *See* Dkt. No. 1. Specifically, plaintiff alleges that
he was deprived of due process in connection with three
disciplinary hearings because (1) the amended DOCS
directives involving UCC materials, which provided the
basis for most of the disciplinary charges, violated his

First Amendment rights and were not properly
promulgated by DOCS; (2) some of the disciplinary
charges against him were based on surveillance of his mail
that violated his First Amendment rights; (3) he did not
have proper notice of the amended rules relating to UCC
materials, on which the disciplinary charges were based;
(4) the procedures followed during the disciplinary
hearings failed to satisfy applicable due process
requirements; and (5) there was insufficient evidentiary
support for some of the disciplinary charges on which he
was found guilty. *See id.* Moreover, plaintiff seems to also
allege that the first two misbehavior reports against him
were issued by defendant O'Hara in retaliation for
plaintiff's exercise of unspecified, protected First
Amendment conduct. *See id.*

> FN1. On April 1, 2011, DOCS and the New
> York State Division of Parole were merged into
> one agency, now referred to as the New York
> State Departments of Corrections and
> Community Supervision. Since the events
> relevant to this action occurred before the
> merger, the Court will refer to New York State's
> corrections agency as "DOCS."

On July 20, 2011, Magistrate Judge Baxter issued a
Report–Recommendation recommending that the Court
grant defendants' motion for summary judgment, deny
plaintiff's purported cross motion, and dismiss the
complaint. *See* Dkt. No. 94. Specifically, Magistrate Judge
Baxter recommended that the Court find that (1) plaintiff
failed to exhaust certain claims, including his retaliation
claim; (2) plaintiff exhausted his administrative remedies
with respect to his due process claims relating to his
disciplinary hearings by appealing the results of each
hearing; (3) the amended DOCS rules regarding inmate
possession of UCC materials does not violate the First
Amendment rights of plaintiff or other inmates, or in the
alternative, the corrections officials who applied the
amended rules are entitled to qualified immunity; (4)
plaintiff may not challenge the outcome of his disciplinary
hearings based on objections to the legality of the
monitoring and confiscation of his mail; (5) plaintiff had
adequate actual notice of the effect of the new rules

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841553 (N.D.N.Y.)

(Cite as: 2011 WL 3841553 (N.D.N.Y.))

relating to UCC materials, or, in the alternative, defendants who applied those rules are entitled to qualified immunity; and (6) no reasonable fact finder could conclude that there was inadequate evidentiary support for the disciplinary charges against plaintiff or that the procedures followed in connection with the hearing did not meet the applicable due process standards. *See id.* at 12–49.

**\*2** Currently before the Court are plaintiff's "objections" to Magistrate Judge Baxter's July 20, 2011 Report–Recommendation. *See* Dkt. No. 95.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). When a party fails to make specific objections, however, the court reviews the magistrate judge's report for clear error. *See Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008); *see also Gamble v. Barnhart,* No. 02CV1126, 2004 WL 2725126, *1 (S.D.N.Y. Nov. 29, 2004) (citations omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

In his "objections" to Magistrate Judge Baxter's July 20, 2011 Report–Recommendation, plaintiff fails to provide the Court with any guidance as to why he believes that Magistrate Judge Baxter improperly recommended granting defendants' motion for summary judgment. In a one-page document, plaintiff simply stated that he

object[s][to] his findings for my Denial of Summary Judgment in its entirety for he has been denying all of my attempts to succeed in this action from the very beginning.

It appears as though there will be no relief for Prisoners in this District. Therefore, I kindly ask for the return or copy of all documents/papers under 42 USC § 1983, which I have submitted and/or enclosed with the Complaint. I will need these documents for my records. Please forward such in Bulk Weight at your earliest

convenience.

*See* Dkt. No. 95.

Having reviewed Magistrate Judge Baxter's July 20, 2011 Report–Recommendation and Order and the applicable law, the Court concludes that Magistrate Judge Baxter correctly determined that the Court should grant defendants' motion for summary judgment and dismiss plaintiff's complaint.[FN2]

> FN2. As noted by Magistrate Judge Baxter, the Court notes that the courts that have dealt with directives similar to the directives at issue in the present matter prohibiting prisoners from possessing UCC materials have all found that these directives withstand constitutional scrutiny. *See, e.g., Monroe v. Beard,* 536 F.3d 198, 207–209 (3d Cir.2008); *Edmonds v. Sobina,* 296 Fed. Appx. 214, 217–18 (3d Cir.2008); *Hudson v. Caruso,* No. 1:05–cv–32, 2007 WL 2363308 (W.D. Aug. 16, 2007); *Ray v. Williams,* No. CV–04–863–HU, 2005 WL 697041 (D.Or. Mar.24, 2005); *Rouse v. Caruso,* No. 06–CV–10961–DT, 2011 WL 918327 (E.D.Mich. Feb.18, 2011).

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's July 20, 2011 Report–Recommendation–Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that plaintiff's cross motion for summary judgment is **DENIED;** and the Court further

**ORDERS** that any other pending motions are denied as **MOOT;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules; and the Court further

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3841553 (N.D.N.Y.)

(Cite as: 2011 WL 3841553 (N.D.N.Y.))

**ORDERS** that the Clerk of the Court shall enter judgment in defendants' favor and close this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Neree v. O'Hara
Not Reported in F.Supp.2d, 2011 WL 3841553 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)

(Cite as: 2010 WL 3635673 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Milton Musa PACHECO, Plaintiff,
v.
George E. PATAKI, Elliot Spitzer, Anthony Ellis,
George B. Alexander, E. Woods, Brian Fisher, Lucien J.
Leclaire, Jr., Robert Dennison, Chairman of the Parole
Board, and John and/or Jane Does, Defendants.
No. 9:07–CV–850 (FJS/GHL).

Sept. 9, 2010.
Milton Musa Pacheco, Comstock, NY, pro se.

Office of the New York State Attorney General, Krista A.
Rock, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

SCULLIN, Senior District Judge.

### I. INTRODUCTION

*1 Currently before the Court are Magistrate Judge
Lowe's August 31, 2009 Report–Recommendation, *see*
Dkt. No. 71, and Plaintiff's objections thereto, *see* Dkt.
No. 72.

### II. BACKGROUND

Plaintiff Milton Musa Pacheco filed this action
pursuant to 42 U.S.C. § 1983, claiming that Defendants
deprived him of legal materials on two occasions.
Specifically, Plaintiff alleged that, while he was housed at
Clinton Correctional Facility, several correctional officers
confiscated his personal property, including legal
materials, pursuant to a policy that allowed inmates only
six draft bags of property. Plaintiff had seven draft bags
of property. *See* Dkt. No. 12 at ¶¶ 142–146. Plaintiff claimed
that Defendants deprived him of his legal materials from
October 10, 2006, through November 7, 2006. As a result,
he was not able to draft and timely serve a discovery
request in one of his pending cases.[FN1] Since Plaintiff's

discovery request in that case was late, defense counsel
refused to respond to it; and Magistrate Judge Treece
denied Plaintiff's motion to compel. *See id.* at ¶¶ 150–153.
Plaintiff complained about the deprivation of his legal
materials to Defendant LeClaire, who "lightly
disregarded" the complaint. *See id.* at ¶ 148. Plaintiff has
also alleged that he informed Defendant Fisher, who
refused to intervene. *See id.* at ¶ 155.

> FN1. The civil rights case to which Plaintiff
> refers is not this case.

In addition, Plaintiff claimed that, on December 15,
2006, Defendant Woods harassed him, called him
insulting names, and asked him why he was suing the
State. *See id.* at ¶¶ 157–158. Defendant Woods then
confiscated "a lot" of Plaintiff's legal materials, *See id.* at
¶ 160, the majority of which was eventually returned, *See
id.* at ¶ 163. Plaintiff filed grievances with Defendant
Fisher, in which he objected to the confiscation of his
legal materials. *See id.* at ¶ 156.

Magistrate Judge Lowe issued a
Report–Recommendation dated August 31, 2009, in which
he recommended that this Court (1) grant Defendants
Woods, Fisher, and LeClaire's motion to dismiss for
failure to state a claim and (2) dismiss Plaintiff's claims
against the Doe Defendants and Defendant George B.
Alexander for failure to serve pursuant to Federal Rule of
Civil Procedure 4(m). *See* Report–Recommendation at 14.

Plaintiff filed objections to Magistrate Judge Lowe's
recommendations. *See* Dkt. No. 72. In his objections,
Plaintiff claimed that Magistrate Judge Lowe erred when
(1) he concluded that Plaintiff had not sufficiently alleged
a violation of his rights to access the courts and
recommended that the Court dismiss the claims against
Defendants Woods, Fisher and LeClaire and (2) when he
recommended that the Court dismiss his claims against
the Doe Defendants and Defendant Alexander.

### III. DISCUSSION

**A. Standard of review**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)

(Cite as: 2010 WL 3635673 (N.D.N.Y.))

When a party makes specific objections to a magistrate judge's report-recommendation, the court reviews *de novo* " 'those portions of the report or specified proposed findings or recommendations to which objection is made.' " *Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660, *10 (N.D.N.Y. July 16, 2009) (quoting 28 U.S.C. § 636(b)(1)(C)) (footnote omitted). If, however, the parties do not object or make only general objections to the recommendations, the court reviews the report-recommendation for clear error or manifest injustice. *See id.* (citation and footnote omitted). After an appropriate review of the report-recommendation, "the Court may 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Id.* (quoting 28 U.S.C. § 636(b)(1)(C)).

**\*2** Rule 8(a) (2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief ....." Fed.R.Civ.P. 8(a)(2). This Rule does not require Plaintiff to assert detailed factual allegations, but he must do more than list the elements of the cause of action and state a conclusion before the court may accept such allegations as true. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level ....." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004)). Bare assertions and conclusory statements do not constitute "factual allegations" and are not entitled to the presumption of truth. *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1951 (2009).

A plaintiff's factual allegations must also plausibly suggest that he is entitled to relief. *See id.* This standard is not met with conclusory statements that rely on "the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly,* 550 U.S. at 561. However, this standard does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. [If the plaintiff[ ] ... [has] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

**B. Plaintiff's claim that Defendants denied him his right of access to the courts**

Magistrate Judge Lowe agreed with Defendants'

assertion that Plaintiff had not stated a claim for denial of access to the courts against Defendants Woods, Fisher, and LeClaire because he " 'ha[d] not articulated the way in which the missing ... documents prejudiced his ability to litigate.' " *See* Report–Recommendation at 9 (quoting Dkt. No. 26–2 at 6). Specifically, Magistrate Judge Lowe concluded that the confiscation of Plaintiff's legal materials did not prejudice him for three reasons: (1) Plaintiff was able to contact attorneys about the possibility of representing him at the time that Defendant Woods confiscated such materials; (2) Plaintiff successfully filed a complaint in this case; and (3), although Plaintiff may have lost some of the exhibits he intended to attach to a § 440.10 motion, he was not prejudiced because a § 440.10 motion "may be made '[a]t any time after the entry of the judgment.' " *See id.* at 11–12 (quotation and other citations omitted).

In his objections, Plaintiff contends that Defendants' confiscation of his legal materials caused him to suffer actual harm. Specifically, he asserts that an attorney listing was one of the documents that Defendant Woods confiscated. *See* Objections at 16. Although Plaintiff admits that he retained a copy of an attorney listing, he claims that this was an "old attorney listing" and that the list that Defendant Woods confiscated held the names of attorneys whom he had not yet contacted. *See id.* Plaintiff claims that, because he was denied access to this list, "no professional attorney was assigned to represent [him and] he had to litigate the cases to the best of his ability [ ] on a *pro se* level." *See id.* at 13. Therefore, Plaintiff asserts that he suffered actual harm because Defendant Woods' confiscation of this listing prevented him from "pursuing legal representation" in this case. *See id.* at 16.

**\*3** Moreover, Plaintiff argues that he was prejudiced despite the fact that he was able to file a complaint in this case because Defendants Woods confiscated his notes, diaries and drafts of complaints. *See id.* at 17. Plaintiff claims that, without these materials, he was unable to state relevant facts in his original complaint, and the Court dismissed his original complaint without consideration of the merits because "it was so technically deficient." *See id.* Plaintiff also notes that he filed an amended complaint, which Defendants now seek to dismiss for further technical difficulties. *See id.* Therefore, Plaintiff argues that the Court should deny Defendants' motion to dismiss

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)

(Cite as: 2010 WL 3635673 (N.D.N.Y.))

because Defendants caused the deficiencies by withholding his legal materials. *See id.*

In addition, Plaintiff claims that Magistrate Judge Lowe's conclusion that he was not prejudiced by the loss of exhibits that he intended to attach to his § 440.10 motion was in error for four reasons: (1) the Court recognized that the legal materials for the § 440.10 motion were lost as a result of Defendant Woods' confiscation; (2) the Court should have realized that filing the § 440.10 motion without the legal materials caused Plaintiff irreparable harm; (3) Plaintiff intended to use the confiscated legal materials as evidence with the motion; and (4) "there is a difference between destroying a 440.10 motion and destroying the legal exhibits/evidence that a plaintiff needs to support the motion ." *See id.* at 18–19.

Finally, Plaintiff contends that Defendant Woods confiscated his legal documents, which were eventually lost, and that the loss of those papers caused him actual injury when Magistrate Judge Treece denied his motion to compel. *See id.*

A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents. *See* Lewis v. Casey, 518 U.S. 343, 350 (1996) (citations omitted). "The tools ... require[d] to be provided are those that the inmates need ... in order to challenge the conditions of their confinement." *Id.* at 355. However, "[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id* . Finally, for the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury. *See id.* at 349.

In his amended complaint, Plaintiff does not offer any factual allegations against Defendants Woods, Fisher and LeClaire that satisfy Rule 8's pleading requirements. Although he states that "factual prejudice and/or actual injury resulted from the denial of access to the courts" and that he has "factually demonstrated that he suffered prejudice by describing/pleading enough facts to state a claim for relief that is plausible on its face," Plaintiff offers no factual allegations to show that he is entitled to

relief. *See* Objections at 6, 14. Nor does he demonstrate that he suffered any harm or injury. Rather, as Magistrate Judge Lowe noted, Plaintiff was ultimately able to file his complaint even after Defendants allegedly confiscated his materials. *See* ReportRecommendation at 12.FN2

> FN2. The Court also notes that, in the case in which Magistrate Judge Treece denied Plaintiff's motion to compel by Order dated April 9, 2007, *see Pacheco v. DeAcevedo,* 9:05–CV–998, Dkt. No. 56, in a Decision and Order dated March 31, 2010, Judge Suddaby granted in part and denied in part Defendants' motion for partial summary judgment, *See id.* at Dkt. No. 105, in response to which Plaintiff filed a motion for reconsideration, *see id.* at Dkt. Nos. 110, 112, which Judge Suddaby recently granted in part and denied in part, *see* Dkt. No. 120. Defendants in that case have filed a second motion for summary judgment. *See* Dkt. No. 111. Plaintiff requested, and the court granted him, an extension of time in which to respond to that motion. *See* Dkt. Nos. 115, 116. Plaintiff recently filed his response. *See* Dkt. Nos. 118–119.

**\*4** Having conducted a *de novo* review of the record and broadly construing Plaintiff's amended complaint, the Court concludes that Plaintiff's allegations against Defendants Woods, Fisher and LeClaire do not state a constitutional claim for denial of access to the courts. Therefore, the Court adopts Magistrate Judge Lowe's recommendation and dismisses Plaintiff's claims against these Defendants.

**C. Plaintiff's claims against the Doe Defendants and Defendant Alexander**

The Court notes, as a preliminary matter, that, after Magistrate Judge Lowe issued his Report–Recommendation, Defendant Alexander was successfully served on January 12, 2010. *See* Dkt. No. 81. Defendant Alexander filed a motion to dismiss on January 28, 2010, *see* Dkt. No. 83, to which Plaintiff filed a response, *see* Dkt. No. 88. In a Report–Recommendation dated May 5, 2010, Magistrate Judge Lowe recommended that this Court grant Defendant Alexander's motion

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)

(Cite as: 2010 WL 3635673 (N.D.N.Y.))

without leave to amend. *See* Dkt. No. 89. Plaintiff requested, and this Court granted, an extension of time to object to Magistrate Judge Lowe's recommendation. *See* Dkt. No. 90 & Unnumbered Text Order dated on May 26, 2010. In an Order dated August 9, 2010, this Court accepted Magistrate Judge Lowe's May 5, 2010 Report–Recommendation in its entirety. *See* Dkt. No. 91. Therefore, the Court rejects, as moot, Magistrate Judge Lowe's recommendation to dismiss Plaintiff's claims against Defendant Alexander for failure to serve him within the required time frame.

Since Plaintiff did not effect service on the Doe Defendants within the time frame that Rule 4(m) of the Federal Rules of Civil Procedure requires, Magistrate Judge Lowe recommended that the Court dismiss Plaintiff's claims against the Doe Defendants without prejudice. *See* Report–Recommendation at 13.

Plaintiff objects, claiming that he "was not provided with the fair opportunity to present any fact in his 'Opposition to Defendant's Motion to Dismiss'" because Defendants did not raise the issue in their motion. *See* Objections at 20. He states that this amounts to the Court dismissing Defendants "without any party seeking redress over the issue." *See id.* at 21. Finally, Plaintiff contends that he was not given the fair opportunity to obtain information from the Doe Defendants in order to serve them in a timely manner. *See id.* at 21–22.

"If a defendant is not served within 120 days after the complaint is filed, the court—on motion or *on its own after notice to the plaintiff*—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m) (emphasis added). The court shall, however, extend the time for service if the plaintiff has shown good cause for the failure to serve and will assist *pro se* incarcerated litigants with inquiries into the identifies of unknown defendants. *See Ruddock v. Reno,* 104 Fed. Appx. 204, 207 (2d Cir.2004) (holding that the Marshals Service's failure to execute service may warrant an extension of time, but "[t]he Marshal needs from the prisoner information sufficient to identify the guard ('John Doe No. 23' won't do) ....").

**\*5** In this case, Plaintiff has not offered any details

that would help to identify the Doe Defendants. Furthermore, the Court has provided Plaintiff with several extensions of time in which to serve all Defendants in this case. *See* Unnumbered Dkt. Entry dated January 20, 2009; Dkt. No. 29; Dkt. No. 16. Accordingly, the Court adopts Magistrate Judge Lowe's recommendation and dismisses Plaintiff's claims against the Doe Defendants without prejudice.

### IV. CONCLUSION

After reviewing the entire file in this matter, Magistrate Judge Lowe's August 31, 2009 Report–Recommendation and Plaintiff's objections thereto, as well as the relevant law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Lowe's August 31, 2009 Report–Recommendation is **ADOPTED** in part and **REJECTED** in part; and the Court further

**ORDERS** that Defendants Woods, Fisher and LeClaire's motion to dismiss Plaintiff's claims against them for failure to state a claim is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's claims against the Doe Defendants are **DISMISSED without prejudice** for failure to serve them within the required time frame pursuant to Rule 4(m) of the Federal Rules of Civil Procedure; and the Court further

**ORDERS** that Magistrate Judge Lowe's Report–Recommendation is rejected as moot insofar as he recommended that the Court dismiss Plaintiff's claims against Defendant Alexander for failure to serve him within the required time frame; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Pacheco v. Pataki

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)

(Cite as: 2010 WL 3635673 (N.D.N.Y.))

Not Reported in F.Supp.2d, 2010 WL 3635673 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))



Only the Westlaw citation is currently available.
United States District Court,

D. Oregon.
Johnney Al OSBORNE, Jr., Plaintiff,
v.
Superintendent Jean HILL, Mr. Brabb, Mr. Cain, Mr.
Foley, Ms. Hicks, Mr. Milhorn, Mr. Oscarson, Mr.
Peters and Ms. Stevens, Defendants.
No. CV 05-641-HA.

May 1, 2006.
Johnney Al Osborne, Jr., Ontario, OR, pro se.

Leonard W. Williamson, Department of Justice, Trial Division Corrections Litigation, Lester R. Huntsinger, State of Oregon, Department of Justice, Salem, OR, for Defendants.

**OPINION AND ORDER**

HAGGERTY, District Judge.

**\*1** This 42 U.S.C. § 1983 civil rights action comes before the court on plaintiff's Motion for Default Judgment [72] and defendants' Motion to Dismiss [58], Motion for Summary Judgment [75], and Motion to Submit In Camera Attachments [78]. The Motion to Submit In Camera Attachments is granted as the exhibits are necessary to the disposition of the pending Motion for Summary Judgment.

**I. *Plaintiff's Motion for Default Judgment [72].***

Plaintiff asks the court to enter a default judgment against defendants because defendants did not timely respond to a discovery request, and because the Oregon Department of Corrections ("ODOC") has not formally appeared despite plaintiff's attempt to add ODOC as a party through a document entitled "joinder/addendum." FN1

FN1. Although plaintiff also argues the merits of his case in his Motion for Default Judgment, it would not be appropriate for the court to enter

default judgment against defendants based on the merits of the case.

Fed.R.Civ.P. 37 permits the district court, in its discretion, to enter a default judgment against a party who fails to comply with an order compelling discovery. Fed.R.Civ.P. 37(b)(2)©; *Computer Task Group, Inc. v. Brotby,* 364 F.3d 1112, 1114 (9th Cir.2004). As plaintiff has not asked this court to issue an order compelling discovery, default judgment for failure to provide discoverable material is not warranted.

Although plaintiff also seeks default judgment against ODOC, ODOC is not a valid defendant to this lawsuit because it is not a named party in the Amended Complaint. Even if plaintiff had properly named ODOC as a defendant to this lawsuit, it would be entitled to Eleventh Amendment immunity because it functions as an arm of the State. *See Savage v. Glendale Union High School,* 343 F.3d 1036, 1040 (9th Cir.2003). The Motion for Default Judgment is therefore denied.

**II. *Motion to Dismiss [58].***

The court previously determined that on June 29, 2005, plaintiff filed his Amended Complaint raising the following claims:

1. Defendants wrongfully confiscated and destroyed plaintiff's personal and religious belongings, and prevented him from completing several courses of religious study, in violation of plaintiff's First, Fifth, Sixth, and Fourteenth Amendment rights;

2. Plaintiff has been denied literary material of a sexual nature and Uniform Commercial Code material through defendants' use of an unconstitutional administrative rule governing prisoners' receipt of mail that is overbroad in violation of plaintiff's First, Fifth, Eighth, Ninth, and Fourteenth Amendments, as well as various federal statutory rights.

3. Plaintiff has been denied safe and secure housing at the Oregon State Penitentiary in violation of his Second,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))

Fifth, Eighth, Ninth, and Fourteenth Amendment rights.

Defendants ask the court to dismiss plaintiff's first claim for failure to exhaust his available administrative remedies.

### A. *Standards.*

The Prison Litigation Reform Act of 1995 amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory, even when the prisoner seeks relief not available in grievance proceedings. *Porter v. Nussle,* 534 U.S. 516, 524 (2002).

**\*2** The failure of a plaintiff to exhaust his administrative remedies is an affirmative defense which defendants must raise and prove. *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.), *cert. denied,* 124 S.Ct. 50 (2003). Because the nonexhaustion defense does not address the merits of the case, it is properly raised in an unenumerated Rule 12(b) motion rather than in a motion for summary judgment. *Id.* When deciding a motion to dismiss for failure to exhaust administrative remedies, the court may look beyond the pleadings and decide disputed issues of fact. *Id* at 1119-1120. If the court concludes that the prisoner has not exhausted his administrative remedies, the proper remedy is dismissal without prejudice. *Id* at 1120.

### B. *Discussion.*

The Oregon Department of Corrections utilizes a three-step administrative review process. For non-emergency grievances, an inmate is required to file a grievance form within 30 working days of the incident. OAR 291-109-0140(3). If an inmate is unable to obtain relief through his initial grievance, he may appeal the result of his initial grievance to the functional unit manager within fourteen days. OAR 291-109-0140(4). If the inmate does not succeed in his appeal to the functional unit manager, he may ask for additional review by the Assistant Director. *Id.* Alternatively, an inmate may pursue administrative remedies through a separate process specifically reserved for issues pertaining discrimination.

See OAR 291-006-0005, *et seq.*

In this case, plaintiff filed a first-level grievance on April 16, 2004 alleging that he had been denied the use of a calculator for his religious studies. Affidavit of Teresa Hicks, p. 4, Attachment No. 2. Plaintiff received a response advising him to consider the calculators approved for sale through the institutional canteen. *Id,* p. 4. Plaintiff did not seek appellate review of this decision from the functional unit manager or the Assistant Director.

Plaintiff filed another first-level grievance on April 16, 2004, this time utilizing ODOC's grievance process reserved for discrimination claims. He raised issues pertaining to the denial of a calculator, the withholding of religious correspondence course materials, and the desecration and loss of his religious property. *Id,* Attachment No. 3. Plaintiff received a response which addressed only the issue involving correspondence course materials. *Id,* Attachment No. 6. Again, plaintiff did not seek appellate review of this decision from the functional unit manager or the Assistant Director.

Because plaintiff has not attempted to complete the administrative review process made available to him at his institution, defendants' Motion to Dismiss is granted, and plaintiff's first ground for relief is dismissed, without prejudice.

### III. *Motion for Summary Judgment [72].*

Defendants next move for summary judgment on Claims Two and Three. A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion, and "identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal citation omitted).

**\*3** "If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))

must present significant probative evidence tending to support its claim or material defense.' " *Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.1991)* (quoting *Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir.1987)*). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).* Rather, he must come forward with sufficient evidence demonstrating to the court that there are genuine issues of material fact to be decided at trial. *Fed.R.Civ.P. 56(e).*

Plaintiff may not simply rely upon the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp., 477 U.S. at 324.* The existence of a genuine issue of material fact may be demonstrated through the use of affidavits, depositions, answers to interrogatories, and admissions. *Id; see also* *Fed.R.Civ.P. 56(c).* If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita, 475 U.S. at 587* (internal citation omitted).

**A. *Qualified Immunity: Legal Standard.***

In their Motion for Summary Judgment, defendants assert the defense of qualified immunity, which protects "government officials .. from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* This rule " 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed, 500 U.S. 478, 494-95 (1991)* (quoting *Malley v. Briggs, 475 U.S. 335, 341 (1986)*).

The entitlement to qualified immunity "is an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).* As such, "a defendant is entitled to a ruling on qualified immunity 'early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.' " *Jeffers v. Gomez, 267 F.3d 895, 909 (9th Cir.2001)* (quoting *Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156 (2001)*).

The required first step in a qualified immunity analysis "is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers, 267 F.3d at 909* (citing *Saucier, 121 S.Ct. at 2156).* "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier, 121 S.Ct. at 2156.*

**\*4** If a constitutional violation could be made out on a favorable view of the submissions before the court, "the next, sequential step is to ask whether the right was clearly established." *Id.* "This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition ...." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne, 526 U.S. 603, 615 (1999)*).

Finally, if the law governing the state official's conduct was clearly established, the court must inquire whether "a reasonable state official [could] have believed his conduct was lawful[.]" *Jeffers, 267 F.3d at 910* (citing *Browning v. Vernon, 44 F.3d 818, 822 (9th Cir.1995)* (citing *Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir.1993)*). "Although a defendant's subjective intent is not relevant to the qualified immunity defense, his mental state is relevant where it is an element of the alleged constitutional violation." *Jeffers, 267 F.3d at 911* (citing *Crawford-El v. Britton, 523 U.S. 574, 589 & n. 11 (1998)*).

**B. *Claim Two: Denial of Sexually Explicit and UCC Material.***

As plaintiff's second claim, he first alleges that prison officials unlawfully banned certain sexually explicit mail which he both sought to send and receive. Specifically, plaintiff was precluded from sending erotic writings which he authored, and prohibited from receiving an issue of "Priaprism Press, Last Gasp Erotica Catalog." In order to defeat defendants' Motion for Summary Judgment, plaintiff must show that the regulations he challenges are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))

not reasonably related to legitimate penological interests, or that there is a genuine issue of material fact regarding the applicability of the regulations to the banned materials. *Bahrampour v. Lampert,* 356 F.3d 969, 973 (9th Cir.2004).

When defendants banned the sexually explicit materials at issue in this case, they relied on OAR 291-131-0035(1). OAR 291-131-0035(1) constitutes a general ban on sexually explicit materials in Oregon's prisons, and the Ninth Circuit has clearly held that the regulation is rationally related to a legitimate penological interest. *Id* at 976.

OAR-291-131-0035(1)(e) does, however, contain an exception for materials with scholarly or literary value. Plaintiff argues that the confiscated sexually explicit materials had literary value, therefore confiscation was not appropriate. The court has conducted an in camera review of the materials at issue and finds that no rational trier of fact could determine that the materials fall outside the scope of OAR 291-131-0035(1), nor could a rational trier of fact conclude that the materials have scholarly or literary value sufficient to exempt them from OAR 291-131-0035(1).

Plaintiff has also alleged that defendants improperly denied him access to the Uniform Commercial Code which he "needed to have to show [he] had a superior claim in litigation of [his] possible release and monetary settlement...." Amended Complaint [10], p. 6. As plaintiff notes in his affidavit supporting his response to the Motion for Summary Judgment, defendants have not addressed this access to courts claim.

**\*5** There is nothing in the Uniform Commercial Code which would help plaintiff challenge the legality of his conviction or the conditions of his confinement. Accordingly, plaintiff is unable to state a valid access to courts claim. *See Lewis v. Casey,* 518 U.S. 343, 350, 355 (1996) (an inmate is only entitled to access to items which will assist him in challenging the legality of his conviction or sentence, or the conditions of his confinement). As plaintiff cannot prove the violation of a constitutional right, defendants are entitled to summary judgment on Claim Two. *See Saucier,* 121 S.Ct. at 2156.

## C. *Claim Three: Failure to Protect.*

On November 3, 2003, plaintiff became involved in an argument with another inmate ("Prock") which ultimately led to a physical confrontation. As a result, plaintiff alleges that defendants have failed to provide him with safe and secure housing in violation of the Constitution. The court construes Claim Three as one alleging a failure to protect on the part of defendants in violation of the Eighth Amendment.

"[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (internal citation omitted). The failure to protect inmates from attacks by other inmates may violate the Eighth Amendment when (1) the deprivation alleged is "objectively, sufficiently serious" and (2) the prison officials had a "sufficiently culpable state of mind," acting with deliberate indifference. *Id* at 834.

"[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id* at 835. Only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991).

The incident at issue was memorialized by defendant Foley in a misconduct report which reads as follows:

On [November 3, 2003], I was assigned to Complex 2, Unit A as the unit officer. At the 2:50 p.m. line movement, I was just closing the doors for the beginning of line movement when I noticed Inmate[ ] Osborne ... and Inmate Prock ... in a little bit of a verbal argument standing by the drinking fountain. I turned away for a moment wand when I looked back at the inmates, I saw Inmate Osborne strike [I]nmate Prock in the chest with both hands. I heard Inmate Prock hit the TV room door with some force and then I called both their names and ordered them to stop and they complied. The mail that I had just given Osborne was on the floor along with mail that also belonged to Inmate Prock. I immediately called for Sgt. Benitez and escorts, I then told everyone to sit down and told both Osborne and Prock to exit the unit. Once out in the hall way inmate Osborne told me he was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))

just pushing inmate Prock away because he was bugging him about the mail he just got. This happened in a full dayroom; the Inmates attention was focused on the officer station where I was handing out mail.

**\*6** Affidavit of Wade Scrogham, Attachment 1.

As a result of this incident, disciplinary charges were brought against both inmates and a formal hearing was held. After Hearings Officer Powell read Foley's report into the record, inmate Prock testified that "pretty much what's written is what happened." *Id,* Attachment 2, p. 6. According to Prock, he asked plaintiff what he was reading, prompting plaintiff to throw his magazine down, ask Prock if he had a problem, and push Prock up against a door. *Id.* At this point, defendant Foley ended the confrontation.

Plaintiff was also given the opportunity to testify during the disciplinary hearing. He confirmed that Prock asked him about his reading material, but also testified that Prock lifted the cover on the magazine, causing it to drop to the ground, which resulted in a verbal argument. *Id* at 7. Plaintiff admitted to pushing Prock with one hand in an attempt to pick up his magazine. *Id* at 8. After hearing the testimony, the Hearings Officer concluded that plaintiff's actions constituted "a unilateral attack Mr. Prock did not actively engage in ... in any way." *Id* at 9.

Plaintiff has filed an affidavit with the court in which he attests that his argument with Prock lasted anywhere between three to five minutes before he pushed Prock. Affidavit of Johnny Osborne, pp. 2-4. According to plaintiff, he struck Prock in self defense after being "left ... in an altercation for five minutes where [he] was pushed, hit, shouldered, etc...." *Id* at 2.

Plaintiff's sworn statement that he was physically assaulted is inconsistent with the allegations in his Amended Complaint, his testimony at the disciplinary hearing, and all of the other evidence in the record. In short, plaintiff has provided no substantiating evidence to support his affidavit's conclusory allegation that he was "pushed, hit, shouldered, etc." Consequently, this allegation, by itself, is not sufficient to overcome defendants' Motion for Summary Judgment. *See Lujan v.*

*National Wildlife Federation,* 497 U.S. 871, 888 (1990) (conclusory allegations in an affidavit insufficient to defeat summary judgment motion).[FN2]

> FN2. It is also noteworthy that plaintiff has neither alleged nor attested that he sought medical attention as a result of the three to five-minute beating he claims to have received, and there is no indication in the record that correctional officials found it necessary to provide any medical attention to either inmate.

The record, taken as a whole, shows that plaintiff was the aggressor in this case, not the victim, and a jury could not conclude otherwise from the evidence before the court. At most, the evidence in this case could support that plaintiff argued with Prock for five minutes before striking him, at which time Foley stepped in to stop the altercation.

Even if plaintiff was not the aggressor in this case, the total absence of injury in the record could not support an Eighth Amendment claim sine the failure to stop a verbal argument does not arise to the level of an Eighth Amendment violation. *See Wilson, supra* (only the unnecessary and wanton infliction of pain implicates the Eighth Amendment); *see also Keenan v. Hall,* 43 F.3d 1083, 1092 (9th Cir.1996) (verbal threats and harassment do not form the basis of an actionable Eighth Amendment claim). Because no reasonable factfinder could conclude that any defendant deliberately disregarded a serious risk to plaintiff's safety, defendants are entitled to summary judgment on Claim Three.

### CONCLUSION

**\*7** Defendants' Motion to Dismiss [58], Motion for Summary Judgment [75], and Motion to Submit In Camera Attachments [78] are GRANTED. Claims Two and Three in plaintiff's Amended Complaint [10] are DISMISSED, with prejudice. Claim One is DISMISSED, without prejudice to plaintiff's right to refile it once he has exhausted his administrative remedies.

Plaintiff's Motion for Default Judgment [72] is DENIED.

IT IS SO ORDERED.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)

(Cite as: 2006 WL 1215084 (D.Or.))

D.Or.,2006.

Osborne v. Hill
Not Reported in F.Supp.2d, 2006 WL 1215084 (D.Or.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. Michigan,
Southern Division.
Arthur ROUSE, Claude Hoffman, Guy Curtis, Michael
Kanipe, Douglas Warner, Carlton Rider, Danny Fritts,
Richard Boone II, Tony Pellin, Mark Ashley, Terry George,
William Taylor, Loren Wicker, Michael Lake, Stewart
Gates, Robert Mcmurray, Erick Deforest, Antonio Manning,
Hilton Evans, John Doe, One through Seven, on behalf of
themselves and all other similarly situated individuals,
Plaintiffs,
v.
MDOC Director Patricia CARUSO, Warden Blaine Lafler,
and Deputy Warden Barbara Meagher, Their Superiors,
Subordinates, Subcontractors, Contractors, Replacements,
Predecessors, and John/Jane Doe, Eight through Fourteen, in
their individual and official capacity, Defendants.
No. 06–CV–10961–DT.

Feb. 18, 2011.

Heather R. Pillot, Marcy L. Rosen, Miller, Canfield, Detroit,
MI, for Plaintiffs.

Mark Ashley, St. Louis, MI, pro se.

A. Peter Govorchin, Clifton B. Schneider, Michigan
Department of Attorney General, Lansing, MI, for Defendants.

***REPORT AND RECOMMENDATION ON (1)
DEFENDANTS' MOTION TO DISMISS (docket # 226);
(2) DEFENDANTS' MOTION FOR PARTIAL
JUDGMENT ON THE PLEADINGS (docket # 230); AND
(3) DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT (docket # 231)***

PAUL J. KOMIVES, United States Magistrate Judge.
**\*1** I. *RECOMMENDATION:* The Court should grant
defendants' motion to dismiss, grant in part and deny in part
defendants' motion for partial judgment on the pleadings, and

grant in part and deny in part defendants' motion for partial
summary judgment.
II. *REPORT:*

A. *Background*

Plaintiffs, nineteen current and former inmates of the St.
Louis and Mid–Michigan Correctional Facilities in St. Louis,
Michigan, commenced this *pro se* civil rights action pursuant
to 42 U.S.C. § 1983 on March 3, 2006. Plaintiffs bring claims,
on behalf of themselves and a purported class of all prisoners
at the St. Louis and Mid–Michigan Correctional Facilities [FN1],
against the defendant prison officials relating to the conditions
of confinement at the facilities. Plaintiffs' complaint is divided
into five claims for relief: (1) an Eighth Amendment claim
based on denial of medical care and medication, dangerous
noise levels, denial of restroom use, serious disease outbreaks,
and prisoners being forced to wait in the cold to receive
medications; (2) an Eighth Amendment claim based on cold
cubicles and poor ventilation, cramped living space, denial of
hygiene, and contaminated drinking water; (3) an Eighth
Amendment claim based on the lack of a proper fire
suppression system, overcrowded conditions, and prisoner
access to inmates' files; (4) a First Amendment access to courts
claim based on inadequate law library time and inadequate law
library resources; and (5) a Fourteenth Amendment due
process claim based on removal of property without a proper
hearing and removal of funds from prisoner accounts without
hearing and in excess of that authorized by law.

> FN1. On October 17, 2010, the Mid–Michigan
> Correctional Facility was consolidated with the Pine
> River Correctional Facility. The consolidated facility
> is now known as the Central Michigan Correctional
> Facility. It appears that this represented an
> administrative change only; the facilities remain the
> same. *See* MICHIGAN DEP'T OF CORRECTIONS,
> *F.Y.I.,* at 4 (Sept. 16, 2010) (available at
> h t t p : / / w w w . m i c
> higan.gov/documents/corrections/2010–09–16_332
> 669_7.pdf). For simplicity, I use the MDOC's "STF"
> designation, used for both the former Mid–Michigan
> Correctional Facility and the current Central

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

Michigan Correctional Facility, to designate the facility throughout this Report.

Five plaintiffs were subsequently dismissed from the action, and *pro bono* counsel was appointed to represent the remaining 14 plaintiffs. On October 21, 2008, counsel filed an amended complaint. In the amended complaint plaintiffs, now consisting solely of current or former inmates of STF, assert three counts, broken down into numerous subparts, some of which are further broken down into sub-subparts, as illustrated in the following chart:

| COUNT | CLAIM | SUBPART | SUB–SUBPART | AMEND. COMPL. |
|---|---|---|---|---|
| I | Eighth Amendment Violations | (A) Cruel & Unusual Punishment | (1) Denial of Medical Care | ¶¶ 27–29 |
| | | | (2) Dangerous Noise Levels | ¶¶ 30–31 |
| | | | (3) Denial of Bathroom Use | ¶¶ 32–33 |
| | | | (4) Disease Outbreaks | ¶¶ 34–39 |
| | | | (5) Medline Prisoners Forced into Cold | ¶ 40 |
| | | (B) Inhumane Treatment | (1) Cold Cubicles and Poor Ventilation | ¶¶ 41–44 |
| | | | (2) Crammed Living Space | ¶¶ 45–47 |
| | | | (3) Denial of Hygiene | ¶¶ 48–49 |
| | | | (4) Contaminated Drinking Water | ¶¶ 50–52 |
| | | (C) Unsafe Living Conditions | (1) Lack of Fire Suppression System | ¶¶ 53–55 |
| | | | (2) Overcrowding | ¶¶ 56 |

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

| | | (3) Access to Prisoner's Personal Files | ¶¶ 57–58 |
|---|---|---|---|
| II | First, Fifth, and Fourteenth Amendment Access to Courts Violations | (A) Inadequate Law Library Time | ¶¶ 59–61 |
| | | (B) Limited Law Books | ¶¶ 62–64 |
| | | (C) Seizure of Property and Legal Materials | ¶¶ 65–66 |
| III | 14th Amendment Due Process Violations | Removal of Property or Money without a Hearing | ¶¶ 67–73 |

**\*2** The named defendants are Patricia Caruso, Director of the Michigan Department of Corrections (MDOC); Blaine Lafler, the Warden at STF during the relevant time period; and Barbara Meagher, a Deputy Warden at STF during the relevant time period. The complaint also names as defendants unknown employees of Correctional Medical Services, Inc., and unknown MDOC employees in the Bureau of Health Care Services. Plaintiffs seek $10,000,000.00 in compensatory damages, as well as declaratory and injunctive relief.[FN2]

> **FN2.** For ease of reference, I will refer to the claims raised by plaintiffs using the letters and numbers provided in the foregoing chart. Thus, plaintiffs' denial of medical care claim will be referred to as Claim I(A)(1), and so on.

On March 23, 2010, counsel sought to withdraw with respect to eight of the remaining fourteen plaintiffs, based on their inability to contact these plaintiffs and these plaintiffs' failure to appear for their depositions or provide requested discovery. I granted counsel's motion to withdraw on April 30, 2010. The remaining plaintiffs represented by counsel are Claude Hoffman, Michael Kanipe, Richard Boone, William Taylor, Michael Lake, and Hilton Evans. The remaining plaintiffs who are no longer represented by counsel are Arthur Rouse, Danny Fritts, Tony Pellin, Stewart Gates, Terry George, Mark Ashley, Robert McMurray, and Eric DeForest.

The matter is currently before the Court on three dispositive motions filed by the named defendants. First, on

April 20, 2010, defendants filed a motion to dismiss the eight unrepresented plaintiffs for failure to cooperate in discovery pursuant to FED. R. CIV. P. 37(d) and for failure to prosecute pursuant to FED. R. CIV. P. 41(b). No plaintiff has filed a response to this motion. Second, on June 1, 2010, defendants filed a partial motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). This motion seeks dismissal for failure to state a claim of plaintiffs' Eighth Amendment claims alleging denial of medical care (Claim I(A)(1)), denial of bathroom use (Claim I(A)(3)), disease outbreak (Claim I(A)(4)), medline prisoners being forced to wait in the cold (Claim I(A)(5)), cold cubicles (¶ 41 of Claim I(B)(1)), denial of hygiene (Claim I(B)(3)), contaminated drinking water (Claim I(B)(4)), and access to prisoner's personal files (Claim I(C)(3)). The motion also seeks dismissal for failure to state a claim of Counts II and III of the amended complaint. The represented plaintiffs filed a response to the motion on July 6, 2010, and defendants filed a reply on July 20, 2010. No unrepresented plaintiff has filed a response to the motion. Third, also on June 1, 2010, defendants filed a motion for partial summary judgment pursuant to FED. R. CIV. P. 56. Defendants contend that they are entitled to summary judgment on the merits of plaintiffs' Eighth Amendment claims alleging excessive noise (Claim I(A)(2)), inadequate ventilation (¶¶ 42–44 of Claim I(B)(1)), overcrowding (Claims I(B)(2) and I(C)(2)), contaminated drinking water (Claim I(B)(4)), and lack of fire safety (Claim I(C)(1)). Defendants also contend that they are entitled to summary judgment on plaintiff's hygiene and fire safety claims (Claims I(B)(3) and I(C)(1)) based on their lack of personal involvement. Defendants

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

further argue that they are entitled to qualified immunity with respect to plaintiffs' claims against them in their individual capacities and to Eleventh Amendment immunity with respect to plaintiffs' claims against them in their official capacities. Finally, defendants argue that because none of the plaintiffs is still incarcerated at the St. Louis Correctional Facility, their claims for injunctive relief are moot. The represented plaintiffs filed a response to this motion on July 6, 2010, and defendants filed a reply on July 20, 2010. None of the unrepresented plaintiffs has filed a response to this motion.

B. *Defendants' Motion to Dismiss the Unrepresented Plaintiffs*

**\*3** In the first motion pending before the Court, defendants seek dismissal of the eight unrepresented plaintiffs for failure to cooperate in discovery or for failure to prosecute. The Court should grant defendants' motion and dismiss these plaintiffs for failure to prosecute the action.

1. *Dismissal for Failure to Cooperate in Discovery*

Defendants first move to dismiss the unrepresented defendants pursuant to *Fed. R. Civ.* P. 37(d), based on their failure to provide discovery. Rule 37(d) provides, in relevant part, that

[t]he court where the action is pending may, on motion, order sanctions if:

(I) a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition; or

(ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

FED. R. CIV. P. 37(d)(1)(A). The rule further provides that "[s]anctions may include any of the orders listed in Rule 37(b)(2) (A)(i)-(vi)." FED. R. CIV. P. 37(d)(3). The sanctions referenced in Rule 37(b), in turn, include "dismissing the action or proceeding in whole or in part." FED. R. CIV. P. 37(b)(2) (A)(v). Ordering dismissal or default [FN3] to sanction a party to the litigation is usually reserved for situations akin to contempt of court or other abusive practices. *See, e. g., Chambers v. NASCO,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115

L.Ed.2d 27 (1991); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Generally, this sanction is not available unless the conduct of the complaining party was done willfully, maliciously, or in bad faith. *See, e.g., National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 640, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam). Before imposing a sanction of dismissal or default, a court should consider the prejudice to the complaining party, the degree of the wrongdoer's culpability, the availability of other measures to redress the problem, and the societal interest in the efficient administration of justice. *See United States v. Shaffer Equip. Co.,* 11 F.3d 450, 462–63 (4th Cir.1993), *cited with approval by Coleman v. American Red Cross,* 23 F.3d 1091, 1094 n. 1 (6th Cir.1994). As the Sixth Circuit has summarized, in determining whether dismissal is an appropriate sanction for failure to comply with discovery orders, a court should consider four factors:

FN3. The Court applies the same standard to determine whether default is an appropriate sanction as it does to determine whether dismissal is appropriate. *See Bank One of Cleveland, N.A. v. Abbe,* 916 F.2d 1067, 1073 (6th Cir.1990); *Bratka v. Anheuser–Busch Co.,* 164 F.R.D. 448, 459–60 (S.D.Ohio 1995); *In re Sams,* 123 B.R. 788, 790 (Bankr.S.D.Ohio 1991).

The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the [offending] party's failure to cooperate in discovery; the third factor is whether the [offending] party was warned that failure to cooperate could lead to dismissal; and the fourth factor is whether less drastic sanctions were imposed or considered before dismissal [is] ordered.

**\*4** *Bass v. Jostens, Inc.,* 71 F.3d 237, 241 (6th Cir.1995); *accord Bank One of Cleveland, N.A. v. Abbe,* 916 F.2d 1067, 1073 (6th Cir.1990). "Consideration of these factors should be given with reference to the dual purposes underlying the use of dismissal as a sanction for willful noncompliance with discovery, namely, of punishing the offending party and deterring future litigants from engaging in similar misconduct." *Reese Corp. v. Rieger,* 201 B.R. 902, 907 (E.D.Mich.1996) (citing *Bass,* 71 F.3d at 241). Further,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

all these factors must be weighed against the strong policy that favors disposition of cases on their merits. *See Little v. Yeutter,* 984 F.2d 160, 162 (6th Cir.1993); *see also, Shaffer Equip.,* 11 F.3d at 462; *Reese Corp.,* 201 B.R. at 907 ("Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on the merits is dismissal appropriate.") (citing *Meade v. Grubbs,* 841 F.2d 1512, 1520 n. 7 (10th Cir.1988)).

Here, even if the unrepresented plaintiffs' failure to respond to discovery requests and appear for their depositions constitutes the type of willful conduct supporting a sanction of dismissal, the other factors all point to the opposite conclusion. First, defendants have not asserted any prejudice resulting from plaintiffs' conduct. This is not a case in which defendants have been unable to investigate plaintiff's claims right up to the eve of trial. *See, e.g., Taylor v. Medtronics,* 861 F.2d 980, 986 (6th Cir.1988) (finding prejudice where "the dilatory tactics of the plaintiffs effectively prevented the defendants from engaging in further discovery after the deposition because of the close proximity of the trial date."); *Brinkman v. Dallas County Deputy Sheriff Abner,* 813 F.2d 744, 750 (5th Cir.1987) (finding prejudice where plaintiff had failed to respond to discover and scheduled trial date was one week from date of dismissal). Further, there is no suggestion by defendants that any evidence sought by the discovery requests is now unavailable due to the delay. *Accord Lolatchy v. Arthur Murray, Inc.,* 816 F.2d 951, 952–53 (4th Cir.1987) (finding no prejudice where "[t]here was no missing witness in the case whose testimony was made unavailable by the delay; ... neither was there any records made unavailable by the delay, nor was there any evidence for the plaintiff which could have been presented earlier, the presentation of which was prevented by the delay."); *see also, Bass,* 71 F.3d at 242 (finding prejudice, in part, because many of the defendant's witnesses where no longer available to be deposed or testify). To be sure further, repeated failures to respond may eventually result in this type of prejudice, but at this stage such prejudice is lacking. In short, the most significant prejudice suffered by defendants at this stage of the proceedings is some delay in receiving this information and the costs involved with securing this discovery. However, this prejudice is remediable through other sanctions, and is not sufficient to warrant the extreme sanctions of dismissal and default judgment. *See, e.g., Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir.1992) ("[T]he delay involved in this case, by itself, would not be sufficient to warrant dismissal absent other justifying circumstances.");

*Shea v. Donohoe Constr. Co., Inc.,* 795 F.2d 1071, 1075 (D.C.Cir.1986) (finding no actual prejudice where only prejudice suffered was costs which could be adequately compensated for by monetary sanctions).

**\*5** Further, the third factor weighs against dismissal because plaintiffs have been neither previously sanctioned for their discovery conduct nor warned that repeated failures to provide the requested discover could result in default. *See Bass,* 71 F.3d at 242 (magistrate judge explicitly warned counsel that failure to comply would result in recommendation that case be dismissed both at hearing and in conditional report and recommendation); *Ehrenhaus,* 965 F.2d at 921 (court adequately put plaintiff on notice that dismissal would be forthcoming by inviting defense counsel to file motion to dismiss if plaintiff failed to provide the ordered discovery); *Taylor,* 861 F.2d at 986 (sanction of dismissal appropriate where court "gave plaintiffs an explicit warning that dire consequences would follow any further abuse."); *In re McDowell,* 163 B.R. 509, 512 (Bankr.N.D.Ohio) (dismissal appropriate where "[t]he Second Show Cause Order placed the Debtor on notice that failure to comply with the Pretrial Order would result in dismissal.").

Finally, the fourth factor also weighs against dismissal. As noted above, the Court has not previously imposed lesser sanctions which have proven ineffective and there is no suggestion in the record that such sanctions will be ineffective. *See, e.g., Bass,* 71 F.3d at 242–43 (sanction of dismissal appropriate where party failed to respond to courts order despite previous imposition of monetary sanctions); *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1413 (9th Cir.1990) (finding this factor satisfied where party had previously been sanctioned and found in contempt); *Taylor,* 861 F.2d at 986 (finding this factor satisfied where "it [was] clear from the record that the court's use of sanctions was measured, gradual, and in proportion to the plaintiffs' misconduct."). Accordingly, the Court should conclude that defendants are not entitled to dismissal of the eight unrepresented plaintiffs' claims pursuant to Rule 37(d).[FN4]

> FN4. Defendants' motion is limited to their request for entry of a default judgment. Accordingly, I express no opinion as to whether defendants are entitled to monetary sanctions and, if so, in what amount. The disposition of this motion is without

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

prejudice to defendants filing a properly supported motion for monetary sanctions under FED. R. CIV. P. 30, 37.

### 2. *Dismissal for Failure to Prosecute*

Nevertheless, the Court should conclude that defendants are entitled to dismissal under Rule 41 based on these plaintiffs' failure to prosecute the action. In support of this argument, defendants note the following facts, which are undisputed at this point: (1) the unrepresented plaintiffs have failed to provide discovery and make themselves available for deposition; (2) they have failed to keep in contact with counsel, or provide either counsel or the Court with their new contact information; FN5 and (3) they have failed to respond to any of the pending dispositive motions, including the motion to dismiss for failure to prosecute.

> FN5. According to the Michigan Department of Corrections' Offender Tracking Information System (OTIS) website (http://www.state.mi.us/mdoc/asp/otis2.html), six of the eight unrepresented plaintiffs—Rouse, Fritts, Pellin, Gates, George, and Ashley—have been discharged from their sentences and are no longer under the jurisdiction of the MDOC. Only plaintiff DeForest is still incarcerated, albeit now at the Marquette Branch Prison. OTIS contains no record of plaintiff Robert McMurray, regardless of whether he is searched for by name or by the prisoner number attributed to him in plaintiffs' original complaint.

Rule 41 provides, in relevant part, that "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." FED. R. CIV. P. 41(b). In determining whether dismissal is appropriate for failure to prosecute, the Court applies the same four factors that it applies to the dismissal inquiry under Rule 37. *See Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 590 (6th Cir.2001). That the same factors are considered, however, does not mean that the conclusion reached under Rule 37(d) controls the Court's analysis under Rule 41(b). Although the factors are the same, the *facts* bearing on those factors is broader. With respect to the willfulness inquiry, for example, evidence of plaintiffs' willfulness includes not only their failures with respect to the discovery matters, but also their failures to respond to the pending

dispositive motions and provide counsel or the Court with current contact information. Likewise, under Rule 37 no prejudice was shown based on the assumption that the discovery sought by defendants could be obtained, and that at this point the only prejudice suffered by defendants was in time and money, which could be compensated by other sanctions. Being unable to locate plaintiffs, however, renders this assumption invalid, and precludes defendants from being able to properly defend themselves against these plaintiffs' claims. Likewise, although plaintiffs have not been warned of the possibility of dismissal through a court order, they were so warned by this Court's local rules, which provide that an attorney or unrepresented party must promptly file new contact information when there is a change of such information, and that "[t]he failure to file promptly current contact information may subject that person or party to appropriate sanctions, which may include dismissal, default judgment, and costs." E.D. MICH. LR 11.2. And this factor, in any event, is less important where, as here, plaintiffs' conduct "demonstrate [their] lack of interest in prosecution this action." *Ali v. Hilton Gateway*, No. 05–2459, 2007 WL 121453, at *2 (D.N.J. Dec.15, 2006). "Plaintiff[s'] failure to keep the Court informed of [their] address[es] and to participate in discovery [and motion practice] prevents the case from proceeding in the foreseeable future" with respect to these plaintiffs. *Williams v. Maricopa County Sheriff's Office*, No. CV–04–2901, 2006 WL 2091713, at *2 (D.Ariz. July 24, 2006). Considered as a whole, the unrepresented plaintiffs' inaction warrants dismissing these plaintiffs pursuant to Rule 41(b). *See Burke v. Morgan*, No. 06–CV–348, 2009 WL 514314, at *2 (E.D.Ky. Mar. 2, 2009); *Young v. Los Angeles County Sheriff's Dep't*, No. CV 07–3586, 2008 WL 2096898, at *2 (C.D.Cal. May 13, 2008); *Doornbos v. Pilot Travel Ctrs., LLC*, No. 3:05–cv–428, 2008 WL 4764334, at *3 (E.D.Tenn. Oct.27, 2008); *Burns v. Glick*, 158 F.R.D. 354, 356 (E.D.Pa.1994). Accordingly, the Court should grant defendants' motion to dismiss for failure to prosecute, and should dismiss the claims of plaintiffs Rouse, Fritts, Pellin, Gates, George, Ashley, McMurray, and DeForest pursuant to Rule 41(b).

### C. *Defendants' Motions for Judgment on the Pleadings*

**\*6** In their next dispositive motion, defendants seek judgment on the pleadings pursuant to Rule 12(c) with respect to plaintiffs' Eight Amendment claims alleging denial of medical care, denial of bathroom use, disease outbreak, being

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

forced to wait in the cold for medication, cold cubicles, denial of hygiene, contaminated drinking water, and access to prisoner's personal files, as well as plaintiff's access to courts and due process claims.

### 1. *Legal Standard*

Rule 12(b)(6) provides that a party may, by way of motion instead of responsive pleading, assert as a defense that the complaint "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Such a motion "must be made before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b). Rule 12 further provides, however, that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). Although presented later in the case, a motion for judgment on the pleadings is equivalent to a motion to dismiss and is governed by the same legal standard. *See Johnson v. Dodson Public Schs., Dist. No. 2–A(C),* 463 F.Supp.2d 1151, 1155 (D.Mont.2006); *Ganthier v. North Shore–Long Island Jewish Health Sys. .,* 298 F.Supp.2d 342, 346 (E.D.N.Y.2004); *cf. Johnson v. Bredesen,* 624 F.3d 742, 746 (6th Cir.2010).

In order for a court to dismiss a complaint for failure to state a claim, it must appear beyond doubt that the party asserting the claim can prove no set of facts supporting his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The party asserting the claim is not required to specifically set out the facts upon which he or she bases his claim. *Id.* at 47. Rather, "a short and plain statement of the claim" pursuant to FED. R. CIV. P. 8(a)(2) gives the opposing party fair notice of the claim and the grounds upon which it rests. *See Conley,* 355 U.S. at 47. However, as the Supreme Court has recently explained, bare legal conclusions need not be accepted by the Court, and a pleading must contain sufficient factual allegations to show that the allegations are plausible:

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [ *Bell Atlantic Corp. v.] Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 [ ] (2007) [, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct.

2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id., at 557.*

**\*7** To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal,* —— U.S. ——, ——– – ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (parallel citations omitted).

A court can only decide a Rule 12(b)(6) motion on the basis of the pleadings; if the court considers matters outside the pleadings, the court must convert the motion into one for summary judgment under Rule 56. *See Kostrzewa v. City of Troy,* 247 F.3d 633, 643–44 (6th Cir.2001); *Weiner v. Klais & Co.,* 108 F.3d 86, 88 (6th Cir.1997); FED. R. CIV. P. 12(d). Here, plaintiffs have attached matters outside the pleadings to their response to defendants' motion for judgment on the pleadings. The Court should exclude these materials and decide the motion solely on the basis of the pleadings, for two reasons. First, although plaintiffs provide and at times rely on these materials, their response argues solely that defendants' motion should be denied under the Rule 12(b)(6) standard for dismissal. They do not make a summary judgment argument, nor have they requested that the Court convert the motion to one for summary judgment as provided for in Rule 12(d). Second, the evidence relates only to some of the claims at issue in defendants' motion, and then only with respect to some of the remaining plaintiffs. The Court would thus be required to partially address the motion under the summary judgment standard, while addressing other parts of the motion under the Rule 12(b)(6) standard. The better course is to simply exclude the materials and address the sufficiency of the complaint, as called for by defendants' motion.

**\*8** To state a viable § 1983 claim, a plaintiff must allege that: (1) he was deprived of a right, privilege or immunity secured by the Federal Constitution or the laws of the United States; and (2) the deprivation was caused by a person while acting under color of state law. *Doe v. Wigginton,* 21 F.3d 733, 738 (6th Cir.1994). It is well established that liability in a § 1983 action cannot be based on a theory of *respondeat superior. See Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009); *Monell v. New York City*

*Dep't of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "To recover damages under 42 U . S.C. § 1983, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right ." *Diebitz v. Arreola,* 834 F.Supp. 298, 304 (E.D.Wis.1993). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own conduct, has violated the Constitution." *Iqbal,* 129 S.Ct. at 1948. In other words, in order to state a claim under § 1983 "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998) (per curiam); *see also, Carr v. Parker,* No. 98–6395, 1999 WL 1206879, at *1 (6th Cir. Dec.9, 1999); *Salehpour v. University of Tennessee,* 159 F.3d 199, 206 (6th Cir.1998). As the Sixth Circuit has stated:

"Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."*

*Taylor v. Michigan Dep't of Corrections,* 69 F.3d 73, 81 (6th Cir.1995) (quoting *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984) (emphasis added)) (emphasis by *Taylor* court); *see also, Monell,* 436 U.S. at 693–95; *Birell v. Brown,* 867 F.2d 956, 959 (6th Cir.1989); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Dunn v. Tennessee,* 697 F.2d 121, 128 (6th Cir.1982); *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976). Furthermore, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon,* 853 F.2d 418, 429 (6th Cir.1988). As the *Haydon* court stated: "A supervisory official's failure to control, or train the offending individual is not actionable, unless the supervisor 'either encouraged the specific incident or in some other way directly participated in it.' " *Haydon,* 853 F.2d at 429 (quoting *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.1982)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

2. *Eighth Amendment Claims (Count I)*

*a. Eighth Amendment Standard*

**\*9** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. In its purest sense, the Eighth Amendment proscribes cruel and unusual punishment meted out in a penal or disciplinary sense. In its application by the courts, the amendment actually protects a wide assortment of interests. It proscribes disproportionate punishments, *see Weems v. United States,* 217 U.S. 349, 366–67, 30 S.Ct. 544, 54 L.Ed. 793 (1910), "unnecessary and wanton infliction of pain," *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). *See generally, Parrish v. Johnson,* 800 F.2d 600, 609 (6th Cir.1986).

The Constitution "does not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). On the other hand, it does not permit inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *see also, Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The amendment imposes affirmative duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). If the offending conduct is not a criminal penalty, then it must reflect an " 'unnecessary and wanton infliction of pain' " to come within the Eighth Amendment's prohibition on cruel and unusual punishment. *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Such claims must satisfy both an objective and a subjective test. *See Farmer,* 511 U.S. at 834; *Wilson v. Seiter,* 501 U.S. 294, 297–300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation.

*Hudson v. McMillian,* 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Brooks v. Celeste,* 39 F.3d 125, 128 (6th Cir.1994). The plaintiff bears the burden of proving these elements by a preponderance of the evidence. *See Brooks,* 39 F.3d at 127–28.

The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *See McMillian,* 503 U.S. at 8–9; *Rhodes,* 452 U.S. at 349 (1981). To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 349. The objective component is contextually driven and is responsive to " 'contemporary standards of decency.' " *McMillian,* 503 U.S. at 8 (quoting *Estelle,* 429 U.S. at 103).

**\*10** The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton." *Wilson,* 501 U.S. at 302; *Moore v. Holbrook,* 2 F.3d 697, 700 (6th Cir.1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson,* 501 U.S. at 302–03; *see Estelle,* 429 U.S. at 104–06. Under this "deliberate indifference" standard, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. A prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. *See id.* at 843–44. However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances. *See id.* at 844–45. In short, " '[d]eliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice." *Wright v. Taylor,* 79 Fed. Appx. 829, 831 (6th Cir.2003) (citing *Farmer,* 511 U.S. at 835–36; *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc)).

Plaintiff claims that defendants denied medically necessary treatment are governed by these objective and subjective tests, as explained by the Supreme Court in *Estelle, supra.* In *Estelle,* the Court held that "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

cause of action under § 1983." *Estelle,* 429 U.S. at 105. Thus, a court faced with failure to treat claims has a two-fold inquiry: (1) does the plaintiff's complaint involve "serious illness or injury"?—*i.e,* the objective prong of the Eighth Amendment analysis; and (2) if so, were the defendants deliberately indifferent to this serious illness or injury?—*i.e.,* the subjective prong of the Eighth Amendment analysis. *See generally, Durham v. Nu'Man,* 97 F.3d 862, 868–69 (6th Cir.1996).

*b. Denial of Medical Care (Claim I(A)(1))*

With respect to their medical care claims, plaintiffs make the following allegations in their amended complaint:

12. As the recent prisoner population at the MMC has increased, the number of medical staff has remained the same. Before the most recent doctor, Jonathan Altman, quit, there was a ratio of one doctor and four nurses to 1,040 prisoners. Since Dr. Altman left, the MMC has only the four nurses and a visiting physician's assistant. The PA is only at the MMC twice a week which leaves the prisoners without proper care and violates MDOC's own policies.

13. There is no medical staff at the MMC after 8 p.m. or on weekends. The only medical care given at those times are at outside hospitals, if a prisoner can prove that they [sic] are suffering from a life-threatening emergency.

**\*11** 14. The policy for Emergency Medical Care gives nurses and doctors the authority to diagnose patients without first examining them, and without knowing their vital signs and medical history. This is a violation of professional medical standards, state law, and the 8th Amendment of the U.S. Constitution, by intentional infliction of pain without a legitimate penalogical reason.

15. Eye exams and dental work required a year-long (and in some cases, even longer) wait. Medication often runs out, causing serious medical problems.

\* \* \* \*

27. Defendants have denied Plaintiffs life's minimal necessities. Such deprivations consisted of but were not limited to the following:

a. The MMC has insufficient medical staff, which has

negatively impacted Plaintiffs and lead to various injuries, including but not limited to:

b. Denial of proper medical care and accessories such as a brace for a pre existing club foot, medication for pain and arthritis, and denial of proper tests to determine if high-risk Plaintiffs have cancer; all of which have resulted in pain and suffering.

c. Nurses giving examinations without regard to Plaintiffs' health records, scratching a Plaintiff's eye when examining him with a dye stick (resulting in a bleeding eye), and refusing tests to save money.

d. Some Plaintiffs and putative class members were on psychiatric medication for years despite never having seen a psychiatrist. Psychiatrists are not available at MMC; nurses prescribed the medication.

e. Many other putative class members have been denied treatment for medical ailments such as high blood pressure, high cancer counts, and enlarged prostates, despite needing the treatment. This is to cut costs and for the prison to save money.

28. The above allegations have resulted in Plaintiffs' and putative class members' unnecessary pain and suffering.

Amended Compl., ¶¶ 12–15, 27–28.

Defendants argue that plaintiff's medical care claims fail to state a claim upon which relief may be granted because they do not allege an objective medical need or subjective knowledge on the part of the defendants. They further argue that these allegations relate to issues cared for by medical staff, issues in which they had no involvement. The Court should disagree. Defendants' arguments would certainly be correct if plaintiffs' were alleging discrete medical issues which were handled by individual doctors or nurses. Plaintiffs, however, are not presenting this type of claim. As the courts have recognized, deliberate indifference " 'may occur on an individual level, such as when a doctor intentionally mistreats an inmate ... or on an institutional level, when the prisoner's system of medical care is so seriously inadequate as to cause unwarranted suffering.' " *Dean v. Coughlin,* 107 F.R.D. 331, 333 (S.D.N.Y.1985) (quoting *Cruz v. Ward,* 558 F.2d 658, 662

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

(2d Cir.1977)) (alteration in original). It is this second type of claim that plaintiffs are bringing. And, "[w]hen a prisoner class seeks to challenge an entire health care system, deliberate indifference to their health needs can be shown either by repeated acts which disclose a pattern of conduct by the prison medical staff, or by evidence of such systemic deficiencies in staffing, facilities, or procedures that unnecessary suffering is inevitable." *Id.; see also, Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980); *Morales Feliciano v. Rossello Gonzalez,* 13 F.Supp.2d 151, 206 (D.P.R.1998); *Grubbs v. Bradley,* 552 F.Supp. 1052, 1123 (M.D.Tenn.1982).[FN6]

> [FN6.] While the Court previously denied plaintiffs' motion for class-certification, this was because, at the time, plaintiffs were proceeding *pro se,* and *pro se* plaintiffs may not maintain a class action. *See Ziegler v. Michigan,* 90 Fed. Appx. 808, 810 (6th Cir.2004). Until they are ruled upon on the merits, plaintiffs' class allegations asserted in the Amended Complaint filed by counsel remain viable.

**\*12** Plaintiffs' amended complaint sufficiently alleges these types of systemic deficiencies. Plaintiffs allege that the facility is staffed by only four nurses and no doctors, and that there is no medical staff present after 8 p.m. or on weekends. They allege that these deficiencies result in inadequate, improper, or a total lack of care. Whether plaintiffs will be able to prove these allegations is not before the Court, and indeed proof of such a systemic claim "entails a heavy burden." *Dunigan ex rel. Nyman v. Winnebago County,* 165 F.3d 587, 591 (7th Cir.1999). Plaintiffs allegations are sufficient to state a systemic medical claim under the Eighth Amendment. Further, they are adequate to allege the personal involvement of the defendant supervisory officials, as the claims stem not from individual treatment decisions of particular medical professionals, but the staffing and policy decisions of the supervisory officials. *See Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir.2003) (internal quotation omitted) ("The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."); *Antonelli v. Sheahan,* 81 F.3d 1422, 1429 (7th Cir.1996) (supervisory officials "can be expected to know of or participate in creating systemic, as opposed to localized, situations."). Accordingly, the Court should conclude that

defendants are not entitled to dismissal of plaintiffs' medical claims.

*c. Denial of Bathroom Use (Claim I(A)(3))*

The Court should conclude, however, that defendants are entitled to dismissal of plaintiffs' claim alleging denial of bathroom use. In this claim, plaintiffs allege:

> 32. Plaintiffs and putative class members are denied bathroom use at the MMC during count time, which takes place six times a day, for 30 minutes or more each time. This includes first thing in the morning after sleeping for six to eight hours. This has caused pain, suffering, and bladder problems.

> 33. Prisoners are also denied bathroom use during Fire Drills and on Top Lock, for up to four hours without any legitimate penological reason. Prisoners are issued a major misconduct ticket if they violate this rule.

Amend. Compl., ¶¶ 32–33.

The Eighth Amendment prohibits conditions of confinement that amount to cruel and unusual punishment and manifest a wanton infliction of pain. It does not prohibit conditions of confinement that "cause mere discomfort or inconvenience." *Hunt v. Reynolds,* 974 F.2d 734, 735 (6th Cir.1992) (internal quotation omitted). As the Supreme Court has explained, "extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson,* 503 U.S. at 8–9 (internal citations and quotations omitted). Temporary restrictions on bathroom use, even ones lasting several hours, do not constitute the wanton infliction of pain or exhibit deliberate indifference to a prisoner's health or safety. *See Abdur–Raheem–X v. McGinnis,* No. 99–1075, 1999 WL 1045069, at * (6th Cir. Nov.12, 1999) ("[T]he Eighth Amendment does not require that prisoner enjoy immediately available ... toilets."); *Hernandez v. Battaglia,* 673 F.Supp.2d 673, 677 (N.D.Ill.2009) (denial of bathroom break during 3–5 hour period of cell "shakedown" did not state Eighth Amendment claim); *Owens v. Padilla,* No. C 06–4778, 2008 WL 3916068, at *4 (N.D.Cal. Aug. 22, 2008) (confinement in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

prison barbershop for six hours without access to bathroom did not state Eighth Amendment claim); *Trevino v. Jones,* No. 06–CV–0257, 2007 WL 710213, at *8 (N.D.Okla. Mar.06, 2007) (use of restrooms only twice during eight hour period does not constitute cruel and unusual punishment). Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to this claim.

### d. Disease Outbreaks (Claim I(A)(4))

**\*13** Plaintiffs also allege that MMC has had many outbreaks of Community Associated Methicillin Resistant Staphylococcus Aureus (MRSA) that is caused or exacerbated by the conditions of confinement and which defendants have failed to stop. *See* Amended Compl., ¶¶ 34–39. Defendants argue that these allegations fail to state a claim upon which relief may be granted because plaintiffs do not allege that they have contracted MRSA, and because plaintiff's allege only that certain conditions of confinement may have contributed to the outbreak, but they do not allege any acts or omissions of defendants that created an unreasonable risk of injury. The Court should agree. The fact, as alleged by plaintiffs, that they may have been exposed to "some risk" of contracting MRSA is insufficient to state a claim. *See Oliver v. Bucks County Correctional Facility,* 181 Fed. Appx. 287, 289 (3d Cir.2006), *cited with approval by Wooler v. Hickman County, Ky.,* 377 Fed. Appx. 502, 505 (6th Cir.2010). Further, the complaint contains no allegations suggesting that defendants knew of the alleged outbreaks or of the risk of such outbreaks, and therefore it fails to allege that defendants were deliberately indifferent under the subjective prong of the Eighth Amendment standard. *Cf. Stewart v. Taft,* 235 F.Supp.2d 763, 769–70 (N.D.Ohio 2002). Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to this claim.

### e. Medline Claim (Claim I(A)(5))

Plaintiffs next allege that "MMC prisoners are forced to stand outside in the cold and rain, with temperatures that may fall below single digits to pick up their medications for up to 45 minutes." Amended Compl., ¶ 40. Plaintiffs do not allege, however, that they are forced to do so without adequate clothing to protect them from the elements, or that this practice has resulted in any harm. *Cf. Chandler v. Moore,* 2 F.3d 847, 848 (8th Cir.1993) (being forced to wait in cold and rain without adequate protective clothing states Eighth Amendment

claim). "Mere discomfort or temporary adverse conditions which pose no risk to health and safety do not implicate the Eighth Amendment." *Whitington v. Ortiz,* No. 07–1425, 2009 WL 74471, at *6 (10th Cir.Jan.13, 2009). An allegation that prisoners were "standing in inclement weather," without more, is not " 'sufficiently serious to violate the Eighth Amendment.' " *Taylor v. Mosley,* No. 2:04CV39, 2006 WL 1475780, at *5 (M.D.Ala. May 25, 2006) (quoting Hudson, 503 U.S. at 8). Plaintiff's allegations therefore fail to state an Eighth Amendment claim. *See Fearance v. Schulteis,* No. 1:08–cv–00615, 2010 WL 582050, at *2 (E.D.Cal. Feb.12, 2010) ("the mere allegations of inadequate clothing and exposure to cold are insufficient, as discomfort alone is not sufficient to violate the Eighth Amendment."); *Ashann–Ra v. Virginia,* 112 F.Supp.2d 559, 563 (W.D.Va.2000) (complaint failed to state a claim where prisoner did "not allege that exposure of his feet to subfreezing temperatures, rain or snow during the brief walks between buildings caused severe pain, disfigurement or life-threatening risks."). Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to this claim.

### f. Cold Cubicles (¶ 41 of Claim I(B)(1))

**\*14** Plaintiffs next allege that their Eighth Amendment rights wer e violated by defendants because, due to inadequate windows, insulation, and thermostats, "rear cubicles [are] cold." Amended Compl., ¶ 41. While the Eighth Amendment requires that prison officials avoid exposing prisoners to prolonged periods of extreme heat or cold, plaintiffs' bare allegation that some cells are "cold" is insufficient to state an Eighth Amendment claim. *See Jenkins v. Livingston,* No. 6:09cv560, 2010 WL 3853099, at *8 (E.D.Tex. Aug.31, 2010) (citing *Johnson v. Texas Bd. of Criminal Justice,* 281 Fed. Appx. 319, 321 (5th Cir.2008) (per curiam)) ("Vague allegations of cold and heat in a prison environment, without an assertion of bodily injury, are insufficient to state a violation of the Eighth Amendment."); *Williams v. Grant,* No. CV408–203, 2009 WL 3317262, at *4 (S.D.Ga. Oct.14, 2009) ("Here, however, Williams has not alleged enough. Under *Iqbal,* he must supply more than conclusions and vague assertions like 'cold bare cell' phraseology."); *Spitsyn v. Morgan,* No. C04–5134, 2008 WL 714095, at *17 (W.D.Wash. Mar. 14, 2008) (complaint failed to state a claim where "plaintiff merely claim[ed] ... that the temperature was cold in his cell."); *Moore v. Monahan,* No. 06 C 6088, 2008 WL 111299, at *9 (N.D.Ill. Jan.10, 2008) (citations omitted)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

(quoting *Bell Atlantic,* 127 S.Ct. at 1959) ("Here, Moore's allegations that his cell was inadequately heated in the winter and extremely hot in the summer does not create any ... inference [of deliberate indifference]. Put differently, Moore's bare-boned allegations do not suggest that he has a "right to relief above the speculative level."). Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to this claim.

### g. Denial of Hygiene (Claim I(B)(3))

Plaintiffs also allege that "[t]he MDOC has a policy that forbids hygiene for one year to an indigent prisoner who was terminated from school, work, or refused a job." Amended Compl., ¶ 48. Defendants do not contend that such a denial of hygiene states an Eighth Amendment claim, nor could they. *Flanory v. Bonn,* 604 F.3d 249, 255 (6th Cir.2010) ("A prisoner whose inability to purchase hygiene items results from his rejection of educational status satisfies the objective and subjective requirements of an Eighth Amendment violation when he alleges a complete deprivation and shows that the deprivation resulted from a deliberate indifference to hygiene needs."). Rather, defendants argue that this claim fails because "[t]here is no allegation ... that any of the named plaintiffs were denied hygiene products ...." Br. in Supp. of Def.s' Mot. for Partial Judgment on the Pleadings, at 10. As with plaintiffs' medical claims, plaintiffs' denial of hygiene claims are brought on behalf of a proposed class of prisoners, and allege a systemic deprivation under the Eighth Amendment. Thus, as with plaintiff's medical claims, the failure to allege specific harm to each named plaintiff does not warrant dismissal at this time. Accordingly, the Court should deny defendants' motion for judgment on the pleadings with respect to this claim.[FN7]

> FN7. Defendants also move for summary judgment with respect to this claim. Application of the summary judgment standard to this claim is discussed below.

### h. Contaminated Drinking Water (Claim I(B)(4))

**\*15** Defendants next seek dismissal of plaintiffs' claims that they are forced to consume contaminated drinking water. With respect to this claim, plaintiffs allege:

24. Saint Louis was added to the Federal Toxic Superfund Cleanup Site. It may be this "nation's costliest environment" cleanup.

25. DDT and other chemicals have polluted Pine River.

Parachlorobenzene sulfonic acid (p-CBSA), is a byproduct of DDT and has been found in the city's drinking water in levels up to 11 times higher than the EPA's safety threshold.

26. The three St. Louis prisons, which hold about 3,000 inmates, were notified of the water contamination, but staff refused to do anything but put bottled water in the store for those who could afford to buy it. Inmates' food was prepared with tap water and those who cannot afford bottled water drink tap water as well.

\* \* \* \*

50. As cited previously, Saint Louis is the only location in the U.S. where the drinking water is contaminated with p-CBSA, a by-product of DDT. After the EPA alerted the Saint Louis prisons that the three wells were contaminated, they did not supply the prisoners with fresh drinking water.

51. No one knows what other chemicals are in the water, nor do they know the long term effects of these toxic chemicals.

52. The Defendants have been informed of these problems and have chose to do absolutely nothing about them [in violation of state and federal laws].

Amended Compl., ¶¶ 24–26, 50–52. The Court should conclude that these allegations state an Eighth Amendment claim.

An allegation that prisoners have been exposed to toxic substances can state an Eighth Amendment claim, even without an allegation of present harm. *See Helling,* 509 U.S. at 33 ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.... We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."). Here, plaintiffs have alleged that they are exposed to drinking water contaminated with p-CBSA, a by-product of DDT. Defendants's assertion that "there is no factual allegation ... on which a jury could conclude that the water was contaminated," Def.s' Br., at 10, is simply incorrect. As set forth above, the Amended Complaint alleges that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

drinking water is contaminated with p-CBSA above the EPA's safety threshold. These averments constitute "factual allegation[s] ... on which a jury could conclude that the water was contaminated." It may be, as defendants argue, that "[t]here is no *evidence* that any of the plaintiffs have been exposed to p-CBSA or any other contaminant," *id.* (emphasis added), and that "there is no ... evidence on which a jury could conclude that the water was contaminated." *Id.* (emphasis added). Plaintiffs, however, are not required to produce evidence to withstand a motion for judgment on the pleadings. Plaintiffs have alleged that they are exposed to drinking water contaminated with a dangerous chemical, and that is sufficient to state a claim for relief. Whether plaintiffs have raised a genuine issue of material fact with respect to this claim is discussed below. Accordingly, the Court should deny defendants' motion for judgment on the pleadings with respect to this claim.

### i. Access to Personal Files (Claim I(C)(3))

**\*16** Plaintiffs also allege that defendants have violated their Eighth Amendment rights by allowing unauthorized access to prisoner personal files. Plaintiffs allege:

57. Prisoners' files are presently kept unlocked, permitting unauthorized persons to gain access to them. There is personal and confidential prisoner and family information kept in the presentence information report (PSI).

58. The MDOC does not authorize officers to access the PSI or prisoner's files. This is because it can and does cause civil unrest and fights.

Amended Compl., ¶¶ 57–58. The Court should conclude that these allegations fail to state a claim upon which relief may be granted.

"[T]he Constitution does not encompass a general right to nondisclosure of private information." *Doe v. Wigginton,* 21 F.3d 733, 740 (6th Cir.1994) (internal quotation omitted). Plaintiffs' vague allegations that access to personal information can cause civil unrest and fights are insufficient to establish that defendants were deliberately indifferent to inmate safety. The Amended Complaint contains no allegations that unauthorized access in fact led to any specific incidences of violence in the prison. Further, plaintiffs have not alleged that these supervisory defendants were personally involved in

leaving the personal files unlocked. Plaintiffs themselves indicate that the MDOC prohibits unauthorized access, and there is no allegation that these defendants were in any way responsible for securing the personal information. This is not the type of systemic conditions claim, such as plaintiffs' medical claim, for which personal responsibility may be imputed to the supervisory defendants. Accordingly, the Court should grant defendants' motion to dismiss this claim.

### 3. Access to Courts Claims (Count II)

Defendants next seek dismissal of plaintiffs' access to courts claims. In these claims, plaintiffs allege that (1) the law library is too small and prisoners are therefore denied adequate law library time, *see* Amended Compl., ¶¶ 59–61; (2) the law library has limited books, and does not include necessary books such as older volumes of the United States Reports and Michigan Supreme Court Reports, *see id.* at ¶¶ 62–64; and (3) prison officials have confiscated Uniform Commercial Code information pursuant to a memorandum issued by defendant Caruso. The Court should conclude that these claims fail to state a claim upon which relief may be granted.

#### a. Legal Standard

Prisoners have a fundamental right of access to the courts. *See* *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "The right springs from the Due Process Clauses of the Fifth and Fourteenth Amendments and the right of petition found in the First Amendment," *Hodge v. Prince,* 730 F.Supp. 747, 751 (N.D.Tex.1990), as well as from the Privileges and Immunities Clause of Article IV. *See* *Chambers v. Baltimore and Ohio R.R.,* 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907). A prisoner's access to the courts must be adequate, effective and meaningful. *See* *Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984); *Ryland v. Shapiro,* 708 F.2d 967, 972 (5th Cir.1983). A prisoner asserting a denial of access to courts claim must satisfy the constitutional standing requirement by alleging an actual injury. *See* *Lewis v. Casey,* 518 U.S. 343, 349, 351–53, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). To meet this requirement, a plaintiff must show that the actions of the prison officials "hindered the prisoner's efforts to pursue a nonfrivolous claim." *Penrod v. Zavaras,* 94 F.3d 1399, 1403 (10th Cir.1996); *accord* *Lewis,* 518 U.S. at 353; *Myers v. Hundley,* 101 F.3d 542, 544 (8th Cir.1996); *Stewart v. Block,* 938 F.Supp. 582, 586 (C.D.Cal.1996) (plaintiff must show "a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

specific instance in which he was actually denied access to the courts.") (internal quotation omitted). Further, "the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis,* 518 U.S. at 354. The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines," and thus the right is limited to safeguarding prisoners' ability "to attack their sentences, either directly or collaterally, and in order to challenge the conditions of their confinement." *Id.* at 355. In other words, "a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus–X v. Blatter,* 175 F.3d 378, 391 (6th Cir.1999) (en banc). Under *Lewis,* dismissal is appropriate where a prisoner fails to allege a specific, litigation-related detriment resulting from the prison official's conduct. *See Pilgrim v. Littlefield,* 92 F.3d 413, 416 (6th Cir.1996).

**\*17** As the Supreme Court has explained, to establish an access to courts claim,

> the named plaintiff must identify a nonfrivolous, arguable, underlying claim .... It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation. It follows, too, that when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

> *Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).

*b. Analysis*

Here, plaintiffs have failed to allege any specific, litigation-related detriment resulting from the allegedly inadequate law library, nor have they identified "a nonfrivolous, arguable, underlying claim," *Christopher,* 536 U.S. at 415, lost by the allegedly inadequate law library. Plaintiffs only allegation regarding injury is a general one that the inadequate facilities "has prejudiced many prisoners because they missed their deadlines and lost their cases."

Amended Compl., ¶ 60. This generic allegation does not allege any specific, litigation related harm to a nonfrivolous challenge to any prisoner's conviction or conditions of confinement, and is inadequate to state a claim under *Lewis.* Further, plaintiffs' allegation that "[e]ach prisoner has a constitutional right to 3 two hour slots per week," Amended Compl., ¶ 61, and their suggestion that the law library is required to stock particular case reporters, is without merit under *Lewis.* The *Lewis* Court explicitly noted that "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 351. And the Court explicitly declined to adopt any exception to the actual injury requirement for claims alleging systemic law library inadequacies. *See id.* at 353 n. 4. Accordingly, plaintiffs' complaint fails to state a claim of denial of access to courts.[FN8]

> **FN8.** Attempting to overcome this conclusion, plaintiffs point to matters outside the record suggesting that two of them did suffer a specific, litigation related harm. As noted above, these matters outside the pleadings are not properly before the Court on defendants' motion for judgment on the pleadings, and cannot cure the Amended Complaint's failure to state a claim. Even if the Court considered this evidence under a summary judgment standard, however, defendants would still be entitled to judgment in their favor. Plaintiffs point to their responses to defendants' Interrogatory No. 14, which asked each plaintiff: "List every lawsuit and legal proceeding in which you missed a deadline, lost your case, or were otherwise injured due to inadequate library time at the Mid–Michigan Correctional Facility and describe the injury." *See, e.g.,* Pl.'s Br., Ex. 13. Plaintiff Lake responded simply: "Once while appealing/fighting a ticket." *Id.* This single statement does not describe a specific, litigation related harm, and in any event a challenge to a ticket is not a claim relating to the validity of the conviction or conditions of confinement which the right of access to courts protects. *See Blanton v. Caruso,* No. 1:10–cv–1187, 2011 WL 202094, at \*5–\*7 (W.D.Mich. Jan.19, 2011). Plaintiff Evans responded that he missed a Michigan Supreme Court deadline for filing his habeas corpus petition, and that a suit for false

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

imprisonment was delayed. *See* Pl.'s Br., Ex. 10. Yet in his deposition plaintiff Evans responded, "I don't know," when asked how his habeas case was affected by inadequate law library time or whether he ever missed any deadlines or lost a case as a result of inadequate law library time. *See id.*, Ex. 11, at 40. Further, these two instances, even if sufficient to establish an access to courts claim with respect to these plaintiffs, are insufficient to establish a systemic failure or justify system-wide relief. *See Lewis,* 518 U.S. at 358–60.

Nor does defendants' alleged confiscation of plaintiff's UCC materials state a claim for denial of access to courts. As noted above the right of access to courts is limited to the pursuant of direct appeals from a criminal conviction, habeas corpus petitions, and civil rights suits regarding conditions of confinement. *See Lewis,* 518 U.S. at 355. Any claim based on the UCC is not one of these types of actions. "There is nothing in the Uniform Commercial Code which would help plaintiff[s] challenge the legality of [their] conviction[s] or the conditions of [their] confinement. Accordingly, plaintiff[s][are] unable to state a valid access to courts claim." *Osborne v. Hill,* No. 05–CV–641, 2006 WL 1215084, at *5 (D.Ore. May 1, 2006); *see also, Smith v. Catinella,* No. 08–14118, 2009 WL 4639112, at *9 (E.D.Mich. Dec.1, 2009) (Lawson, J., adopting Report of Morgan, M.J.); *Friske v. Scutt,* No. 07–CV–13747, 2009 WL 454654, at *8 (E.D.Mich. Feb.24, 2009) (Rosen, J.); *Tomzek v. Blatter,* No. 1:08–cv–635, 2008 WL 4738942, at *5 (W.D.Mich. Oct.24, 2008); *Frazier v. Diguglielmo,* 640 F.Supp.2d 593, 599 (E.D.Pa.2008). And even if plaintiffs attempted to use the UCC to challenge their convictions or conditions of confinement, such claims would be frivolous. As noted above, it is plaintiffs' burden to establish the nonfrivolous nature of their underlying claims. *See Christopher,* 536 U.S. at 415. The courts have repeatedly held that the UCC has no bearing on the validity of a prisoner's conviction or subsequent incarceration. *See, e.g., United States v. Holloway,* 11 Fed. Appx. 398, 400 (6th Cir.2001); *United States v. Reed,* No. 4:09–CR–076, 2010 WL 99128, at *4 (D.N.D. Jan.5, 2010); *Chandler v. Curtis,* No. 05–CV–72608–DT, 2005 WL 1640083, at *2 (E.D.Mich. July 13, 2005) (Cohn, J.). Indeed, the federal courts have repeatedly characterized such claims as frivolous. *See, e.g., Noble v. Pearson,* No. 5:09–cv–123, 2009 WL 4728698, at *4 (S.D.Miss. Dec.3, 2009); *Kestner v. Lafler,* No. 1:08–cv–877,

2009 WL 3754393, at *1 (W.D.Mich. Nov.5, 2009); *Diaz v. Diaz,* No. 7:09–cv–00017, 2009 WL 272870, at *1 (W.D.Va. Feb.3, 2009); *Smith v. Burt,* No. 08–CV–14239, 2008 WL 4791348, at *2 (E.D.Mich. Oct.24, 2008) (Cohn, J.); *Bartz v. Van De Graaf,* No. 1:07–cv–219, 2008 WL 2704882, at *2 (D.Vt. July 8, 2008); *Hamby–Bev v. Bergh,* No. 08–CV–13284, 2008 WL 3286227, at *2 (E.D.Mich. Aug.7, 2008) (Battani, J.). Thus, even if plaintiffs were attempting to use UCC materials in an action in the class of court cases protected by the access-to-courts right under *Lewis,* plaintiffs cannot show that they were hindered in their ability to pursue a *nonfrivolous* action. Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to plaintiffs' access to courts claims.

*4. Property Deprivation/Due Process Claims (Count III)*

**\*18** Finally, defendants seek judgment on the pleadings with respect to plaintiffs' claims that they were deprived of property without due process of law, asserted in Count III of the Amended Complaint. In this Count, plaintiffs allege that: (1) a class member had his guitar seized without a proper hearing; (2) prisoners are not given a hearing when funds are removed from their accounts; and (3) the prison is removing more money than required by statute or court order. *See* Amended Compl., ¶¶ 67–73. The Court should conclude that defendants are entitled to judgment on the pleadings with respect to these claims.

First, although defendants have clearly moved for judgment on the pleadings with respect to the claims asserted in Count III, *see* Def.s' Mot., at 1; Br. in Supp. of Def.s' Mot., at 13–17, plaintiffs do not address this claim, or this aspect of defendants' motion, in their response brief. "It is well understood ... that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., General Bd. of Global Ministries,* 284 F.Supp.2d 15, 25 (D.D.C.2003), *aff'd,* 98 Fed. Appx. 8 (D.C.Cir.2004). Because plaintiffs "failed to respond to [defendants] argument or otherwise address this claim, the Court [may] deem it abandoned." *Bute v. Schuller Int'l, Inc.,* 998 F.Supp. 1473, 1477 (N.D.Ga.1998); *see also, Colon ex rel. Disen–Colon v. Colonial Intermediate Unit 20,* 443 F.Supp.2d 659, 677 (M.D.Pa.2006).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

Second, plaintiffs' claim fails on the merits. The Fourteenth Amendment does not protect against all of the State's deprivations of life, liberty, or property. *See Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). It protects against only those deprivations of life, liberty, or property that are "without due process of law." *Id.* Accordingly, the Supreme Court has recognized that the negligent deprivation of an inmate's property does not violate due process if the state provides an adequate remedy to redress the wrong. *See id.* at 537, *overruled in part by Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence does not amount to a "deprivation" at all, thus the Due Process Clause is not implicated). Likewise, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In asserting a violation of procedural due process, a plaintiff must plead and prove that available state procedures for redressing the wrong are not adequate. *See Vicory v. Walton,* 721 F.2d 1062, 1065–66 (6th Cir.1983); *see also, Wilson v. Beebe,* 770 F.2d 578, 584 (6th Cir.1985) (en banc).

Here, plaintiffs have made no allegation that Michigan does not have an adequate post-deprivation remedy to address their alleged property loss. Michigan's grievance system provides state prisoners with an adequate procedure to challenge actions taken by prison officials. An inmate may file a written grievance; if its resolution is unsatisfactory to plaintiff, he may then seek sequential evaluation of its disposition by supervisory staff, the warden, the MDOC deputy director, the department director, and the ombudsman. Furthermore, if these five levels prove insufficient, Michigan law allows for judicial review of administrative decision in the state courts. *See De Walt v. Warden, Marquette Prison,* 112 Mich.App. 313, 315 N.W.2d 584, 585 (Mich.Ct.App.1982); MICH. COMP. LAWS §§ 791.251 *et seq.* Finally, a state tort remedy is available. These remedies have been held to be adequate under federal due process standards. *See Copeland v. Machulis,* 57 F.3d 476, 480 (6th Cir.1995); *Branham v. Spurgis,* 720 F.Supp. 605, 608 (W.D.Mich.1989). In short, plaintiffs have "not shown that no adequate postdeprivation state remedy was available," and therefore they have not alleged a violation of their procedural due process rights so as

to enable them to state a § 1983 claim. *See Barnier v. Szentmiklosi,* 810 F.2d 594, 600 (6th Cir.1987). Accordingly, the Court should grant defendants' motion for judgment on the pleadings with respect to this claim.

D. *Defendants' Motion for Summary Judgment*

**\*19** In a separate motion, defendants seek summary judgment with respect to plaintiffs' Eighth Amendment claims alleging dangerous noise levels (Claim I(A)(2)), poor ventilation (¶¶ 42–44 of Claim I(B)(1)), crammed living space (Claim I(B)(2)), lack of fire suppression system (Claim I(C)(1)), and overcrowding (Claim I(C) (2)).

1. *Legal Standard*

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick,* 355 F.3d at 451–52 (citing *Anderson,* 477 U.S. at 248). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury,* 344 F.3d 603, 613 (6th Cir.2003); *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir.2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick,* 355 F.3d at 451 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.,* 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir.2001) (quoting

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also,* FED. R. CIV. P. 56(e).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained:

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50. (citations omitted); *see Celotex Corp.,* 477 U.S. at 322–23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland,* 344 F.3d at 613.

2. *Analysis*

a. *Dangerous Noise Levels (Claim I(A)(2))*

**\*20** In their complaint, plaintiffs allege that they are subjected to dangerous noise levels. Specifically, they allege:
30. There is an Air Raid Siren placed on top of Housing Unit–F. This siren sounds off for twenty minutes or longer at least once a month. This has caused hearing damage to the Plaintiffs and the putative class members.

31. There are two Bull Horns located in each of the housing units in the sleeping area. They must reach Prisoners under it and located 50 ft. away in cubicles.

Amended Compl., ¶¶ 30–31. Defendants argue that they are entitled to summary judgment on this claim because plaintiffs have failed to produce any objective medical evidence showing any hearing impairment, or to show that defendants were aware of any danger of hearing loss. Defendants further argue that plaintiffs have failed to produce any evidence quantifying the noise level from which a jury could find that the noise levels presented an unacceptable risk of hearing loss. The Court should agree.

There is no doubt that "[e]xcessive noice in a prison can state a valid Eighth Amendment claim." *Green v. Strack,* No. 94–17214, 1995 WL 341544, at *1 (9th Cir. June 8, 1995). To do so, however, the noise must be so excessive and pervasive as to pose a serious risk of injury, *see Lunsford v. Bennett,* 17 F.3d 1574, 1580 (7th Cir.1994), or pain, *see Williams v. Boles,* 841 F.2d 181, 183 (7th Cir.1988), or sleep deprivation, *see Caldwell v. District of Columbia,* 201 F.Supp.2d 27, 35 (D.D.C.2001). On the other hand, "subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare." *Lunsford,* 17 F.3d at 1580. As one court has observed, the cases finding an Eighth Amendment violation based on excessive noise have all "involved incessant noise throughout the day and night, which at times was significantly beyond acceptable decibel levels and could have resulted in possible hearing loss." *Sterling v. Smith,* No. CV606–103, 2007 WL 781274, at *3 (S.D.Ga. Mar.08, 2007) (discussing *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir.1996); *Antonelli v. Sheehan,* 81 F.3d 1422, 1433 (7th Cir.1996); *Toussain v. McCarthy,* 597 F.Supp. 1388, 1410 (N.D.Cal.1984), *rev'd in part on other grounds,* 801 F.2d 1080, 1110 (9th Cir.1986)).

Here, plaintiffs have failed to present any evidence regarding the severity or pervasiveness of the noise. They allege only that the air raid siren on Unit F sounds off for twenty minutes at least once a month. They provide no evidence for the decibel level of the siren or bull horns, nor any evidence regarding the frequency with which they are sounded.[FN9] Nor have they presented any evidence that the noise levels created a risk of hearing impairment, pain, or loss of sleep. In the absence of any evidence regarding the severity, frequency, and duration of the allegedly excessive noise, defendants are entitled to summary judgment. *See Lucien v. Gramley,* No. 94–3725, 1996 WL 590539, at *2–*3 (7th Cir. Oct.10, 1996); *Green,* 1995 WL 341544, at *1.

FN9. In their brief, plaintiffs cite to only one item of evidence supporting their excessive noise claim, page 33 of the deposition transcript of plaintiff Hoffman. *See* Pl..'s Br., at 11. The portion of plaintiff Hoffman's deposition attached to the response, however, does not include page 33, and none of the included pages address the noise level in the prison. *See id.,* Ex. 14.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

*b. Poor Ventilation (¶¶ 42–44 of Claim I(B)(1))*

**\*21** Plaintiffs allege that the ventilation at MMC is inadequate. Specifically, they allege that:

42. The ventilation at the MMC has not worked in F–Unit for months. Ventilation in other units only works half the time. The exhaust system in H–Unit runs for one hour and shuts off for one hour, back and forth throughout the day. Each Unit has a high and low side system. These systems are supposed to cycle back and forth so that the ventilation is constantly working.

43. The Filtering System is very poor and is not properly maintained by Professional Personnel. The air is very stale and constantly reeks of cigarette smoke, which causes headaches and sickness. There are only two fresh air handlers (Air Intakes) for up to 140 prisoners. These bring in air from the Attic which has Black Mold in it, in violation of State Code and the Fresh Air Act, MCL 333.12602.

Amended Compl., ¶¶ 42–43. Defendants seek summary judgment on this claim, arguing that plaintiffs' allegations of headaches and sickness constitutes a *de minimis* injury, and that plaintiffs' allegations regarding the functioning of the ventilation system is unsupported by the evidence. In support of this argument, defendants point to their response to plaintiffs' Interrogatory No. 13, which states:

Each housing unit has two exhaust systems that produce 1950 cubic feet per minute (cfm) each, six exhaust vents 24″ x 24″ in the ceiling of each unit that allows 650 cfm each to be vented out of the unit. Each housing unit has four exterior wall ventilators that blend fresh air from the outside with the interior air to reach the temperature set on the thermostat in the units, during the heating season. These systems were installed at the time of construction in 1989. These systems are maintained semi-annually. No known defects or deficiencies were noted at the time of the request.

Def.s' Br., Ex. 1, at 5. Defendants also attached to their interrogatory response copies of completed preventative maintenance work orders, reflecting invoiced work for preventative maintenance on a roughly semi-annual basis from July 2006 through August 2008. *See id.* at 10–22. Plaintiffs' principal rejoinder is to focus on their claims that the prison is inadequately heated, and argue that this should be considered in conjunction with their inadequate ventilation claims. However, as explained above plaintiffs' amended complaint fails to state a claim of inadequate heating. With respect to the ventilation issues specifically, plaintiffs point only to the affidavit of plaintiff Lake, who avers that "[i]n the unit the air is very stale. There is much cigarette smoke in the air[.]" Pls.' Br., Ex. 1, at 4.[FN10] The Court should conclude that this evidence is insufficient to withstand summary judgment.

> FN10. Plaintiffs also cite to the deposition transcripts of plaintiffs Hoffman and Evans. However, the testimony cited to discusses only the alleged inadequate heating; neither plaintiff testified with respect to inadequate ventilation. *See* Pl.'s Br., Ex. 11, at 34; Ex. 14, at 18.

"Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary." *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir.1996) (internal quotation omitted). Plaintiffs, however, have failed to provide any evidence that the ventilation in the prison is inadequate, or that the ventilation system undermines the health and safety of the inmates. "The Eighth Amendment does not guarantee a certain type of ventilation system or a certain rate of air exchange ." *Bolton v. Goord,* 992 F.Supp. 604, 628 (S.D.N.Y.1998). Defendants have provided an explanation of the ventilation system, as well as maintenance records showing that it was regularly maintained. In response, plaintiffs have "offered only [the] conclusory allegation[ ] [of plaintiff Lake], without backing from medical or scientific sources, that the rank air exposed him to diseases and caused respiratory problems which he would not otherwise have suffered. Such conditions do not fall below 'the minimal civilized measure of life's necessities.' " *Dixon v. Godinez,* 114 F.3d 640, 645 (7th Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834); *see also, King v. Berghuis,* No. 1:10–cv–57, 2010 WL 565373, at \*4 (W.D.Mich. Feb.13, 2010) (plaintiffs' allegations that inadequate ventilation system "cause[d] them discomfort in the form of headaches, sinus problems and nose bleeds" did not allege sufficiently severe deprivation to state conditions of confinement claim). Plaintiff Lake's averment that the air was stale is insufficient to raise a genuine issue of material fact that the ventilation was inadequate. *See Vasquez v. Frank,* No. 05–C–528–C, 2007 WL 3254702, at \*7 (W.D.Wis. Nov.02, 2007) ("Plaintiff refutes the adequacy of the ventilation,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

relying on the way it felt to him and other prisoners. Again, although plaintiff can testify to how he felt, he is not qualified to give an opinion of the actual quality of the ventilation. Without any basis for finding that the air quality was so poor as to constitute a risk to plaintiff's health, I cannot find a genuine issue of material fact regarding the adequacy of the ventilation."), *aff'd,* 290 Fed. Appx. 927, 930 (7th Cir.2008); *Malone v. Becker,* NA 01–101–C H/H, 2003 WL 22080737, at *15 (S.D.Ind. Aug.29, 2003) ("With respect to the issue of ventilation, at most, plaintiffs have alleged that at times the air was 'stale,' 'nasty,' or 'funky.' Plaintiffs have not offered any admissible evidence of a serious ventilation problem, let alone one that had risen to the level of a constitutional violation."). Further, plaintiffs cannot establish that defendants were deliberately indifferent under the subjective prong of the *Farmer* test, in light of the evidence establishing regular maintenance of the ventilation system. *See Vasquez,* 290 Fed. Appx. at 930 (no deliberate indifference shown where prison officials believed ventilation system was adequate). Accordingly, the Court should grant defendants' motion for summary judgment with respect to this claim.

*c. Living Space/Overcrowding (Claims I(B)(2) and I(C)(2))*

**\*22** Plaintiffs allege that crammed living conditions and overcrowding have resulted in a denial of their Eighth Amendment rights. Specifically, plaintiffs allege that inmates are housed four inmates in a 6' x 7' area, giving each prisoner approximately 10 square feet of living space. *See* Amended Compl., ¶ 20. They also allege that the prison has only two officers per every 140 inmates. *See id.,* ¶ 21. Plaintiffs allege that the space available for each prisoner is below the standard 60 square feet of living space set by the American Correctional Association, *see id.* at 45, and that the crowding has "caused many fights, thefts, and arguments." *Id.,* ¶ 46. Plaintiffs further allege that "[most of the activities at the MMC are taxed over their maximum capacities. This includes the yard, chow hall, and school." *Id.,* ¶ 56. The Court should conclude that defendants are entitled to summary judgment on these claims.

"Overcrowding *per se* is not unconstitutional; what must be tested against constitutional standards are the basic living conditions in a jail." *Fischer v. Winter,* 564 F.Supp. 281, 298 (N.D.Cal.1983); *see also, Simpson v. Horn,* 25 F.Supp.2d 563, 571 (E.D.Pa.1998). Overcrowding violates the Eighth Amendment only when it "leads] to deprivations of essential food, medical care, or sanitation" or "increasers] violence

among inmates or create other conditions intolerable for prison confinement." *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *see also, Simpson,* 25 F.Supp.2d at 571. It is not enough for a court to conclude *"in the abstract* that prison overcrowding and double Helling ... generally results in serious harm to the inmates.... A court is under the obligation to examine the actual effect of challenged conditions upon the well-being of the prisoners ." *Id.* at 367 (Brennan, J., concurring).

To the extent plaintiffs' claims are based on the amount of living space they are afforded, the claim is without merit. Contrary to plaintiffs' allegations, defendants have presented evidence that each inmate has more than 10 square feet of living space. In response to plaintiffs' Interrogatory No. 14, defendants state that each cubicle is 249.48 square feet, and houses either 7 or 8 prisoners. This amounts to 35.64 or 31.185 square feet of living space per prisoner, in line with the 31.5 square feet afforded the prisoners in *Rhodes, see Rhodes,* 452 U.S. at 343. The *Rhodes* Court found that this did not amount to an Eighth Amendment violation. Nor have plaintiffs presented any evidence that the crowding at MMC has lead to deprivations of essential food, medical care, and sanitation, or lead to increased violence among inmates. Plaintiffs assert that "forcing seven inmates to occupy a space constructed to house four has increased the number of fights and near fights in STF." Pl.s' Br., at 14. The only evidence they cite in support of this claim, however, is their own generalized averments that "[t]he overcrowding has cause [d] more fights and arguments in the unit and/or the yard." *Id.,* Ex. 1, at 4 (Lake affidavit); see also, *id.,* Ex. 3, at 4 (Boone affidavit) ("The living space is very confined. Fights, arguments, etc., break out due to this cramping issue."). They cite to no evidence, however, of a causal connection between the crowded conditions and the incidents of violence. They do not present, for instance, any evidence regarding the frequency of fights over time as the occupancy of the prison has increased. "In order to overcome a motion for summary judgment, plaintiff must present evidence that violence within the jail increased at a rate disproportionate to the population as a result of overcrowding. Plaintiff[s] merely claims that there was an increase in fighting and disagreements when the cells were crowded." *Ramirez v. City and County of San Francisco,* No. C 89–4528, 1997 WL 33013, at *5 (N.D.Cal. Jan.23, 1997) (citing *Rhodes,* 452 U.S. at 343); *see also, Rhodes,* 452 U.S. at 343 (no Eighth Amendment violation where evidence showed only that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

violence increased in proportion to the prison population plaintiffs "failed to produce evidence that double Helling itself caused greater violence.").

**\*23** Plaintiffs also contend that "the overcrowding has resulted in a denial of basic hygienic needs" because "23.3 inmates share a single shower, and 17.5 inmates share a single toilet." Pl.s' Br., at 14–15. Beside citing these numbers, however, plaintiffs present no evidence that shower and toilet facilities are insufficient to meet their basic hygienic needs. There is no evidence regarding the frequency with which inmates are able to shower, nor is there any allegation or evidence that the number of toilets causes sanitation or health problems. The mere fact that a number of prisoners are required to share shower and toilet facilities, without more, is insufficient to establish an Eighth Amendment violation. *See Austin v. Coughlin,* 668 F.Supp. 882, 830–31 (S.D.N.Y.1987) (ratios as high as 28 inmates per shower and 13 inmates per toilet did not establish Eighth Amendment violation where there was no evidence that inmate hygiene was affected); *Miles v. Bell,* 621 F.Supp. 51, 58–62 (D.Conn.1985) (fact that 14–24 inmates shared single shower head and 10–15 inmates share single toilet insufficient to establish Eighth Amendment violation where plaintiffs did "not challenge the sanitary conditions of the toilet and shower facilities, but only the number of toilets and showers. Plaintiffs cited no case law in support of their theory that the number of toilets and showers is constitutionally inadequate.").

Plaintiffs also assert that "the overcrowding has denied Plaintiffs the basic necessity of health," because they "were unable to secure prompt medical attention" and because the "overcrowded living conditions created a situation in which communicable illnesses" such as the flu and MRSA "were quickly and easily spread." Pl.s' Br., at 15. Again, however, plaintiffs have failed to provide any evidence to support these assertions. For instance, plaintiff Lake's affidavit avers various disputes with the treatment he received, and claims that he had to wait to see an outside specialist, *see* Pl.'s Br., Ex. 1, at 1, but it does not aver that he suffered any delay in seeing the facility medical staff, nor does it provide any evidence that the alleged inadequacies in his treatment resulted from the population level in the prison. And plaintiffs have presented no evidence of any serious disease outbreaks, only plaintiff Hoffman's testimony that four people in his unit contracted MRSA. This evidence is insufficient to create a genuine issue of material fact with

respect to plaintiffs' overcrowding claim. Accordingly, the Court should conclude that defendants are entitled to summary judgment with respect to these claims.

### d. Denial of Hygiene (Claim I(B)(3))

Plaintiffs allege that they were denied proper hygiene in two ways. First, plaintiffs allege that "[t]he MDOC has a policy that forbids hygiene for one year to an indigent prisoner who was terminated from school, work, or refused a job." Amended Compl., ¶ 48. Second, they allege that "[t]he MDOC has no provision to provide hygiene products if a prisoner's hygiene products are stolen or lost." *Id.,* ¶ 49. In moving for summary judgment with respect to this claim, defendants address only the second allegation, contending that they are entitled to summary judgment because they implemented a policy by which "care packages" were to be provided, and had no personal involvement in the distribution of such items or lack thereof. With respect to the claim asserted in ¶ 49, the Court should agree that defendants are entitled to summary judgment. In response to plaintiffs' Interrogatory No. 16, defendants indicated that in cases of theft or loss of personal hygiene items, Assistant Resident Unit Supervisors are provided care packages of hygiene products to distribute. *See* Def.s' Br., Ex. 1, at 6. Plaintiffs have presented no evidence to rebut this assertion. Thus, the evidence shows that the defendant supervisory officials in fact promulgated a policy of replacing lost and stolen hygiene products, and were therefore not deliberately indifferent. The defendant supervisory officials cannot be held vicariously liable for any failures on the part of the Assistant Resident Unit Supervisors to properly distribute the care packages.

**\*24** However, the Court should conclude that defendants' are not entitled to summary judgment with respect to the allegation in ¶ 48 that defendants instituted a policy of denying indigent status for the purchase of hygiene products to inmates terminated from school or work. Such a policy, if it in fact exists, would be unconstitutional. *See Flanory v. Bonn,* 604 F.3d 249, 255 (6th Cir.2010) ("A prisoner whose inability to purchase hygiene items results from his rejection of educational status satisfies the objective and subjective requirements of an Eighth Amendment violation when he alleges a complete deprivation and shows that the deprivation resulted from a deliberate indifference to hygiene needs ."). Plaintiff Evans testified that such a policy, either formal or informal, in fact existed, *see* Pl.s' Br., Ex. 11, at 58, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

defendants have presented no evidence to the contrary. Accordingly, the Court should conclude that defendants are entitled to summary judgment with respect to the hygiene claim asserted in ¶ 49, but are not entitled to summary judgment with respect to the hygiene claim asserted in ¶ 48.

### e. Water Contamination (Claim I(B)(4))

Defendants next contend that they are entitled to summary judgment with respect to plaintiffs' water contamination claims. The Court should agree.

The evidence in the record fails to raise a genuine issue of material fact with respect to whether the drinking water is, in fact, unsafe to drink, or with respect to whether the defendants were deliberately indifferent to plaintiffs' health and safety. A 2005 Water Quality Report for St. Louis prepared by the United States Environmental Protection Agency (EPA) indicated that levels of arsenic, barium, fluoride, selenium, lead, and copper were all well below the EPA's Maximum Containment Level for safe drinking water. *See* Def.s' Br., Ex. B, at 14. Although p-CBSA is unregulated and therefore does not have a Maximum Containment Level, testing indicated the presence of p-CBSA in the 21–180 parts per billion (ppb) range. *See id.* In a March 30, 2006, e-mail to prison officials, St. Louis City Manager Robert McConkie informed the MDOC that the EPA provided information to the city about toxicology studies indicating that p-CBSA is not a carcinogen, was not retained in the body because it is water soluble, and was not harmful when consumed at levels below 25,000 parts per billion (ppb). Testing of the city's wells indicated p-CBSA levels of 21–180 ppb. *See* Def.'s Br., Ex. 2, at 8. The e-mail noted that the Michigan Department of Environmental Quality (MDEQ) suggested a lower threshold than the EPA, 7,300 ppb, but that the p-CBSA levels in the city's wells were still significantly below this threshold. *See id.* at 9. A 2007 Water Quality Report for St. Louis contains findings similar to the 2005 Report, with p-CBSA levels having decreased to 0–190 ppb in the wells tested. *See id.* at 16. The 2007 Report also indicates in a footnote that "USEPA toxicology studies have shown that p-CBSA is not teratogenic or carcinogenic in concentrations lower than 25,000 ppb." *Id.* The EPA's Five–Year Review Report prepared in September 2007, reflects similar findings. *See* Pl.s' Br., Ex. 5, at 21.

**\*25** Plaintiffs have presented no evidence to rebut these water quality reports. They assert only that the long term

effects of arsenic and p-CBSA are not fully known, and thus any level of contamination is unacceptable. Even were this so, however, plaintiffs cannot show that defendants were deliberately indifferent under the subjective prong of the Eighth Amendment inquiry. There is no evidence that defendants have acted in reckless disregard for the health and safety of the inmates. On the contrary, defendants have reasonably relied on the information given them concerning the level of contamination of the city's wells and the non-harmful effects of those levels by the state and federal agencies possessing expertise in this area. Plaintiffs simply cannot show that such reliance amounts to deliberate indifference. As the Seventh Circuit has aptly explained:

Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than certain and immediate. But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not. Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

*Carroll v. DeTella,* 255 F.3d 470, 472–73 (7th Cir.2001) (citations omitted); *see also, Wright v. New York State Dep't of Correctional Servs.,* No. 06 Civ. 03400, 2008 WL 505660, at *12 (S.D.N.Y. Oct. 10, 2008) (reliance on statements from state health official regarding level of water contamination "was not even negligence, let alone deliberate indifference to contamination."), *magistrate judge's report adopted,* 2008 WL 5084193 (S.D.N.Y. Nov.24, 2008), *aff'd,* 372 Fed. Appx. 175 (2d Cir.2010); *Brown v. Williams,* 399 F.Supp.2d 558, 566–67 (D.Del.2005) (footnote and citations omitted) ("Even though

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

State defendants knew of the inmates' concern about the water conditions, there is nothing to suggest that State defendants knew that the water posed serious health risks. To the contrary, maintenance at HRYCI, the City of Wilmington, and Delaware Health and Social Services all informed State defendants that the water was not contaminated. In light of these findings, and absence of evidence indicating otherwise, it cannot be said that State defendants had the requisite awareness for a finding of deliberate indifference."). Accordingly, the Court should conclude that defendants are entitled to summary judgment on plaintiffs' water contamination claims.

*f. Fire Safety (Claim I(C)(1))*

**\*26** Finally, defendants seek summary judgment with respect to plaintiff's fire safety claim. In this claim, plaintiffs allege:

53. None of the buildings at the MMC have automatic fire suppression systems, in violation of state and Federal law.

54. All of the windows are now being blocked by bunk beds, which restrict the emergency exits and/or emergency entrances for rescue personnel. This violates state building codes and can be a fire hazard.

55. Many of the windows in the unit sleeping areas are not up to state and Federal codes. State of Michigan building codes require the use of "Egress Windows", that are at least 4 ft. in width so that rescue personnel can enter in an emergency. This is a level one prison, the last stop before returning home.

Amended Comp., ¶¶ 53–55. The Court should conclude that defendants are entitled to summary judgment with respect to these claims.

"The Eighth Amendment requires that prison officials provide adequate fire safety to inmates." *Johnson v. Texas Bd. of Criminal Justice,* 281 Fed. Appx. 319, 321–22 (5th Cir.2008). However, "[w]hile fire and electrical codes can be helpful in determining whether a lack of fire safety can constitute a violation of the Eighth Amendment, they are not determinative, and the Eighth Amendment does not require that prisons meet fire and electrical codes." *Id.* at 322. "Unless objective assessment of prison conditions compels the conclusion that inmates are being subjected to unreasonable

safety risks, the federal courts must avoid becoming enmeshed in the minutiae of prison operations, and should decline to second-guess prison administrators in the operation of correctional facilities." *Coniglio v. Thomas,* 657 F.Supp. 409, 414 (S.D.N.Y.1987) (citing *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Here, plaintiffs have failed to present any evidence that fire safety measures at the prisons are inadequate. Although they allege that some windows may be blocked and that the prison lacks an automatic sprinkler system, they present no evidence regarding these matters, nor do they "address numerous factors affecting fire safety at the prison. [They] fail[ ] to [provide any evidence] that the prison lacks a comprehensive fire safety plan or address other factors such as fire extinguishers; smoke detectors in the cell corridors, stairwells and elevator landings; the fire alarm system, evacuation plans, and fire drills; locking devices on cell doors; the prison's combustible load; fire walls; or smoke containment capabilities in the ventilation systems," all factors relevant to whether defendants are deliberately indifferent to the risk of harm to prisoners from fire. *Cable v. Wall,* No. 09–439, 2010 WL 1486494, at \*5 (D.R.I. Mar.18, 2010), *magistrate judge's report adopted,* 2010 WL 1531374 (D.R.I. Apr.13, 2010).[FN11] Defendants have presented evidence that each housing unit has four evacuation doors, smoke detectors in or just outside of each room or cubicle, and multiple fire alarms and fire extinguishers. *See* Def.s' Br., Ex. C, at 16–23. The prisons also have detailed procedures for conducting fire evacuation drills. *See id.* at 12–15. Plaintiffs have presented no evidence to suggest that these fire safety measures are inadequate, much less that they exhibit deliberate indifference to the safety of the inmates.

> FN11. Plaintiffs' allegations that fire safety is inadequate because some windows may be blocked by bunk beds and because the windows are not properly sized egress windows border on absurd. The windows of a *prison* are not supposed to allow a means of ingress or egress. Plaintiffs do not allege or provide any evidence that the designated emergency exit doors are blocked.

**\*27** Moreover, plaintiffs have failed to raise a genuine issue of material fact regarding defendants' personal involvement. The MDOC's regulations make clear that the Physical Plant Division is responsible for developing and implementing fire safety protocols, evaluating fire safety

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

matters, and ensuring compliance with state fire codes. *See* Def.'s Br., Ex. C, at 2–11, MDOC Policy Directive 04.03.120. Thus, plaintiffs cannot show that defendants were personally involved in creating the allegedly inadequate fire safety conditions. For these reasons, the Court should grant defendants' motion for summary judgment with respect to these claims.

### 3. *Qualified Immunity*

Defendants also contend that they are entitled to summary judgment on the basis of qualified immunity. As a general matter, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The purpose behind qualified immunity is to protect public officials "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806. In determining whether an official is entitled to qualified immunity, a court asks "whether the violation involved a clearly established rights of which a reasonable official would have known" such that the official's conduct "was objectively unreasonable in light of the clearly established constitutional right." *Feathers v. Ahey,* 319 F.3d 843, 848 (6th Cir.2003); *see also, Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996).

If the Court accepts my above recommendations, only plaintiffs' medical care claims and the denial of hygiene claim asserted in ¶ 48 of the Amended complaint will survive dismissal or summary judgment on the merits. With respect to those claims which are dismissed or for which summary judgment is granted, the conclusion that the claims fail on the merits makes it unnecessary to consider defendants' alternative argument that they are entitled to qualified immunity. *See Taylor Acquisitions, L.L.C. v. City of Taylor,* 313 Fed. Appx. 826, 838 n. 10 (6th Cir.2009). With respect to the claims which survive, defendants do not contest that the law was not clearly established; rather, they argue only that they are entitled to qualified immunity because the underlying claims are without merit. Because defendants assert that they are entitled to qualified immunity "only on the basis that plaintiff has failed to state federal constitutional claim" and "they do not allege that the rights alleged to have been violated were not clearly

established[,] ... the Court need not separately address defendants['] qualified immunity argument." *Otrusina v. Crysler,* No. 2:09–CV–12828, 2010 WL 3702647, at *9 (E.D.Mich.Aug.29, 2010) (Komives, M.J.), *magistrate judge's report adopted,* 2010 WL 3702646 (E.D.Mich.Sept.16, 2010) (Cohn, J.).

### 4. *Injunctive Relief*

**\*28** Finally, defendants argue that plaintiffs' claims for injunctive relief are moot because none of the remaining plaintiffs is still incarcerated in the St. Louis prisons. The Court should decline to dismiss plaintiffs' requests for injunctive relief at this time. It is well established that "[a] prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility." *Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir.2002); *see also, Incumaa v. Ozmint,* 507 F.3d 281, 286–87 (4th Cir.2007) (citing cases from Second, Third, and Eighth Circuits); *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996). Nevertheless, plaintiffs' Amended Complaint raises class allegations, and the Court has yet to consider whether a class action is appropriate in this case now that plaintiffs are represented by counsel. Should the Court ultimately determine that a class action including current residents of the prisons is appropriate, plaintiffs' request for injunctive relief will not be moot. If no class is certified, plaintiffs' request for injunctive relief can be dismissed as moot at that time.

### E. *Conclusion*

In view of the foregoing, the Court should: (1) grant defendants' motion to dismiss the unrepresented plaintiffs (docket # 226); (2) grant in part and deny in part defendants' motion for partial judgment on the pleadings (docket # 230); and (3) grant in part and deny in part defendants' motion for partial summary judgment (docket # 231). Specifically, the Court should:

(1) dismiss for failure to prosecute the claims of plaintiffs Rouse, Fritts, Pellin, Gates, George, Ashley, McMurray, and DeForest pursuant to Rule 41(b);

(2) dismiss plaintiffs' claims alleging denial of bathroom use (Claim I(A)(3), ¶¶ 32–33), disease outbreaks (Claim I(A)(4), ¶¶ 34–39), exposure in medline (Claim I(A)(5), ¶ 40), cold cubicles (¶ 41 of Claim I(B)(1)), denial of access to courts (Claim II, ¶¶ 59–66), and removal of property (Claim III, ¶¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)

(Cite as: 2011 WL 918327 (E.D.Mich.))

67–73);

(3) deny defendants' motion for judgment on the pleadings with respect to plaintiffs' claims alleging denial of medical care (Claim I(A)(1), ¶¶ 27–29), denial of hygiene (Claim I(B)(3), ¶¶ 48–49), and contaminated drinking water (Claim I(B)(4), ¶¶ 50–52);

(4) grant defendants' motion for summary judgment with respect to plaintiffs' claims alleging dangerous noise levels (Claim I(A)(2), ¶¶ 30–31), poor ventilation (¶¶ 42–44 of Claim I(B)(1)), crammed living space and overcrowding (Claims I(B)(2) and I(C)(2), ¶¶ 45–47, 56), denial of hygiene by failure to replace lost or stolen hygiene products (¶ 49 of Claim I(B)(3)), contaminated drinking water (Claim I(B)(4), ¶¶ 50–52), and lack of fire suppression system (Claim I(C)(1), ¶¶ 53–55); and

(5) deny defendants' motion for summary judgment with respect to plaintiffs' claim alleging denial of hygiene products by virtue of a prison policy forbidding indigent status to prisoners who have their work or schooling terminated (¶ 48 of (Claim I(B)(3)) and with respect to plaintiffs' claims for injunctive relief.

**\*29** If the Court accepts this recommendation, the claims remaining in the case will be plaintiffs' denial of medical care claims asserted in ¶¶ 27–29 of the Amended Complaint and the denial of hygiene claim asserted in ¶ 48.

III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Howard v. Secretary of Health & Human Servs., 932 F.2d 505 (6th Cir.1991); United States v. Walters, 638 F.2d 947 (6th Cir.1981).* Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs., 931 F.2d 390, 401 (6th Cir.1991); Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370,*

*1373 (6th Cir.1987).* Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

E.D.Mich.,2011.

Rouse v. Caruso
Not Reported in F.Supp.2d, 2011 WL 918327 (E.D.Mich.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ronald DAVIDSON, Plaintiff,
v.
Clement B. CAPUANO, David R. Harris and Joseph P.
Keenan, Defendants.
No. 78 CIV. 5724 (RLC).

June 16, 1988.
OPINION AND ORDER

NINA GERSHON, United States Magistrate:

*1 In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff Ronald Davidson (formerly Ronald Finkelstein) alleges that the defendants deprived him of his constitutional right to procedural due process of law in a prison disciplinary proceeding. Specifically, he claims that the hearing officer was not impartial, and that he was not permitted to call witnesses, make an oral statement, or present documentary evidence in his defense. In addition, the requisite written statement detailing the evidence relied on by the hearing officer in determining his guilt is alleged to be inadequate. Davidson seeks damages for the loss of package room and prison account privileges from October 1, 1978 to January 31, 1979 and for the loss of a prison job and of a kosher diet which resulted from his transfer to another institution.

Plaintiff filed his *pro se* complaint in this matter on November 30, 1978. In February of 1983, the case was referred to me for all proceedings and entry of judgment pursuant to 28 U.S.C. § 636(c) and in November of that year I granted plaintiff's request for appointment of counsel. Plaintiff's second amended complaint was filed on October 29, 1984 and he subsequently moved for partial summary judgment on the ground that a prior judgment in his favor in a New York State Article 78 proceeding precluded the defendants from relitigating certain issues of liability. The defendants also moved for summary judgment on numerous grounds, including res judicata on the basis that plaintiff failed to assert the

Section 1983 damages claim in the prior state action. On January 31, 1985 I granted summary judgment for defendants, finding that, under New York law, res judicata principles precluded this federal action. The Court of Appeals for the Second Circuit reversed this ruling in *Davidson v. Capuano,* 792 F.2d 275 (2nd Cir.1986) and the case was remanded for further proceedings.

Now before me are the parties' motions for summary judgment on the grounds not previously addressed. The parties were given the opportunity to brief the remaining legal issues in supplemental papers. Both parties also have now submitted statements pursuant to Local Civil Rule 3(g). The plaintiff moves for partial summary judgment on certain liability issues under the principle of collateral estoppel. The defendants move for dismissal of the complaint on several grounds: res judicata arising from a second Section 1983 action previously adjudicated in this Court; absolute and qualified immunity; lack of personal involvement; and absence of merit to the procedural due process claims.

*FACTUAL BACKGROUND*

None of the material facts raised by the parties' motions are in dispute. The disciplinary proceeding at issue in this lawsuit began on September 8, 1978 when a "Misbehavior Report" charging Davidson with fraud in violation of prison regulations was filed by Institution Steward Sunny Schriver and Correctional Officer K. Keane. Briefly summarized, the report alleges that on or about May 18, 1978 plaintiff placed an order for merchandise with the J.C. Penny department store under the name Reverend Ronald Finkelstein and that in July he notified the store and the institution that he, in fact, did not order any merchandise and that someone else had placed the order and charged it to his account. The report discounted this denial by Davidson by stating that he had exhibited knowledge of the order that only the person who placed it could possess and that he had a prior history of improperly using the title "Reverend" in making purchases. The report also noted that plaintiff had solicited and received a refund from the store which was credited to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

his inmate account on August 4, 1978. Davidson was accused of seeking additional refunds by submitting a claim to the prison and by writing a letter to the store on August 21, 1978 claiming that he had not received the reimbursement.

Davidson was served with a copy of the "Misbehavior Report" on September 8, 1978 and was brought, on September 11, 1978, before the prison Adjustment Committee. The Committee determined that the charges required a Superintendent's Proceeding. On September 13, 1978, defendant Harris, then the Superintendent of the Green Haven facility, appointed defendant Deputy Superintendent Capuano to conduct the hearing. Three days later, a "Formal Charge" was served on Davidson which reiterated the substance of the fraud accusations set out in the Misbehavior Report.

**\*2** Pursuant to New York State prison regulations governing prison disciplinary proceedings (See 7 N.Y.C.P.R. § 253, *et seq.*), plaintiff was permitted to select a member of the prison staff to assist him in preparing a defense to the charge. The regulations required the assistant to investigate any reasonable factual claim the inmate could make in his defense and to submit a written report to the hearing officer, including any documentary evidence and the statements of witnesses that the inmate requested be interviewed. Plaintiff selected Correctional Counselor Hutchinson to assist him. Hutchinson submitted a preliminary report to defendant Deputy Superintendent Keenan on September 21, 1978. The report noted requests by Davidson that certain witnesses be interviewed and that samples of his signature be compared with the merchandise order form at issue. Under the heading "Inmate's Explanation or Statement About Charges", Hutchinson referred Keenan to a two page document written by Davidson and entitled "Statement of Events Leading to Administrative Charges Against Me and the Superintendent's Proceeding".

The Superintendent's Proceeding was convened on September 24, 1978 before defendant Keenan. He read the charges to plaintiff and asked him, "What do you say?". Plaintiff responded, "Not guilty", and asked to make a statement. Keenan told him, "Not at this time", and adjourned the hearing. Keenan then instructed Hutchinson to take the statements of the three witnesses that Davidson

had designated. Hutchinson took statements from two of the witnesses, an inmate named Conroy and a guard named Boulanger who worked in the package room. The third witness, Officer Gilroy, who also worked in the package room, was not interviewed. Hutchinson stated in his September 28, 1978 report that Gilroy's statement was unnecessary because the only information Gilroy could provide, regarding packages received by Davidson, would come from the same records that Boulanger examined and reported on.

On September 29, 1978, Capuano assumed his role as hearing officer for the Superintendent's Proceeding. Prior to the actual hearing he interviewed Schriver and Keane, the authors of the initial Misbehavior Report. According to an affidavit submitted by Capuano on the motion for summary judgment, he also reviewed the hearing file, which included the misbehavior report, the statements of the witnesses that Davidson had designated and plaintiff's two page written statement concerning the charges. (Capuano Afft. ¶ 6(h)). The Superintendent's Proceeding was reopened on October 7, 1978.[FN1] When the hearing began, Capuano read the accusations from the Formal Charge and then stated, "On the first hearing you pleaded not guilty. I have since interviewed the individuals initiating the misbehavior report—I subsequently affirm the charge of fraud." Capuano then announced Davidson's punishment: two years loss of privileges in the use of his inmate account and the package room, along with restitution for the phone charges incurred by the prison in response to the claim for reimbursement.

Davidson responded by asking to make a statement. Capuano assented and Davidson began by protesting that he had not been given the "opportunity to present [his] case" or to explain "his side of the story". Capuano then made some reference to the written statement that plaintiff had given Hutchinson.[FN2] Davidson stated that he wanted to supplement the statement in order to "make it clear". He also asked to submit certain documents as evidence and to call witnesses to testify in his defense.

**\*3** In the ensuing discussion, Davidson offered to submit various pieces of correspondence and orders for merchandise that he authored under the title "Reverend", none of which were placed through the institution or out

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

of his inmate account. By these documents Davidson sought to prove that he had never used his clerical identity in the manner charged and to show that he had not placed the order in question. Plaintiff also denied that it was his signature on the order and argued that the circumstances pointed to a fraud committed by someone else to "harass" or to "spite" him. Regarding the accusation that he had sought multiple reimbursements, Davidson stated that, once he was informed that a refund was deposited in his account, he stopped all activity to collect the funds.

After Davidson's presentation Capuano stated that he still found plaintiff guilty. Davidson then argued that his prior disciplinary record did not warrant the penalty imposed. Capuano in response "held in abeyance" 18 months of the two year suspension of privileges. He did, however, state that he was now going to recommend to the "Program Committee" that plaintiff be transferred to another institution.

Following the hearing, Davidson wrote a letter to defendant Superintendent Harris protesting the outcome of the hearing and in particular claiming that Capuano had violated his due process rights. He stated that he had not been allowed to make a statement in his own defense and that Capuano had not permitted him to call witnesses or present documentary evidence.

On October 10, 1978, Capuano signed the "Superintendent's Proceeding Report." Under the heading "Evidence Relied Upon", he wrote: "Misbehavior Report submitted by S. Schriver, Steward". This form, along with the rest of the record of the proceeding was then submitted to Superintendent Harris for review.

By his affidavit submitted on this motion Harris explained the review process and its purpose (Harris Afft. ¶ 2):

[I]t was my practice as Superintendent of GHCF to review each of the proceedings to check for compliance with the procedural due process requirements set forth in Chapter V of 7 NYCRR ...

Such a review process would consist of my scanning the entire Superintendent's Proceeding file ... to ascertain,

among other things ... whether the facts of an incident had been adequately developed and the inmate given an opportunity to present a defense;

Harris did not, however, conduct the review of Davidson's hearing.[FN3] At that time, Harris was absent from the facility and Deputy Superintendent Keenan was appointed Acting Superintendent. In this role, Keenan handled routine matters, including the review of disciplinary matters. On October 10, 1978, Keenan reviewed Davidson's case and concluded that all applicable procedural due process requirements had been met.

Davidson wrote a second letter to Superintendent Harris on October 13, 1978. He referred to his initial correspondence and repeated his claim that he had been deprived of his due process rights. In particular, he quoted from provisions of the state regulations granting him the right to an impartial hearing officer and the opportunity to make an oral statement at the hearing. Defendant Keenan received both of plaintiff's letters in his capacity as Acting Superintendent. After speaking with Capuano about the complaints, Keenan rejected Davidson's arguments concerning the validity of the hearing and sent him a memorandum to that effect.

*4 In November of 1978, plaintiff filed two lawsuits, this Section 1983 action in federal court and an Article 78 proceeding in the New York Supreme Court, Dutchess County. In the latter case, brought against Superintendent Harris and Richard Hongisto, Commissioner of Correctional Services, plaintiff sought an order vacating the Superintendent's proceeding and restoring his lost privileges. As described more fully at p. 17, *infra,* the state court, by order dated January 31, 1979, granted the requested relief.

Plaintiff was transferred from Green Haven to another prison facility in January of 1979. The following March, he filed a second Section 1983 lawsuit in this court alleging that the transfer violated his First Amendment right to freely practice his religion. (79 Civ. 1523 (CES)). This case was tried before a jury which rendered a verdict in favor of the defendants.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

### DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* ––– U.S. –––, 107 S.Ct. 1570 (1987).

On a motion for summary judgment, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–248 (1986) (emphasis in original). Material facts are determined by the substantive law underlying the action; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The moving party bears the burden of demonstrating the absence of any material and genuine issue of fact in dispute. *Adickes v. Kress,* 398 U.S. 144, 157 (1970). Although this burden is a difficult one to meet, motions for summary judgment, when properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. United States Fire, supra,* 804 F.2d at 12. The Supreme Court has stated that a motion for summary judgment is properly regarded as:

an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action'.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact ..., but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

**\*5** *Celotex v. Catrett,* 477 U.S. 317, 327 (1986).

### I. *DEFENDANTS' MOTION: RES JUDICATA*

The defendants' first argument for dismissal of the complaint is that under the principle of res judicata, another Section 1983 lawsuit which was brought against the same three defendants, Harris, Keenan and Capuano, and decided against plaintiff bars him from pursuing this action. Res judicata provides that a valid judgment on the merits is a bar to a subsequent action between the same parties upon the same claim. "Such a judgment precludes subsequent litigation both of issues actually decided in determining the claim asserted in the first action and of issues that could have been raised in the adjudication of that claim." *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir.1983).

It is undisputed that in the previous lawsuit, there was a final judgment on the merits between the same parties. The sole issue remaining is whether the claim in the present case is the same as that raised in the previous litigation.

Although the instant case was filed first, plaintiff's other lawsuit, *Finkelstein v. Harris, Keenan, Butterfield, McDermott and Capuano,* 79 Civ. 1523 (CES), went to trial in August of 1983. In that action plaintiff sought to recover damages resulting from violation of his First Amendment rights by prison officials. He alleged that the defendants had transferred him to another maximum security facility with knowledge that he would be deprived of the kosher diet that he received at the Green Haven prison. A jury decided in favor of the defendants on this freedom of religion claim. In the pending suit, plaintiff is seeking damages for the violation of his due process rights in the prison disciplinary proceeding which eventually led to the transfer at issue in the other case. Plaintiff is alleging some of the same damages in both suits, that is the loss of prison employment and his kosher diet from the transfer.

The defendants argue that the overlap in the events underlying the two suits and the fact that the damages sought are partially the same is dispositive of the identity of claims issue. These similarities, however, do not resolve the issue. "[T]he fact that several operative facts may be common to successive actions between the same

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

parties does not mean that a judgment in the first will always preclude litigation in the second." *Tucker v. Arthur Anderson & Co.,* 646 F.2d 721, 727 (2d Cir.1981).

The test for determining if the claims asserted are the same for purposes of res judicata involves the application of several criteria: whether the same evidence is needed to maintain both causes of action; whether the essential facts and issues are similarly presented in both cases; and whether a different judgment in the second action would impair or destroy the rights or interests established by the first judgment. *See Herenden v. Champion Intern. Corp.,* 525 F.2d 130, 133–134 (2d Cir.1975); *N.L.R.B. v. United Technologies, supra,* 706 F.2d at 1260.

First of all, the issues involved in the two suits are markedly different. In this case, the defendants' conduct with regard to Davidson's rights at the Superintendent's Proceeding is at the heart of the matter; in order to prevail, plaintiff must prove that the defendants violated his due process rights, and that these violations proximately caused his damages, including the transfer to another prison, and the subsequent loss of a job and a special diet. In the first case, by contrast, the primary issue was the defendants' knowledge of plaintiff's religious beliefs and their failure to accommodate his practices and diet in the transfer to another facility. Even though the transfer to another prison is an event which is involved in both actions, there is no question that the "wrongful acts" alleged against the defendants are different. *See Herenden, supra,* 525 F.2d at 134. It necessarily follows that no judgment obtained in the present case will impair or destroy any of the rights established by the prior judgment. The finding that the defendants were not liable under allegations that they deprived plaintiff of his freedom to practice his religion will not be affected by any determination as to whether the disciplinary hearing was valid under due process standards. Accordingly, I find that the claims asserted by plaintiff in the two lawsuits are not the same and that res judicata does not bar plaintiff from pursuing this action. Defendants' motion for summary judgment on this basis is denied.

II. *DEFENDANT HARRIS'S MOTION: LACK OF PERSONAL INVOLVEMENT*

*\*6* Defendant David Harris, formerly the Superintendent of the Green Haven facility, has moved for dismissal of the complaint against him on the ground that he was not actually involved in or responsible for the alleged due process violations.[FN4] 42 U.S.C. § 1983 imposes personal liability on the individual who "subjects or causes to be subjected" any person to the deprivation of a right guaranteed by the federal Constitution or statutes. Accordingly, liability cannot be imposed simply on the basis of respondeat superior, *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978), and personal involvement of the defendant must be shown. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). In the prison setting, a Section 1983 damage claim against a prison official "requires a showing of more than the linkage in the prison chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

The requisite showing of personal involvement in a case such as this may be made in several ways. As stated in *Williams v. Smith,* 781 F.2d 319, 321 (2d Cir.1986) (citations omitted):

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Plaintiff argues that Harris may be found "personally responsible" for his participation in the disciplinary proceeding process. According to plaintiff, Harris's selection of Capuano as hearing officer and his delegation of the review process to Keenan evinces either a policy of allowing constitutional deprivations to occur or gross negligence in the managing of his subordinates. The single incident alleged in this lawsuit, however, is insufficient proof of such claims. "[A]bsent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy [may] not ordinarily be inferred from a single incident of illegality." *Sarus v. Rotundo,* 831 F.2d 397, 402 (2d Cir.1987) (quoting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

*Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016 (1980)). Cf. *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1984), where the court held prison officials liable for their gross negligence and deliberate indifference upon a showing that that no prisoner had ever been allowed to call witnesses at a certain type of disciplinary proceeding, in clear violation of the Constitution.

**\*7** On the undisputed facts relating to Harris's role in the alleged due process violations, plaintiff, has, however, shown personal involvement in one area. Plaintiff is claiming that Capuano, by virtue of his supervisory relationship to the personnel who brought the charges, was biased and therefore Harris's appointment of Capuano as hearing officer deprived him of a fair hearing. If this claim against Capuano were meritorious, Harris's act of appointing Capuano would constitute direct participation by Harris in the deprivation of Davidson's due process rights.

I have determined, however, that no constitutional violation occurred when Capuano served as hearing officer (see pp. 19–20, *infra* ). Harris was not personally involved, therefore, in the claims alleged by plaintiff and he is entitled to summary judgment and dismissal of the complaint against him.

### III. *DEFENDANTS KEENAN AND CAPUANO'S MOTION: ABSOLUTE IMMUNITY*

Defendants Keenan and Capuano move for summary judgment on the ground that they are entitled to the common law defense of absolute immunity from liability in this civil rights action. They argue that in their capacity as hearing officers they serve a "quasi-judicial" function and therefore cannot be held liable for any errors committed in the course of disciplinary proceedings. This argument is without merit. The Supreme Court has expressly held that prison officials who preside over disciplinary proceedings are not entitled to claim absolute immunity. *Cleavinger v. Saxner,* 474 U.S. 193 (1986).

### IV. *PLAINTIFF'S MOTION: COLLATERAL ESTOPPEL*

Turning to the merits, plaintiff moves for partial summary judgment on the ground that the defendants are collaterally estopped from relitigating some of the liability issues that were determined against them in prior litigation. The prior litigation which plaintiff invokes is the Article 78 proceeding which he commenced in November, 1978 in the Supreme Court, Dutchess County. In that suit, Davidson alleged that he had been deprived of his due process rights under the federal Constitution and state law in the October 7, 1978 disciplinary hearing which is at issue in this lawsuit. The defendants in the proceeding were Superintendent Harris and Richard Hongisto, the Commissioner of the New York state prison system, and plaintiff sought only equitable relief: an order vacating the decision rendered at the disciplinary hearing and the restoration of his prison privileges.

Plaintiff seeks to preclude the defendants from relitigating the specific findings made by the Supreme Court on January 31, 1979, following an evidentiary hearing, namely, that plaintiff's constitutional due process rights were violated at the disciplinary hearing by Capuano's failure to consider documentary evidence and to allow Davidson to make a statement.

**\*8** The Second Circuit Court of Appeals has recently held, under very similar factual circumstances, that the plaintiff in a federal Section 1983 action is not entitled to use an Article 78 state court judgment for purposes of collateral estoppel. *Gutierrez v. Coughlin,* 841 F.2d 484 (2d Cir.1988). The Court cited its decision in the instant case, *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986), for the proposition that damages for civil rights violations may not be recovered in an Article 78 proceeding. Because of this, the Court found, the individuals named as defendants in the state action could not be held personally liable and therefore "they did not have the same incentive to litigate that state court action as they did the federal § 1983 action." *Id.* at 486 (citing to *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330–31 (1979)). The Court of Appeals also noted that, in the Article 78 proceeding, the defenses of absolute or qualified immunity, or lack of personal involvement, had not been available to the defendants. *Id.*

Plaintiff's motion for partial summary judgment on the basis of the doctrine of collateral estoppel is therefore denied.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

V. *DEFENDANTS' MOTION: NO DUE PROCESS VIOLATIONS OCCURRED*

The defendants have moved for summary judgment on the ground that plaintiff's allegations of due process violations are meritless. A discussion of a prisoner's right to procedural due process must begin with the case of Wolff v. McDonnell, 418 U.S. 539, 563–572 (1974). In *Wolff*, the Supreme Court held that in disciplinary proceedings inmates are entitled to minimal due process rights. Under the Fourteenth Amendment, the inmate must receive advance written notice of the charges and be allowed to make a statement, call witnesses and present documentary evidence in his defense when doing so will not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 566. In addition, after the hearing is completed, the inmate must be given a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken. Under the guidance of *Wolff*, the lower federal courts have further delineated a prisoner's procedural entitlements, such as the right to a fair and impartial factfinder. *See* McCann v. Coughlin, 698 F.2d 112, 122 (2d Cir.1983).

A. *Appointment of Capuano as Hearing Officer*

Plaintiff claims that it was improper for Capuano to serve as hearing officer because of his supervisory relationship to the officers who originally filed the charges. It has been established in this Circuit that, in order to ensure a fair hearing, an administrator who was a witness to an act charged against an inmate, or who has investigated the underlying charges, may not serve as hearing officer. McCann v. Coughlin, supra, 698 F.2d at 122 n. 10. It is also true that "in some circumstances the nature of one's position or the relationship between that position and the outcome of the adjudication disqualifies that person from serving with the impartiality mandated by the Due Process Clause...." Powell v. Ward, 542 F.2d 101, 103 (2d Cir.1979).

When plaintiff was brought up on charges, Capuano served as the Deputy Superintendent for Administration and he was responsible for many areas of prison business, including Inmate Accounts and Inmate Claims. Acting in this role, Capuano served as the direct supervisor to Schriver and Keane, the personnel who authored the Misconduct Report filed against plaintiff. However, it is

undisputed that Capuano was not personally involved in the investigation leading to the filing of formal charges and that he was not knowledgeable of the details or the outcome of the investigation prior to being appointed to hear the matter.

**\*9** Under these facts, it was proper for Capuano to serve as the hearing officer. The mere fact that Capuano heard a case which arose out of his area of administrative supervision does not offend due process. In *Powell v. Ward, supra,* the Court of Appeals modified a District Court injunction to remove a restriction against prison administrators responsible for institutional security from presiding over Superintendent's Proceedings at which an inmate was charged with acts threatening prison security. The rationale behind plaintiff's claim that Capuano could not conduct a hearing to determine the veracity of charges brought by subordinate employees within his sphere of responsibility was specifically rejected in the *Powell* case. The defendants are entitled to summary judgment on this claim.

B. *The Naming of Witnesses Who Capuano Interviewed*

Davidson's second alleged due process deprivation is that Capuano failed at the October 7, 1978 hearing to identify the persons who initiated the Misbehavior Report; while Capuano stated at the hearing that he had interviewed the authors of the report he did not tell plaintiff their names. It is unnecessary to determine if this error, in and of itself, would constitute a due process violation. Despite Capuano's omission, the names of the persons who filed the Report, Schriver and Keane, were plainly known to plaintiff at the time of the hearing. It is undisputed that Davidson was served with a copy of the report on September 8, 1978 and that the names of the authors are clearly noted on the report. Moreover, prior to the Superintendent's hearing, plaintiff had mailed a *pro se* complaint to this court (to begin this litigation) which named Schriver and Keane as defendants for their role in instigating charges against him.

C. *Davidson's Presentation of a Defense*

Plaintiff next charges that he was not permitted to present a defense to the charges at the hearing. First, Davidson alleges that Capuano did not allow him to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

submit documentary evidence in his favor. From the transcript of the hearing, it appears that plaintiff possessed certain documents that he wanted Capuano to consider. These documents were offered to prove that, although Davidson had used the name Reverend Ron Finkelstein to make purchases from retailers, he never utilized the title "Reverend" when placing orders through his prison account:

*Finkelstein:* I have not been given the opportunity to present my case. Now I have evidence here which I wish to present....

**\*10** *Finkelstein:* Now the only time that I have used the name Rev. Finkelstein is when I had orders sent in as paid and you can examine them if you wish. It says here that they have been paid.

*Capuano:* Do you wish to submit them for the record?

*Finkelstein:* If you wish to examine them. I'd like to have them back since I don't have a photostatic of them, but if you'd like to look at them right here you can see they've all been paid for, and not one of them sir would be listed on the inmate account ledger because I've never sent them out through the institution....

*Capuanao:* How did you send these out?

*Finkelstein:* I had my folks ... send them out and pay for them and here's a receipt.... I have never made any orders ... for a substantial amount of money through the institution ..., never $34 or $35 and I've never used the title Rev. Finkelstein.

From this portion of the transcript I conclude that plaintiff was given an opportunity to present his documentary evidence at the hearing. Although the transcript does not indicate what weight Capuano gave the documents, the evidence was non-probative as to the particular incident of which plaintiff was charged and Capuano clearly had the right to disregard or exclude such evidence without offending due process of law. As the Supreme Court in *Wolff v. McDonnell, supra,* 418 U.S. at 566–67, noted:

[T]he inmate ... should be allowed to call witnesses

and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.... It may be that an individual threatened with serious sanctions would be normally entitled to present witnesses and *relevant documentary evidence,* but here we must balance the inmate's interest ... against the needs of the prison,.... prison officials must have the necessary discretion to keep the hearing within reasonable limits.... Although we do not prescribe it, it would be useful for the Committee to state its reasons for refusing to call a witness, whether it be for *irrelevance, lack of necessity*.... There is much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents. (emphasis added)

From the portion of the transcript quoted above, the documents plaintiff offered tended to prove only that plaintiff had in the past used the title "Reverend" to place orders, through his family, for outside merchandise. They did not prove or disprove whether the particular order to J.C. Penny at issue at the hearing was placed by him, or whether he had attempted to obtain duplicate refunds from the retailer and the institution. Capuano's conduct at the hearing with regard to plaintiff's documentary evidence did not violate plaintiff's due process rights and the defendants are entitled to summary judgment on this claim.

Plaintiff also argues that Capuano improperly refused his request to call witnesses to testify at the hearing. It is undisputed that Davidson asked Capuano to call inmate Conroy and Officer Gilroy, from the package room, to testify and that Capuano did not act on the request. Conroy and Gilroy were originally listed by plaintiff as witnesses when he solicited the assistance of Counselor Hutchinson under 7 N.Y.C.R.R. § 253.3(1), prior to the hearing.

**\*11** Hutchinson took the statement of Conroy on September 28, 1978. The statement, which was made part of the hearing record, shows that Conroy's knowledge of the events leading up to the charges was limited to statements that plaintiff made to him. Conroy stated that prior to the filing of the Misconduct Report, Davidson had sought his advice on how to recover money improperly disbursed from an inmate account. At that time, plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

told Conroy that the order was not his and that someone had forged his name.

Plaintiff's express purpose is seeking the testimony of Gilroy was to verify that he had not received any package which corresponded to the order at issue. Although Officer Gilroy's statement was never taken, the desired information be received at a disciplinary hearing. "While there can be no doubt that a prisoner should ordinarily be permitted to call witnesses in his defense, the prisoner's right is obviously not unbridled and must at a minimum be subject to a preliminary showing that the proposed witnesses may have probative testimony to offer." *Pino v. Dalsheim,* 605 F.Supp. 1305, 1315 (S.D.N.Y.1984).

The third aspect of his defense that Davidson claims Capuano denied him at the hearing was an opportunity to make an oral statement. It is undisputed that Capuano began the proceeding by reading the charges and then pronouncing his determination that plaintiff was guilty. When Davidson protested that he be allowed to give his side of the story, however, Capuano allowed him to speak.

A lengthy dialogue then ensued between Davidson and Capuano during which plaintiff denied that it was his signature on the order form in question and offered the documents (discussed above) to show that he only used the name "Reverend" to place orders through family intermediaries. In addition, plaintiff argued that the package may have been directed to another part of the institution because, as evidenced by the statement of officer Boulanger, the package never arrived. As to the accusation that he sought duplicate refunds, plaintiff stated that he received the "pink slip" informing him that the refund check had been deposited in his account a month late and that, once he did learn that the refund came in, he stopped all action to collect from the department store.

Plaintiff also stated that, although he did not know who placed the order, it could be someone with a personal grudge against him, who placed the order out of spite or in order to harass him. In support of this argument, plaintiff noted that the shoes were ordered in sizes 8 and 9, neither of which would fit him. Finally, he related that Hutchinson, the prison employee he chose to help him assemble a defense, told him that a similar fraud had occurred several months before in the institution.

Minimum due process, as set forth by *Wolff v. McDonnell, supra,* requires only that the inmate facing disciplinary charges be given an opportunity to confront the accusations by making a statement in his defense which will be weighed by the factfinder against the evidence presented against him. The transcript reveals that plaintiff was given ample opportunity to present his side of the story and argue against the accusations made against him. Although Capuano erred in assuming that Davidson had presented his defense in a prior written statement and in pronouncing the finding of guilt at the outset of the hearing, the error, which was promptly corrected, does not rise to the level of a due process violation.[FN7]

D. *The Statement of Evidence Relied Upon*

**\*12** The last due process violation alleged by plaintiff is that Capuano's written statement of the evidence he relied upon in determining Davidson's guilt was inadequate. The Supreme Court held in *Wolff v. McDonnell, supra,* 418 U.S. at 564, that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." (citation omitted). Such statements are necessary because (*Id.* at 565):

[T]he actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision ... to transfer an inmate to another institution ..., and are certainly likely to be considered by state parole authorities.... Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary proceeding itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others.

In this instance, Capuano, following the hearing, filled out a form entitled "Superintendent's Proceeding Report". Under the heading of "Evidence Relied Upon", he wrote: "Misbehavior Report submitted by S. Schriver, Steward". In light of the nature of the charges and the quantity and quality of the evidence presented to Capuano before and during the hearing, this statement does not fulfill the requirements of *Wolff, supra,* and plaintiff's right to due process was violated in this regard.

As previously described, Capuano was presented with many sources of information concerning the charges brought against Davidson. The Misbehavior Report was only the first document to set forth the accusations and to initiate the disciplinary proceedings. After Capuano was appointed hearing officer he was provided with additional documents, including two reports by Counselor Hutchinson, and the written statements of plaintiff, inmate Conroy and Officer Boluanger.[FN8] In addition, Capuano personally conducted interviews of Schriver and Keane, the authors of the Misbehavior Report, during which he solicited inculpatory information concerning the charges which went outside the scope of the original report.

Similar, limited statements listing only a source or sources of information relating to charges have been found to be inadequate. As stated by the Court in *Powell v. Ward,* 487 F.Supp. 917, 930 (S.D.N.Y.1980), *modified on other grounds,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832 (1981):

**\*13** ... the forms themselves are inadequately completed ... [T]he statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, one statement lists as evidence relied upon 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young.' This information does not 'protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding.' "

Here too, the "statement" by Capuano consists merely of a reference to a source of information presented to him; even though Capuano was not required to raise and analyze every argument presented by Davidson (*see, Pino v. Dalsheim,* 605 F.Supp. 1305, 1316 (S.D.N.Y.1984)) the Constitution mandates that an explanation of the evidence relied on consist of more than the incorporation of a single report when the charge is refuted and complex or lengthy evidence bearing on the charges is presented to the factfinder.

The case law from other Circuits supports this conclusion. In *Hayes v. Thompson,* 555 F.2d 625, 632–33 (7th Cir.), *cert. denied* 434 U.S. 959 (1977), the Court held that a statement of the evidence relied on, which simply stated that the decision was based upon two reports filed by correctional personnel, did not meet minimum due process requirements:

Rather than pointing out the essential facts upon which the inferences were based, the Committee merely incorporated the violation report and the special investigator's report. This general finding does not ensure that the prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on a misunderstanding of the initial decision.

*See also, King v. Wells,* 760 F.2d 89, 93–94 (6th Cir.1985).

In cases where statements referring only to whole reports submitted to the factfinder have been found to be adequate, it was evident what evidence the factfinder relied on and how the finding of guilt was reached. *See e.g. Brown v. Frey,* 807 F.2d 1407, 1412–14 (8th Cir.1986); *Saenz v. Young,* 811 F.2d 1172, 1174 (7th Cir.1987). In *Brown,* the Court declined to follow the requirement in the Sixth and Seventh Circuits of what it termed a 'technical and detailed' reconstruction of the incident. 807 F.2d at 1413. It upheld a statement which incorporated a "violation conduct report" and a joint memorandum by three correctional officers involved in the incident because an examination of the documents made

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

it "immediately apparent what statements in them were relied upon by the board in reaching its decision." Furthermore, the statements implicating the prisoner were unambiguous and nothing remaining in the documents was contradictory to the decision of guilt in the matter. The Court warned, however, that in certain situations due process would require a disciplinary board to refer to specific statements within the submitted reports, rather than just incorporating the report by reference. "For example, a certain report may be so lengthy ..., or the report may contain contradictory or ambiguous statements, making it difficult to ascertain with certainty what statements in the report the board relied on in reaching its decision." *Id.*

Similarly, the Court in *Saenz, supra,* upheld an evidentiary statement which referred only to a guard's written statement. The guard had witnessed an attempted battery by one inmate on another and had recorded his observations. At the hearing, the report was submitted and the board also considered the inmate's testimony denying involvement in the incident. Under these circumstances, the Court found it "plain the committee relied on the reporting officer's eyewitness account.... Obviously, the committee believed the conduct report and disbelieved the plaintiff. As there is no mystery about its reasoning process, despite the extreme brevity ... that statement is not so deficient as to create error of constitutional magnitude." *Id.* at 1174. The Court distinguished previous holdings in the Circuit which rejected similar statements of reasons, because in those previous cases either the charge, or the evidence before the disciplinary body, was complicated. In those instances, when "the committee fails to explain its findings, the reviewing court will find it difficult and maybe impossible to determine whether the committee on one hand found facts showing that the prisoner really was guilty of the charges, or on the other hand based the finding of guilt on erroneous legal premises." *Id.*

**\*14** In the instant case, neither the charge nor the evidence presented to Capuano for a decision was so simple that the mere incorporation of the misconduct report satisfied due process. Moreover, in contrast to the circumstances in *Brown, supra,* it is not readily apparent which part or parts of the misconduct report Capuano

relied on in determining that Davidson was guilty of the charges.

Plaintiff is entitled to summary judgment on this issue of liability. Although plaintiff's motion does not seek summary judgment on the merits of his due process claims, this Court is empowered to award summary judgment to the non-moving party when there are no disputed issues of material fact and judgment is appropriate as a matter of law. *See Lowenschuss v. Kane, 520 F.2d 255, 261 (2d Cir.1975); Brandon v. Board of Ed. of Guilderland, 487 F.Supp. 1219, 1233 (S.D.N.Y.1980); aff'd, 635 F.2d 971 (2d Cir.1980); cert. denied, 454 U.S. 1123 (1981).*

## VI. *DEFENDANTS' MOTION: QUALIFIED IMMUNITY FROM LIABILITY*

The defendants argue that, even if any of plaintiff's procedural due process rights were violated, they acted in good faith and are thus immune from personal liability for damages.

The affirmative defense of qualified or "good faith" immunity will generally shield administrative officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* As explained in the recent Supreme Court decision in *Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987),* (citations omitted): "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent."

The use of this objective standard, measuring the reasonableness of a person's conduct by reference to clearly established law, permits the resolution of insubstantial claims on summary judgment. As stated in *Harlow,* at pp. 818–19 (footnote omitted):

**\*15** [T]he judge appropriately may determine, not

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at the time was not clearly established, an official could not ..., fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense should ordinarily fail, since a reasonably competent official should know the law governing his conduct.

*See also, McCann v. Coughlin,* 698 F.2d 112, 124 (2d Cir.1983), where the Court stated: "[Prison] officials can be held liable only for actions which were unlawful at the time in issue.... [They], however, may be charged with constructive knowledge of the established law at the time." (citations omitted).

At the time of plaintiff's 1978 disciplinary hearing, it was clearly established under *Wolff v. McDonnell, supra,* that a prisoner had the right to receive a statement of the evidence relied upon to protect him from collateral consequences and to provide a sufficient basis for review of the proceedings. *See McCann v. Coughlin, supra,* 698 F.2d at 124–25. Under *Anderson v. Creighton, supra,* 107 S.Ct. at 3039, it must also be determined whether a reasonable official would understand that the statement of evidence relied on in this case violated that right, that is to say, whether in light of preexisting law, the unlawfulness of the statement was apparent.

I conclude that Capuano and Keenan are not entitled to immunity under this standard. This conclusion follows from the decision in *Powell v. Ward, supra,* 487 F.Supp. at 936, where the Court found the superintendent of a New York State prison facility in contempt and ordered damages and injunctive relief for her failure to comply with the procedural requirements established in *Wolff v. McDonnell,* and set forth in a 1975 Order by the district court in response to earlier litigation. (See *Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975), *modified on appeal,* 542 F.2d 101 (2d Cir.1976)). Specifically, the Court found (among other violations) that, during the time between the issuance of the Order in 1975 and the contempt motion filed in early 1979, the prison administrators had failed to provide adequate statements of the evidence they relied on in ruling on disciplinary matters. As noted earlier (see p. 28, *infra* ) the Court found that statements akin to the one

at issue here were constitutionally inadequate: "The statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, ... 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges and information ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young.'' '

The plaintiffs in *Powell* requested damages resulting from the due process violations and the defendant raised the defense of qualified immunity. In response, the Court held (487 F.Supp. at 936): "The immunity defense is unavailing here, where 'the constitutional right allegedly infringed was clearly established at the time of her challenged conduct', 'she knew or should have known of that right, and [she] knew or should have known that [her] conduct violated the constitutional norm' '' (quoting *Procunier v. Navarette,* 434 U.S. 555, 562 (1978)). *See also Chavis v. Rowe,* 643 F.2d 1281, 1288–89 (7th Cir.), *cert. denied,* 454 U.S. 907 (1981)

**\*16** The plaintiff is entitled to summary judgment on this issue. Defendants Capuano and Keenan are not immune from personal liability and damages may be assessed against them.

## VII. *DEFENDANTS' MOTION: PLAINTIFF IS LIMITED TO NOMINAL DAMAGES*

The defendants' final argument on their motion for summary judgment is that plaintiff is limited to nominal damages for any due process violations that may have occurred. In order to collect damages in a Section 1983 action for the violation of due process, the plaintiff must demonstrate that the constitutional violation caused him some actual injury, for damages are not "presumed to flow from every deprivation of procedural due process". *Carey v. Piphus,* 435 U.S. 247, 263 (1978). If the plaintiff cannot show causation, only nominal damages may be awarded. *Id.; McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983).

In his complaint, plaintiff has alleged that he was injured in several ways and that the constitutional violations caused his injuries. Specifically, he claims that he was deprived of the privileges of using the package

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

room and his inmate account for approximately a one year period and that he was wrongfully transferred to another institution where he lost the benefit of a prison job and a kosher diet.

The failure of Capuano to provide an adequate written statement of the evidence relied on did not "directly bear on the integrity of [the] decision making process" or the outcome of the hearing. *McMann v. Coughlin, supra,* 698 F.2d at 126. Here, as in *McCann,* plaintiff's inability to show a link between the inadequate statement of evidence and the outcome of the hearing precludes him from demonstrating that the punishment he received was an injury caused by this particular due process violation.

Similarly, in responding to defendant's motion, plaintiff has not shown that the transfer to another prison (and thus the loss of the job and the diet), as recommended by Capuano at the close of the disciplinary hearing, is in any way attributable to the inadequate statement of evidence relied on. There is simply no basis within the record upon which a factfinder could find that the inadequacy of the statement played any role in the decision to transfer him to another institution. As plaintiff has failed to demonstrate this causal connection, an award of damages "would constitute a windfall, rather than compensation." *Carey v. Piphus, supra,* 435 U.S. at 260.

Plaintiff is entitled, however, to recover nominal damages, for "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266–67. The amount due plaintiff is one dollar. *See, e.g. Auwood v. Harry Brandt Booking Office, Inc.,* 647 F.Supp. 1551, 1555–56 (D.Conn.1986).

**\*17** Plaintiff's Second Amended Complaint also includes a prayer for punitive damages. Punitive damages may be awarded in a Section 1983 action (*see Carlson v. Green,* 446 U.S. 14, 22 (1980)), when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).

I find that summary judgment is properly entered for the defendants on this issue, for, as stated in *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322 (1986) (quoting *Anderson v. Liberty Lobby, supra* ):

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict...."

"In essence, ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).

In this instance, plaintiff, in opposing defendants' motion for summary judgment on the issue of punitive damages must offer concrete evidence from which a reasonable juror could return a verdict in his favor as to defendant's state of mind (that is evil motive or intent, or reckless or callous indifference to plaintiff's rights) in order to recover punitive damages. *See Anderson v. Liberty Lobby, supra,* 477 U.S. at 256; *Contemporary Mission Inc. v. New York Times Co.,* 842 F.2d 612, 621–22 (2d Cir.1988).

Capuano and Keenan have submitted affidavits on the motion for summary judgment in which they explain their conduct with regard to plaintiff's disciplinary proceeding. Their statements concerning the statement of evidence relied on by Capuano does not reflect the type of conduct or state of mind which is susceptible to an award of punitive damages. In response, plaintiff has not presented any evidence to this Court to support his wholly conclusory claim that the defendants' conduct in this matter was such that punitive damages may be awarded.

Rule 56(e) provides that a party opposing a properly supported motion for summary judgment may not rest upon "mere allegation ..., but must set forth specific facts showing that there is a genuine issue for trial.... This is true even where the evidence is likely to be within the possession of the defendant [e.g. the defendant's state of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

mind], as long as the plaintiff has had a full opportunity to conduct discovery". *Anderson, supra,* 477 U.S. at 256–257. The defendants are therefore granted summary judgment on the issue of punitive damages.

### CONCLUSION

Defendant Harris' motion for summary judgment is granted. Defendants Capuano and Keenan are granted summary judgment as to all of plaintiff's due process claims except that pertaining to the adequacy of the post-hearing statement of evidence relied on. As to that particular claim and the defendants' defense of qualified immunity, the plaintiff is granted summary judgment. The defendants' motion on the issues of nominal and punitive damages is granted. The parties are directed to submit a proposed judgment pursuant to this order on five days' notice.

**\*18** SO ORDERED.

FN1. The hearing was tape recorded and a transcript of the hearing has been submitted by the defendants as an exhibit to their motion. Plaintiff does not dispute the accuracy of the transcript of the tape recording.

FN2. The exact reference is not clear from the transcript. It is undisputed that certain portions of the tape are inaudible, and there is no material dispute as to what occurred during the moments of inaudibility.

FN3. The identity of the person who conducted the review in this case was the source of some confusion. The review form was originally thought by all parties to have been signed by Harris, but it is now undisputed that defendant Keenan conducted the review and signed the review form in his own name, but over the signature line of "David H. Harris."

FN4. Harris is the only defendant to move for dismissal on this basis.

FN5. Plaintiff argues that the defendants violated not only his rights under the Constitution, but also specific state regulations governing disciplinary proceedings. (*See,* 7 N.Y.C.R.R., part 253, chapter V.). He has not set forth a pendent state claim, but is contending that the violation of state regulations is actionable under Section 1983. This contention is meritless. "[I]t is unnecessary for us to determine if [the defendants] have violated any applicable state law. Clearly, [such] a violation is not cognizable under § 1983." *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). "State procedural requirements do not establish federal constitutional rights." *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 229 (1987).

FN6. Plaintiff has never suggested that these witnesses could have offered any other information or that they would have testified any differently at the hearing if they were called.

FN7. Capuano has submitted an affidavit in support of his motion for summary judgment, in which he states that he did not take plaintiff's oral statement prior to finding him guilty because he believed that plaintiff's defense was contained in the 2 page written statement submitted to Counselor Hutchinson. Although Capuano admits that prior to the hearing he had determined that Davidson was guilty of the charges, he states that, once he realized his error regarding the written statement, he considered what Davidson said at the hearing and then confirmed his earlier findings after no new evidence came to light.

My conclusion that no due process violation took place does not rest upon Capuano's explanation. The critical factor is that, on the undisputed record of the proceedings, Davidson was allowed to speak at length in his defense.

FN8. It is unclear what other sources of evidence were reviewed by Capuano prior to the hearing. The defendants, in support of their motion for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

(Cite as: 1988 WL 68189 (S.D.N.Y.))

summary judgment have provided copies of all the forms, correspondence, memoranda and records (authored by the plaintiff, the department store personnel and the prison staff) having to do with the order for merchandise, the investigation following plaintiff's denial of the order and the efforts made to secure a reimbursement of funds. Although Capuano, in his affidavit in support of the motion, does not discuss these documents, both Hutchinson, in his preliminary report, and Schriver, in her interview, referred Capuano to some additional documentation which they believed supported the accusations against plaintiff.

S.D.N.Y.,1988.

Davidson v. Capuano
Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Marvenia D. GRAHAM, Plaintiff,
v.
CITY OF ALBANY; Thomas J. Breslin; Matthew
Ecker; Sergeant Kevin McKenna; Sergeant Kuck;
Commander Burris Beattie; Albany Police Department;
Randall Kehoe, Esq.; Christian D'Alessandro; Anthony
Crudo; David Soares; County of Albany; General
Casualty Insurance Company, Defendants.
Civ. No. 1:08–CV–892 (RFT).

Nov. 23, 2009.
Marvenia D. Graham, Canton, NY, pro se.

City of Albany Corporation Counsel, John J. Reilly, Esq.,
of Counsel, Albany, NY, for Defendant City of Albany
and Albany Police Department Defendants.

Thuillez, Ford Law Firm, William C. Firth, Esq., of
Counsel, Albany, NY, for Defendants Breslin and General
Casualty Insurance Company.

D'Agostino, Krackeler Law Firm, Rebekah R. Kennedy,
Esq., Kathleen M. Ryan, Esq., of Counsel, for Albany
County Defendants Christian D'Alessandro, Anthony
Crudo, and David Soares.

### MEMORANDUM–DECISION and ORDER[FN1]

> FN1. By an Order, dated January 7, 2009, the
> parties consented to the jurisdiction of this Court
> over all proceedings in this case pursuant to 28
> U.S.C. § 636(c) and FED. R. CIV. P. 73. Dkt.
> No. 12.

RANDOLPH F. TREECE, United States Magistrate
Judge.

*1 *Pro se* Plaintiff Marvenia Graham brings this civil
rights action, pursuant to 42 U.S.C. §§ 1983 & 1985,
alleging that the Defendants violated her constitutional
rights by conspiring to cover-up a "hit-and-run" of her
automobile perpetrated by Defendant Thomas J. Breslin.
Dkt. No. 13, Am. Compl. Specifically, Plaintiff alleges
Defendants conspired against her and violated her rights
to due process, access to the courts, and equal protection
under the law. *Id.*

Presently before the Court are three separate Motions
to Dismiss: one brought by Defendants City of Albany,
Albany Police Department, Matthew Ecker, Kevin
McKenna, Burris Beattie, and Sergeant Eric Kuck,[FN2] Dkt.
No. 27; another brought by Defendants Thomas Breslin
and the General Casualty Insurance Company, Dkt. No.
35; and a third brought by Defendants Christian
D'Alessandro, Anthony Crudo, and David Soares, Dkt.
No. 46.[FN3] Plaintiff has opposed the Defendants' Motions.
Dkt. Nos. 41 & 50.

> FN2. The Docket caption fails to reflect that
> Defendants Ecker, McKenna, Kuck, and Beattie
> have been served with process. Service was
> accepted on behalf of these Defendants by their
> attorney, City of Albany Corporation Counsel
> Office's William Kelly, Esq., of counsel, on
> March 2, 2009. Dkt. No. 19.

> FN3. The only Defendant who has not yet moved
> for dismissal is Randall Kehoe, Esq. Defendant
> Kehoe was served with process and filed an
> Answer to the Amended Complaint. Dkt. Nos.
> 21–22. However, as explained below, Plaintiff's
> claims against Kehoe are nonetheless dismissed.
> *See infra* Part II.H.

For the reasons that follow, the Defendants' Motions
to Dismiss are **GRANTED** and the Amended Complaint
shall be **DISMISSED** in its entirety.

### I. BACKGROUND

The following facts are derived from Plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

Amended Complaint, which, in accordance with the standard for deciding a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6), must be accepted as true.[FN4] *See infra* Part II.A.

> FN4. Because of the standard for deciding motions to dismiss, pursuant to FED. R. CIV. P. 12(b)(6), *see infra* Part II.A, the documentary evidence attached as Exhibits to Defendants' Motions to Dismiss and to Plaintiff's Responses thereto have not been considered in rendering this decision. *See* Dkt. Nos. 27–2, 41–2, & 46–4.

On September 8, 2004, at approximately 6:10 a.m., Plaintiff's car was struck by another vehicle as she was driving along Interstate Route 90 in Albany, New York. The collision forced Plaintiff off the highway where she crashed into a cement highway divider. Dkt. No. 13, Am. Compl. at ¶¶ 10–11. The dark green car that hit her sped away from the crash scene, but not before Plaintiff viewed part of its New York State license plate number, "3TX." *Id.* at ¶ 25. Another citizen who observed the collision called the police, and thereafter, Defendant Officer Matthew Ecker of the Albany Police Department (APD) arrived at the scene. Plaintiff described to Ecker what happened and told him the color and partial license plate number of the car that ran her off the road. *Id.* at ¶¶ 18–26 & 32. Plaintiff sustained the following injuries from the collision: chronic whiplash, broken jaw, facial nerve damage, headaches, fibromyalgia, and shoulder, hip, and pelvic misalignment. *Id.* at ¶ 15.

On or around September 14, 2004, in Albany, New York, Plaintiff spotted a green car with a male driver that she believed to be the car and driver that hit her. Later that evening, she called the APD to report the car's complete New York license plate number, "3TX540 ." *Id.* at ¶ 59. Plaintiff was told to contact Ecker, the reporting officer, with her new information. After several attempts, Plaintiff finally got in touch with Ecker and indicated to him her belief that the green car with license plate number "3TX540" had hit her. *Id.* at ¶¶ 65–66. In late September 2004, Ecker indicated to Plaintiff that he was looking into the information she had given him, but had nothing additional to report. Several days after the collision, Plaintiff again spotted the green "3TX540" vehicle, and this time took pictures of the car, which had suffered

substantial damage to its body. *Id.* at ¶¶ 73 & 81.

**\*2** On September 16, 2004, Plaintiff received a copy of the Police Report (hereinafter "Report") written by Defendant Ecker. *Id.* at ¶ 34. Plaintiff discovered that the Report "insinuat[ed] that the damage on Plaintiff's vehicle was solely due to contact with the guardrail and/or the cement divider on the highway," and did not mention the collision with the green car. *Id.* at ¶ 321. Moreover, the Report did not include a description of the damage done to Plaintiff's vehicle or the green marks that were present on its body, nor did it include statements from any witnesses, including Plaintiff and the man who called the police. *Id.* at ¶¶ 36–45 & 48–52. Plaintiff alleges that "Ecker wrote a false and misleading Report to make it appear that Plaintiff was merely driving down the highway and incidentally, crashed her own vehicle." *Id.* at ¶ 46. However, the call ticket order from the APD states that "Plaintiff was hit by another vehicle" and that "a person[ ] other than the Plaintiff called [ ] to report the September 8th, 2004 incident." *Id.* at ¶¶ 325–26.

Through an inquiry with the Department of Motor Vehicles (DMV), Plaintiff discovered that Defendant Thomas Breslin was the owner of the "3TX540" green car. *Id.* at ¶¶ 77 & 81. After several unsuccessful attempts to contact Ecker, Plaintiff wrote to Sergeant McKenna, head of APD's Traffic Division. After receiving no response from McKenna, Plaintiff contacted the Albany County District Attorney's Office on July 14, 2005, and spoke with Defendant Christian D'Alessandro, who told Plaintiff to follow up with Ecker, the author of the Report. *Id.* at ¶¶ 82–86. On August 30, 2006, Plaintiff again spoke with D'Alessandro, who this time instructed Plaintiff to contact Defendant Sergeant Kuck in APD's Internal Affairs Division. *Id.* at ¶¶ 88–89. Plaintiff informed Kuck about the hit-and-run, but Kuck failed to take any action on her behalf. *Id.* at ¶¶ 90–93. Later, Plaintiff made contact with Defendant Commander Burris Beattie, who told her that the matter "was never an Internal Affairs case, and he was sorry to inform [Plaintiff] that he could not help [her]." *Id.* at ¶ 103.

On November 29, 2007, Plaintiff spoke directly with David Soares, Albany County District Attorney (DA), describing the events that had transpired and advising him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

of her belief that Thomas J. Breslin was the driver of the car that hit her. *Id.* at ¶¶ 140–43. Soares took her contact information, and within two weeks of that conversation, Plaintiff received a call from D'Alessandro who said he was going to assign Defendant Detective Anthony Crudo to her case. *Id.* at ¶¶ 104–05. On December 7, 2007, Plaintiff explained the situation to Crudo, who asked her questions about insurance money she had received from the collision, which made Plaintiff feel "leery." *Id.* at ¶¶ 110–112 & 145. Plaintiff told Crudo she was awarded $12,500, but that she was not accepting the payment because it did not cover her medical bills. *Id.* at ¶¶ 151–52. Thereafter, Crudo notified Plaintiff that the APD would assist her no longer, and urged her to either drop the case or pursue a civil action. *Id.* at ¶ 156. However, he continued to question Plaintiff, "asking her what [ ] she [had] heard from [Breslin's] automobile insurance company;" Plaintiff responded by asking Crudo if he was gathering information from her to relay back to Breslin, an accusation that garnered no response from Crudo. *Id.* at ¶¶ 158–60.

**\*3** Later, Plaintiff met with Crudo and D'Alessandro at the DA's office, where Plaintiff displayed photographs she had taken of the damage to both her car and Breslin's car. *Id.* at ¶¶ 173–78. Plaintiff expressed her desire that criminal charges be brought against Breslin. On May 22, 2008, Plaintiff submitted an "in-depth written account of the hit-and-run accident" to the DA's office. *Id.* at ¶ 197. And, despite D'Alessandro's statement that day to Plaintiff that an investigation into the matter was pending, no criminal charges were ever filed against Breslin. *Id.* at ¶¶ 198–200.

On September 6, 2005, Breslin's car insurer, General Casualty Insurance Company ("General Casualty") was notified about his participation in the hit-and-run, but they also took no action. *Id.* at ¶¶ 216 & 219. During a conversation with a General Casualty representative, Plaintiff was told that Breslin had filed a claim for an accident that allegedly occurred in Washington, D.C., on September 10, 2004, for which General Casualty paid him $4,000. *Id.* at ¶ 221. Plaintiff requested a copy of the police report from that incident, but General Casualty denied possessing any such document. *Id.* at ¶ 222–23.

Plaintiff struggled to find legal representation until she retained Defendant Randall Kehoe, Esq., in December 2006. *Id.* at ¶ 115. Plaintiff showed Kehoe the photographs of her vehicle and Breslin's vehicle, and he agreed to assist her "in instituting civil and/or criminal proceedings against [ ] Breslin and his automobile insurance company." *Id.* at ¶¶ 118 & 122. However, on January 3, 2007, Kehoe informed Plaintiff that he could not help her pursue claims against Breslin because "her story was not going to stick," and told her she would be better off pursuing her own insurance company for no-fault benefits. *Id.* at ¶¶ 125 & 134. At Kehoe's insistence, Plaintiff altered their retainer agreement by crossing out Breslin's name and the name of his auto-insurer, General Casualty, and putting her initials next to the cross-outs. *Id.* at ¶¶ 127–130.

Plaintiff brings the following causes of action against the Defendants:

1. Malicious Abuse of Process against Defendants Ecker, McKenna, Kuck, Beattie, City of Albany, Soares, D'Alessandro, Crudo, and Albany County;

2. Denial of Access to the Courts against Defendants Ecker, Soares, and Kehoe;

3. Denial of Equal Protection against Defendants Ecker, McKenna, Kuck, Beattie, City of Albany, Soares, D'Alessandro, Crudo, and Albany County;

4. Conspiracy to Violate her Civil Rights against all Defendants;

5. Supervisory Liability against Defendants City of Albany and Albany County;

6. Denial of Due Process against all Defendants.

*Id.* at ¶¶ 228–389.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

**\*4** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint* ' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* ––– U.S. –––, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* ––– U.S. ––––– 129 S.Ct. at 1950 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* ––– U .S. ––––– 129 S.Ct. at 1949. This plausibility standard "is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ––– U.S. ––––– 129 S.Ct. at 1950–51.

**B. Statute of Limitations**

All of the moving Defendants contend in their respective Motions that Plaintiff's claims are barred by the statute of limitations (SOL). Dkt. Nos. 27, 32, & 46. In § 1983 actions, the applicable statute of limitations is a state's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002). In New York, a three-year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well. *Id.; see also* N.Y.C.P.L.R. § 214(5). Federal constitutional claims accrue when the plaintiff "knows or has reason to know" of the injury that is the basis for her action. *Pauk v. Bd. of Tr. of City Univ. of New York,* 654 F.2d 856, 859 (2d Cir.1981); *see also Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001).

**\*5** Defendants assert that Plaintiff knew or had reason to know of the alleged harm on or about September 16, 2004, the date she received a copy of Ecker's Report. Dkt. Nos. 27 at pp. 5–6, 32 at pp. 2–3. Alternatively, Defendants posit that the accrual date for the SOL should be June 20, 2005, the date Plaintiff asserts she went to APD and was told that there were no other reports nor information relating to the collision. *Id.;* Am. Compl. at ¶ 78. Plaintiff does not challenge those asserted accrual dates, but counters that the SOL was tolled for the following reasons: (1) the Defendants were "united in interest;" (2) she suffered from certain medical conditions; (3) she attempted to arbitrate her medical claims against her insurance company; (4) she initiated a state court

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

action; (5) she was the victim of a crime; (6) application of the continuing violation doctrine; and (7) she was denied access to the courts. Dkt. No. 41, Pl.'s Resp. to Defs.' Mots. to Dismiss at pp. 6–11. We consider these arguments in order below.

First, under New York law, whether the Defendants were "united in interest" is the second prong in a three-pronged test used to decide whether the addition of a new party through an amended complaint will "relate back" to the time the original complaint was filed; it does not speak to whether or not the SOL should be tolled for the filing of an original complaint. *See De Sanna v. Rockefeller Center, Inc., 9 A.D.3d 596, 597–98 (N.Y.App. Div.3d Dep't 2004).* Therefore, the question of whether Defendants were "united in interest" is inapposite here because Plaintiff is not seeking to add a new party to this action.

Second, Plaintiff argues that the SOL should be deemed tolled due to her ongoing medical condition and/or disability. While a medical condition may be grounds for the equitable tolling of a SOL, *see, e.g., Brown v. Parkchester South Condominiums, 287 F.3d 58, 60 (2d Cir.2002),* in this case, Plaintiff has failed to provide any details about the timing or nature of her alleged disability, *see* Pl.'s Resp. at p. 7 (asserting that she was "legally incapacitated at the time of the initial incident and could not perform normal functions and daily ... activities"). Therefore, Plaintiff's conclusory allegation of a medical condition does not constitute grounds to equitably toll the SOL and, as an aside, such allegation is specious given Plaintiff's claims about her tireless efforts to seek justice. *See Boos v. Runyon, 201 F .3d 178, 185 (2d Cir.2000)* (denying equitable tolling because plaintiff's claim did not provide a "particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights").

Plaintiff cites to the New York Civil Practice Law and Rules ("CPLR") § 204(b) for the proposition that the SOL can be equitably tolled during the pendency of an arbitration demand. *See* Pl.'s Resp. at p. 8. CPLR § 204(b) "tolls the statute of limitations during the pendency of an arbitration that ends with a determination that there was no obligation to arbitrate." *Individual Securities, Ltd. v.*

*Ross, 152 F.3d 918 (2d Cir.1998).* However, Plaintiff alleges that she arbitrated her no-fault medical claims with her own insurance company, not that she attempted to arbitrate the constitutional claims now before this Court. Therefore, the SOL cannot be tolled on that basis.

**\*6** Next, Plaintiff cites to *Lang v. Hanover Ins. Co., 3 N.Y.3d 350 (2004)* and N.Y. INSURANCE LAW § 3420 for the proposition that the SOL should be deemed equitably tolled because she has a pending state court action against Defendant Breslin. Pl.'s Resp. at p. 8. N.Y. INSURANCE LAW § 3420 "grants an injured plaintiff the right to sue a tortfeasor's insurance company to satisfy a judgment obtained against the tortfeasor" once a judgment against that tortfeasor has been obtained. *Lang v. Hanover Ins. Co., 3 N.Y.3d at 352.* Here, Plaintiff has accused the Defendants, including Breslin and his insurance company, General Casualty, of constitutional violations under § 1983. Plaintiff does not seek satisfaction for a judgment against a Defendant, nor does she allege that any such judgment has been obtained. Therefore, this argument fails. *See also Branch v. Guilderland Cent. School Dist., 239 F.Supp.2d 242, 252 n. 7 (N.D.N.Y.2003)* (citing cases for the proposition that the "Second Circuit has [ ] routinely refused to toll the statute of limitations for § 1983 claims during the pendency of state judicial proceedings").

Plaintiff asserts that pursuant to CPLR § 213–b, the SOL was tolled because she was the victim of a crime. CPLR § 213–b provides a basis to equitably toll the SOL when an action by a crime victim is brought against a defendant who has been "convicted of a crime." Plaintiff has made no allegation that any Defendant has been convicted of a crime and therefore, this argument is also without merit.

Plaintiff attempts to invoke the continuing violation doctrine as a basis for tolling the SOL. The continuing violation exception "extends the limitations period for all claims of discriminatory acts committed *under an ongoing policy of discrimination* even if those acts, standing alone, would have been barred by the statute of limitations." *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir.1998)* (emphasis in original) (internal quotation marks and citation omitted). A continuing violation may also be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

found where there is proof of ongoing discriminatory practices. *Id.* at 766 (citation omitted). As a general rule, courts in this Circuit "have viewed continuing violation arguments with disfavor." *Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 244 (S.D.N .Y.2000) (citing cases).

Here, there is no allegation that Defendants' alleged actions were part of a common policy or practice. In that respect, "[d]iscrete incidents of discrimination that are unrelated to an identifiable policy or practice ... will not ordinarily amount to a continuing violation, unless such incidents are specifically related and are allowed to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* (internal quotation marks and citation omitted). To the extent Plaintiff's claims against the various Defendants can be characterized as discriminatory, they are related only by their inclusion in Plaintiff's conspiracy claim. Indeed, there is no apparent connection between the separate acts of Breslin, a private citizen, Kehoe, Plaintiff's former attorney, and those of the other Defendants serving in the APD and DA's office, nor do the alleged acts plausibly suggests the existence of a unified ongoing discriminatory practice or policy. Therefore, the continuing violation doctrine is inapplicable here.

**\*7** Lastly, Plaintiff suggests that the SOL be tolled based on her inability to access the courts as a consequence of Defendants' actions. Though Plaintiff asserts that she failed to induce the DA's office to bring criminal charges against Breslin, Pl.'s Resp. at p. 9, she does not allege how that office's actions prevented her from filing a civil action, and in fact, Plaintiff alleges that she has been able to pursue a civil action against Breslin in state court. Moreover, as explained further in Part II.C *infra,* Plaintiff has failed to identify how her civil claims were hindered by Defendants' alleged actions.

For these reasons, we find Plaintiff's tolling arguments to be without merit. With respect to the accrual date of Plaintiff's conspiracy claims, the Second Circuit has held that

[t]he crucial time for accrual purposes is when the plaintiff becomes aware that [she] is suffering form a

wrong for which damages may be recovered in a civil action. To permit [her] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable [her] to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

*Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994) (internal quotation marks and citation omitted). Here, Plaintiff became aware of the Defendants' alleged actions at the time they occurred. Thus, because there is no basis to deem the SOL equitably or statutorily tolled, only those claims arising out of alleged acts that occurred on or after August 20, 2005 (three years prior to Plaintiff's submission of the original Complaint) are timely. However, even considering all of Plaintiff's constitutional claims as timely, they still fail to state a valid claim.

### C. Failure to Prosecute

The crux of Plaintiff's case is that she was deprived of a criminal investigation into her automobile accident and a criminal complaint being lodged against Defendant Breslin. Yet, seminal constitutional principles tell us that a plaintiff does not have a constitutional right to bring or to compel a criminal prosecution against one whom she alleges caused her injury and damages. *Chandler v. Carroll,* 2009 WL 2514428, at \* 5 (D.Vt. Aug. 12, 2009) ("It is well settled law that a private citizen does not have a constitutional right to bring a criminal complaint against another individual.") (citations omitted); *Price v. Hasly,* 2004 WL 1305744 (W.D.N.Y. June 8, 2004). Initiating a criminal complaint or prosecution rests solely within the discretion of district attorneys. Moreover, "a citizen lacks standing to contest the policies of the prosecuting authority when [s]he is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973); *In re Appointment of Indep. Counsel,* 766 F .2d 70, 75–76 (2d Cir.1985) (quoting *Linda R.S.,* 410 U.S. at 619, for the proposition that a "private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"). In any event, a prosecutor's decision to initiate a criminal prosecution, or not, is protected with absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409 (1976); *Doe v. Phillips,* 81 F.3d 1024, 1210. Here, DA Soares and his staff, Defendants D'Alessandro and Crudo, are cloaked with absolute immunity and thus

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

entitled to **dismissal** of any such claims of failure to prosecute. Notwithstanding the controlling implications of this Ruling, the Court must consider Plaintiff's other constitutional claims, which are substantively similar to her failure to prosecute claim, but analytically distinct.

### D. Access to the Courts

**\*8** In her Second Cause of Action, Plaintiff alleges that Defendants Ecker and Soares [FN5] violated her First Amendment right to access the judicial system by failing to investigate and bring criminal charges and by inhibiting her ability to pursue civil actions against Breslin. To state a claim for denial of access to the courts, a plaintiff must allege that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Cusamano v. Sobek,* 2009 WL 211155, at \*50 (N.D.N.Y. Jan. 26, 2009). In this case, Plaintiff alleges that Ecker's falsification of the Report hindered her ability to bring civil claims. Am. Compl. at ¶¶ 273, 289, & 292. However, according to Plaintiff, in addition to the instant federal lawsuit, she initiated a tort action against Defendant Breslin in state court, and has deposed Breslin in connection with that lawsuit. Am. Compl. at ¶¶ 150 & 201. Thus, Plaintiff has not been denied actual access to the courts, nor do her allegations suggest a deprivation of meaningful access to the courts. *Lewis v. Casey,* 518 U.S. at 354; *see also Williams v. Savage,* 538 F.Supp.2d 34, 42 (D.D.C.2008) (denying motorist-plaintiffs' claims that an inaccurate police report denied them access to the courts because they were "free to avail themselves of the courts and fully engage in the adversarial process").

> FN5. Plaintiff also lists Defendant Kehoe as one who denied her access to the courts. We discuss Plaintiffs claims against Kehoe in Part II.I *infra.*

Plaintiff has failed to explain how Defendants' actions frustrated or impeded her efforts to pursue a non-frivolous legal claim. Ecker's alleged falsification of the Report through his failure to interview witnesses, exclusion of Plaintiff's own statements, and failure to accurately document the damage to Plaintiff's car, would not and has not hindered Plaintiff's ability to bring a civil claim in state court. Under New York law, the Report itself would be considered hearsay, and any statements made by third parties (including Plaintiff) that were included or should

have been included in the Report would constitute inadmissible hearsay within hearsay. Even Ecker's opinion is inadmissible hearsay. The business record exception to the hearsay rule would not apply in these circumstances because under New York law, police reports "must be excluded if the recording officer did not observe the matter personally *and* the declarant did not have a duty to make the statement to the recording officer." *Perfetto v. Hoke,* 898 F.Supp. 105, 114 (S.D.N.Y.1995) (emphasis in original) (citing *Johnson v. Lutz,* 253 N.Y. 124, 128 (N.Y.1930)) (holding that the business records exception "was not intended to permit the receipt in evidence of entries based upon voluntary statements made by third parties not engaged in the business or under any duty in relation thereto")); *Lynn v. Bliden,* 443 F.3d 238, 252 (2d Cir.2006) (citing *Perfetto* and finding the recording of a police officer's *personal observations* was not inadmissible hearsay; *see also matter of Leon RR,* 48 N.Y.2d 117, 122 (1979) (affirming *Johnson's* holding that the reporter must be under a business duty to record the event, and the "informant must be under a contemporaneous business duty to report the occurrence" to the reporter). In this case, Ecker did not personally witness the collision, and neither Plaintiff nor any other potential witness had a duty to speak with Ecker and as such, the business records exception would not apply. Thus, the alleged omissions from the Report could not and did not hinder Plaintiff's ability to meaningfully access the courts.

**\*9** To the extent Plaintiff's access to the courts claim is based on Defendants' alleged refusal to investigate and/or prosecute Breslin, such claims are without merit for reasons stated above in Part II.C. For these reasons, Plaintiff's access to the courts claim is **dismissed.**

### E. Due Process Claims

In Plaintiff's First and Sixth Causes of Action, she accuses Defendants of violating her due process rights by failing to investigate and prosecute charges against Breslin, a failure Plaintiff alleges constituted a malicious abuse of process. Am. Compl. at ¶¶ 228–263 & 382–389.

*1. Falsification of Report and Failure to Investigate*

Plaintiff alleges that Defendants Ecker, McKenna,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

Kuck, and Beattie failed to properly investigate her complaints and that Defendants D'Alessandro, Crudo, and Soares failed to prosecute Breslin for his alleged criminal actions. Plaintiff also alleges that Defendant Ecker falsified and failed to include important information in his Report.

In order to bring a valid § 1983 claim, a plaintiff must establish that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). With respect to Plaintiff's claim that Ecker falsified or otherwise failed to properly document the collision that occurred on September 8, 2004, the "mere filing of false police reports, by themselves and without more, [does] not create a right of action in damages under 42 U.S.C. § 1983." *Bailey v. Tricolla,* 1995 WL 548714, at *5 (E.D.N.Y. Sept. 12, 1995) (quoting *Landrigan v. City of Warwick,* 628 F.2d 736, 744–45 (1st Cir.1980)); *see also Jarrett v. Township of Bensalem,* 2008 WL 818615, at *3 (E.D.Pa. Mar. 26, 2008) ("[T]he filing of a false police report is not itself a constitutional violation, even when the report is the result of an intentional conspiracy among police officers to cover up police misconduct.") *aff'd,* 312 Fed. Appx. 505 (3rd Cir. Feb. 20, 2009). However, a due process violation may lie if the filing of the false report leads to an unconstitutional deprivation of life, liberty, or property. *Landrigan v. City of Warwick,* 628 F.2d at 744–45 (citing *Paul v. Davis,* 424 U.S. 693 (1976)).

Here, Plaintiff does not allege that she was deprived of her life or liberty. But, Plaintiff alleges that Defendants' actions, Ecker's falsification of the Report in particular, have hindered her ability to recover damages against Breslin in court. Am. Compl. at ¶¶ 271–273, 288, & 291–292. Interpreting her *pro se* Amended Complaint liberally, Plaintiff asserts a property interest in her ability to recover money damages in a civil action. However, the Fourteenth Amendment's Due Process Clause protects only those property interests to which a person has "a legitimate claim of entitlement," not those based solely on abstract hopes and expectations. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972); *see also Jarrett v. Township of Bensalem,* 2008 WL 818615 at *4 (holding that plaintiff had no property interest in "obtaining a large

insurance settlement"). Moreover, as previously discussed, Plaintiff fails to make clear how Defendants hindered her ability to pursue a civil claim [FN6] against Breslin. Because Plaintiff has failed to allege a legitimate claim of entitlement, we find she has failed to identify a cognizable property interest of which she was deprived. Therefore, Plaintiff's due process claims based on Ecker's alleged falsification of the Report are **dismissed.**

> FN6. To the extent Plaintiff's claim is based on her assertion that the Defendants prevented her from pursuing a criminal action against Breslin, Am. Compl. at ¶ 273, Plaintiff has no constitutionally protected interest in the criminal prosecution of another citizen. *See supra* Part II.C.

**\*10** Moreover, the Due Process Clause does not guarantee the right to an investigation by government officials. *See DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196–97 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," and as such, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."); *see also Town of Castle Rock, Colorado v. Gonzales,* 545 U.S. 748, 768 (2005) ("[T]he benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause."); *Longi v. County of Suffolk,* 2008 WL 858997, at *6 (E.D.N.Y. Mar. 27, 2008) (holding that "there is no constitutional right to an investigation by government officials"). Therefore, Plaintiff's claim that Defendants failed to investigate the alleged hit-and-run does not state a valid cause of action under § 1983 and must be **dismissed.**

### 2. Malicious Abuse of Process

Plaintiff claims that the Defendants' actions constituted a malicious abuse of process. The malicious abuse of criminal process has been held to violate the Fourteenth Amendment's Due Process Clause, and therefore, can constitute a valid cause of action under §

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

1983. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Federal courts look to state law for the elements of malicious abuse of process claims. *Id.* Under New York law, such claims must include the following three elements: (1) the defendant utilizes standard legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Id.* (cited in *Sullivan v. LaPlante,* 2005 WL 1972555, at *8 (N.D.N.Y. Aug. 16, 2005)).

In this case, Plaintiff has not alleged that she was issued a form of legal process, such as a summons or complaint, in order to compel her performance or forbearance of some act. Rather, Plaintiff alleges Defendants conspired to protect Breslin and cover-up his crime. Therefore, Plaintiff has failed to state a valid malicious abuse of process claim and such claim is **dismissed** .

### F. Equal Protection

In her Third Cause of Action, Plaintiff accuses Defendants of denying her Fourteenth Amendment right to equal protection under the law. Essentially, Plaintiff's claim is that the Defendants protected Breslin, shielded him from prosecution, and therefore, did not equally enforce the law. Am. Compl. at ¶¶ 310 & 334.

The Equal Protection Clause of the Fourteenth Amendment states "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly situated ... be treated alike." *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999) (internal citations and quotation marks omitted). As a general rule, the Equal Protection Clause protects suspect classes and fundamental rights against inequitable treatment. *LeClair v. Saunders,* 627 F.2d 606, 611 (2d Cir.1980) (citing *Dandridge v. Williams,* 397 U.S. 471, 487 (1970)). However, an equal protection claim may be brought "by a 'class of one' where a plaintiff alleges that she has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362–63 (2d Cir.2002) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).

**\*11** To establish a valid equal protection claim based on selective enforcement, a plaintiff must demonstrate that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d at 609–10. Here, Plaintiff does not allege that *she* was selectively treated as compared with others similarly situated, but that *Breslin* was afforded protection and therefore treated differently from other criminals. Plaintiff does not have standing to assert a Fourteenth Amendment equal protection claim because she has not alleged that she was selectively treated in comparison to others similarly situated and no accord can be extended to this argument. *See* *Lewis v. Gallivan,* 315 F.Supp.2d 313, 317 (W.D.N.Y.2004) (noting that Supreme Court precedents "consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution"); *see also* *LeClair v. Saunders,* 627 F.2d at 608 ("Mere failure to prosecute ... is not a basis for a finding of denial of equal protection.") (citation omitted). Thus, the converse proposition—that Breslin was afforded greater protection than others—does not bestow standing upon Plaintiff either.

Plaintiff's reliance on *DeMuria v. Hawkes,* 328 F.3d 704 (2d Cir.2003) is misplaced. Dkt. No. 41, Pl.'s Resp. at p. 21. In that case, the Second Circuit held that the plaintiffs had stated a facially valid equal protection claim against the defendant police officer who allegedly "subjected the plaintiffs to a different standard of police protection than any other citizens" when he maliciously and arbitrarily allowed plaintiffs' neighbors to harass and threaten them with impunity because the neighbors were his friends. *Demuria v. Hawkes,* 328 F.3d at 705 (internal quotation marks omitted). In this case, Breslin's alleged criminal acts preceded Plaintiff's contact with the other Defendants, and there is no allegation that those Defendants intentionally permitted the commission of additional criminal actions against Plaintiff after the alleged hit-and-run occurred. Thus, as opposed to the police officer's behavior in *DeMuria,* Defendants' alleged

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

failure to pursue Breslin did not cause any identifiable injury to Plaintiff.

For the above reasons, Plaintiff's equal protection claim is **dismissed.**

### G. Conspiracy

Plaintiff brings claims of conspiracy against the Defendants pursuant to 42 U.S.C. §§ 1983 and 1985. The third subsection of 42 U.S.C. § 1985, which is the only part of this statute applicable to the claims made in this case, states, in pertinent part:

If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ..., if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the Untied States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**\*12** 42 U.S.C. § 1985(3).

To recover under this section, a plaintiff must show the existence of (1) a conspiracy (2) meant to deprive a person or persons of the equal protection of the laws or privileges and immunities under the laws with "(3) an overt act in furtherance of the conspiracy[,] (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States[,]" and (5) "some racial or perhaps otherwise class-based, invidious discriminatory animus[.]" *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (citations omitted). "In this context, 'class-based animus' encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex." *Martin v. New York State Dep't of Corr. Servs.,* 115 F.Supp.2d 307, 316 (N.D.N.Y.2000) (citations omitted).

To support a conspiracy claim under § 1983, a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002).

In this case, Plaintiff fails to allege cognizable §§ 1985(3) and 1983 conspiracy claims because she identifies no underlying constitutional violation or injury. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) ("[A] plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights."); *see also D'Angelo–Fenton v. Town of Carmel,* 470 F.Supp.2d 387, 398 (S.D.N.Y.2007) (noting that "as with a § 1983 conspiracy claim, actual infringement of a constitutional right is required" under § 1985(3)). Although Plaintiff has alleged physical injuries that resulted from her collision with Breslin, those alleged injuries were not the result of the alleged conspiracy to cover-up his crime. Therefore, because Plaintiff has not stated a valid constitutional injury as a result of the alleged conspiracy, her conspiracy claims are **dismissed.** *See Cefalu v. Village of Elk Grove,* 211 F.3d 416, 423 (7th Cir.2000) ("[T]here is no constitutional violation in conspiring to cover-up an action which does not itself violate the constitution.").

### H. Respondeat Superior/*Monell* Claim

In her Fifth Cause of Action, Plaintiff alleges that Defendants Albany County and City of Albany are liable "under the doctrine of respondeat superior for the intentional torts of government defendants committed within the scope of their employment." Am. Comp. at ¶ 379. Pursuant to *Monell v. Dep't of Soc. Servs. of City of New York,* "a municipality cannot be held liable under § 1983 on a respondeat superior theory." 436 U.S. 658, 691 (1978). A municipality may only be held liable for constitutional claims under § 1983 if the alleged conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipal] officers[,] ... [or] governmental 'custom' even though such a custom has not received formal approval through the ... [municipality's] official decision[-]making channels." *Id.* at 690–91.

**\*13** In this case, Plaintiff fails to identify any policy or custom adopted by the City of Albany or Albany

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)

(Cite as: 2009 WL 4263510 (N.D.N.Y.))

County. Moreover, because Plaintiff has failed to state any cognizable constitutional claim against the individual Defendants, there can be no liability on the part of municipal Defendants Albany County and the City of Albany. *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.") (cited in *Van Cleef v. Seneca County,* 2009 WL 1150407, at *6 (W.D.N.Y. Apr. 27, 2009)). Therefore, Plaintiff's respondeat superior/*Monell* claims are **dismissed.**

### I. Remaining Claims

Although it is unclear, Plaintiff appears to bring tort and other state-law based claims against Ecker, Breslin, and possibly the other Defendants. Am. Compl. at ¶¶ 204 & 293–94. To the extent Plaintiff intended to bring such claims, because we have found Plaintiff's federal constitutional claims to be without merit, we decline to exercise continuing pendent jurisdiction over any such remaining claims.

Defendant Kehoe has not moved for dismissal in this case. However, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), this Court has the discretionary power to *sua sponte* dismiss a *pro se* complaint "at any time" for failure to state a claim on which relief may be granted.[FN7] Plaintiff brings claims against Kehoe for denial of access to the courts, conspiracy, and due process. Am. Compl. at ¶¶ 228–389 (Causes of Action Nos. 2, 4, & 6). Plaintiff's claims that Kehoe independently violated her rights to due process and access to the courts must be dismissed because Kehoe is not a state actor, and thus not "clothed with the authority of state law," a necessary element under § 1983. *Polk County v. Dodson,* 454 U.S. 312, 317–18 (1981) (internal quotation marks and citation omitted). Liability may attach to a non-state actor if that person acts "jointly" with state actors to deprive constitutional rights, but in this case, Plaintiff has alleged no facts to suggest that Kehoe acted jointly with the other Defendants. *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 271 (2d Cir.1999) (citing *United States v. Price,* 383 U.S. 787, 794 (1966)). In fact, there is no allegation that Kehoe had any interaction or agreement with the APD or DA's Office, Breslin, or General Casualty. In addition, because we find

that Plaintiff's access to the courts, conspiracy, and due process claims are wholly without merit as against the other Defendants, there is no basis upon which liability could attach to Kehoe based upon his connection to their alleged acts.

> FN7. On August 21, 2008, this Court granted Ms. Graham's Application to proceed *In Forma Pauperis,* Dkt. No. 3. Thus, consideration of her claims under 28 U.S.C. § 1915(e) is appropriate.

For the above reasons, the Court will **dismiss,** *sua sponte,* all claims brought against Kehoe pursuant to §§ 1983 and 1985 for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B)(ii). To the extent Plaintiff intended to assert state-law tort or malpractice claims against Kehoe, the Court also declines to exercise continuing supplemental jurisdiction over those claims.

### III. CONCLUSION

**\*14** For the reasons stated herein, it is hereby

**ORDERED,** that the Defendants' Motions to Dismiss (Dkt. Nos. 27, 35, & 46) are **GRANTED,** and the Amended Complaint (Dkt. No. 13) is **DISMISSED**[FN8] in its entirety.

> FN8. Because we find dismissal of the Amended Complaint appropriate under FED. R. CIV. P. 12(b)(6), we need not address Defendants' assertion of qualified immunity, nor Breslin's defense of insufficiency of process.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.

Graham v. City of Albany
Not Reported in F.Supp.2d, 2009 WL 4263510 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Myra SALGADO, Plaintiff,
v.
THE CITY OF NEW YORK, Robert Davis,
individually, Nicolas Negron, individually, Robert A.
Martin, individually, Martin P. Glynn, individually,
Joanne Brown, individually, Richard Tobing,
individually, Yvette Plata, individually, and John Does
1-10, individually, Defendants.
No. 00 Civ. 3667(RWS).

March 26, 2001.

Brune & Richard L.L.P., New York, NY, By: Hillary
Richard, Laurie Edelstein, Nina Beattie, for Plaintiff, of
counsel.

Corporation Counsel for the City of New York, New
York, NY, By: Lynn A. Severino, for Defendants the City
of New York, Robert Davis, Robert A. Martin, Martin P.
Glynn, Joanne Brown, Richard Tobing, and Yvette Plata,
of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants the City of New York, Robert Davis
("Davis"), Robert A. Martin ("Martin"), Martin P. Glynn
("Glynn"), Joanne Brown ("Brown"), Richard Tobing
("Tobing"), and Yvette Plata ("Plata") (collectively, the
"Defendants") have moved for partial judgment on the
pleadings, pursuant to Federal Rule of Civil Procedure
12(c).FN1 For the reasons set forth below, the motion is
granted in part and denied in part.

> FN1. Defendant Nicolas Negron ("Negron"),
> who had not appeared in this action at the time
> the instant motion was filed, is not a party to this
> motion.

*The Parties*

Plaintiff Myra Salgado ("Salgado") was at all relevant
times employed as a police officer by the City of New
York and the New York City Police Department (the
"NYPD").

The City of New York is a municipal corporation
created and duly authorized under the laws of the State of
New York.

The NYPD is the municipal agency established by,
and which acts as the agent of, the City of New York in
the area of law enforcement.

Davis was at all relevant times employed as a police
officer holding the rank of Lieutenant within the NYPD
Missing Persons Squad (the "Missing Persons Squad").

Negron was at all relevant times employed as a police
officer with the rank of Sergeant within the Missing
Persons Squad.

Martin was at all relevant times employed as a police
officer with the rank of Deputy Inspector within the
Special Investigations Division ("Special Investigations")
of the NYPD.

Glynn was at all relevant times employed as a police
officer with the rank of Captain within Special
Investigations.

Brown was at all relevant times employed as a police
officer with the rank of Detective within the Missing
Persons Squad.

Tobing was at all relevant times employed as a police
officer with the rank of Detective within the Missing
Persons Squad.

Plata was at all relevant times employed as a police
officer with the rank of Detective within the Missing
Persons Squad.

Defendants John Does 1-10 are unknown police

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

officers employed by the NYPD.

*Prior Proceedings*

This action was initiated by the filing of a complaint by Salgado on May 15, 2000, asserting claims for employment discrimination, hostile work environment, and retaliation on the basis of sexual orientation under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and New York City Administrative Code § 8-101 *et seq.*

*Facts*

The following facts are as alleged in the complaint and do not constitute findings by the Court.

Salgado was hired by the NYPD as a police officer in January 1983. In or about January 1988, she was assigned to the Missing Persons Squad, a subdivision within Special Investigations. In or about September 1989, she was promoted to the rank of Third Grade Detective.

Salgado is a lesbian. In or about the fall of 1993, she began sharing an office with Negron, who was the second in command officer of the Missing Persons Squad. In or about April 1994, Negron discovered that Salgado was gay. From that point forward until Negron's retirement in April 1996, Negron began harassing Salgado based on her sexual orientation. For example, he over-supervised Salgado, excessively monitored her schedule, and disproportionately assigned her to uniform detail-an undesirable assignment-as compared with heterosexual officers with similar experience and seniority. In addition, shortly after learning of Salgado's sexual orientation, Negron ordered her to move out of the office they had shared for approximately eight months. Negron also repeatedly made derogatory comments to other detectives in the Missing Persons Squad regarding Salgado's sexual orientation, and on one occasion circulated a cartoon that represented Salgado in a derogatory manner. Other detectives in the Missing Persons Squad told Salgado that Negron was out to get her because she was a lesbian.

**\*2** Other detectives and officers in the Missing Persons Squad, including Brown, Tobing, and Plata, routinely made comments that Salgado looked "butchy" or "gay," and other derogatory comments regarding her personal life and sexual orientation, and isolated and ignored Salgado in the workplace.

At the time Negron ordered Salgado to move out of their office, Davis, who was the Commanding Officer of the Missing Persons Squad, was away. Immediately upon Davis's return, Salgado complained to him that Negron was discriminating against her. On several subsequent occasions Salgado again complained to Davis about the discrimination she was experiencing both from Negron and other officers and detectives within the Missing Persons Squad. Davis also witnessed discriminatory action by Negron and these others.

Davis did not act to stop or remedy the discriminatory behavior, and did not report the conduct, as required, to the NYPD's Office of Equal Employment Opportunity (the "OEEO").

On or about April 24, 1996, Salgado filed a complaint with the New York City Commission on Human Rights (the "Human Rights Commission") against the NYPD, Negron, and Davis, alleging discrimination and harassment on the basis of her sexual orientation. Subsequently, the discriminatory behavior continued and increased.

In May 1996, Davis ordered Salgado to move from her private office into the general population. On May 23, 1996, a command discipline was filed against Salgado based on actions that allegedly occurred six months earlier, in November 1995. In the spring of 1996, after two other openly homosexual officers were transferred into the Missing Persons Squad, Salgado heard Brown, a fellow detective, make repeated derogatory comments about Salgado based on her sexual orientation, including "It's going to be gay city in here," and "Why doesn't she [Salgado] just get transferred out of here?".

In July 1996, Salgado's fellow detectives and officers in the Missing Persons Squad, knowing that Negron had already retired and knowing of his behavior towards Salgado, placed a banner on her desk and draped another banner across a message board, both stating "Welcome back, Sergeant Negron," in order to make Salgado think Negron was coming back.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

On or about August 1, 1996, Salgado found the word "Dike" [sic] written in bold letters next to her name on her file cabinet. Salgado immediately reported this incident to Davis.

On or about August 7, 1996, Salgado filed a complaint of employment discrimination based on sexual orientation with the OEEO. In December 1996, the OEEO issued a determination that the complaint was founded. However, no action was taken as a result of this finding. For example, the NYPD did not discipline anyone or order any type of training for members of the Missing Persons Squad.

On February 23, 1997, shortly after Salgado returned from vacation, she found a letter in her mailbox stating, "Where does [sic] Sgt. Giuffre and Det. Salgado go on vacation together? They go to Dike [sic] City in Gay County where girls can be with girls." Sergeant Giuffre, who was one of the openly homosexual officers who had been transferred to the Missing Persons Squad, received an identical letter. A report was made concerning the letters and it was assigned to the Internal Affairs Bureau ("Internal Affairs") for investigation, which then referred the investigation to the OEEO. Salgado was never informed of the outcome of the investigation.

**3** From May 1996 through February 1997, Salgado was consistently given undesirable assignments in a disproportionate amount as compared with heterosexual detectives with similar experience and seniority, and continued to be subjected to gossip about her personal life.

Beginning in mid-1996 and continuing until Salgado's constructive discharge, Salgado made repeated verbal and written requests for a transfer out of the Missing Persons Squad. Salgado's counsel also made transfer requests on Salgado's behalf. For example, on August 1, 1996, Salgado's counsel wrote to Tomaso Simonetti ("Simonetti"), First Deputy Commissioner of the NYPD, requesting his assistance in obtaining a transfer. On August 8, 1996 and again on September 4, 1996, Salgado's counsel wrote to Captain Lazdan of the OEEO with the same request. These requests were ignored.

In August 1996, Salgado applied for a position in the Department Advocate's Office. In December 1996, February 1997, and March 1997, counsel for Salgado reiterated Salgado's request to be transferred to the Department Advocate's Office in writing. Between August 1996 and March 1997, at least seven new officers were assigned to the Department Advocate's Office. Salgado was not one of them. Salgado was informed that she was not wanted in the Department Advocate's Office because she is a lesbian and her female lover worked there. She was also told that she would never be able to leave the Missing Persons Squad unless she retired or vested out. Salgado remained in the Missing Persons Squad.

From March 1997 through Salgado's constructive discharge, she continued to be assigned to undesirable assignments with more frequency than similarly-situated heterosexual officers. Brown, Tobing, Plata, and other officers and detectives in the Missing Persons Squad continued to gossip about Salgado's personal life and to make derogatory comments about her sexual orientation, and to isolate and ignore her in the workplace. Brown openly made derogatory comments in the workplace about Salgado, her sexual orientation, and homosexuals in general.

From March 1997 through October 1997, Salgado continued to request a transfer out of the Missing Persons Squad. Salgado also requested of her supervisor, Sergeant Michael Codella ("Codella"), that she be reassigned to a different unit with the squad that was being newly established, the D.O.A. team. On October 21, 1997, the new D.O.A. team was announced, to be supervised by Codella. Salgado was not selected for it, but Brown was.

On or about October 27, 1997, Salgado's guns were stolen out of padlocked cubby locker located within the Missing Persons Squad. The lock had been clipped. Only police officers had access to the area where the lockers were located, an area that was supposed to be monitored 24 hours a day. An investigation was begun into the theft, but Salgado was never informed of its outcome.

As a result of the above-described conduct, Salgado became emotionally and professionally distraught. On October 30, 1997, she informed the new Commanding Officer of the Missing Persons Squad, Lieutenant Robert

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

Groth ("Groth"), that she was unable to endure the harassment and discrimination any longer and had decided to vest out of the NYPD as of January 1998. Groth did not accept Salgado's resignation. Salgado also requested that she be transferred out of the Missing Persons Squad until she vested out.

**\*4** Groth informed his superior, Glynn, who was a Captain and the Executive Officer of Special Investigations, of Salgado's transfer request. Glynn ordered Groth to remove Salgado's guns and to send her to the NYPD's Psychological Services Unit ("Psychological Services"). Groth refused to remove Salgado's guns, but did order her to go to Psychological Services.

On November 3, 1997, Salgado's guns, permanent identification card, and shield were removed, and her status was changed from full duty to restricted duty. She was given a temporary identification card stamped "no firearms" on the back. She was given no reason as to the change of status and removal of her guns.

Salgado was still not granted a transfer out of the Missing Persons Squad, and was ordered to return to that squad.

After numerous meetings and phone calls, including the intervention of Psychological Services, Salgado was finally granted a transfer to the NYPD Photo Unit (the "Photo Unit"). The Photo Unit is a very undesirable assignment. In addition, the transfer was conditioned on Salgado resigning and vesting out of the NYPD as of January 3, 1998.

On or about January 3, 1998, Salgado was compelled to resign from the NYPD as a result of the discrimination, harassment, and retaliation to which she had been subjected and the Defendants' failure to take effective remedial measures.

Martin, the Deputy Inspector of Special Investigations from 1994 through 1998, was aware of the discriminatory and harassing behavior to which Salgado was being subjected, as well as her complaints. Martin took no action to address or stop the behavior even though he had the authority to order and require employees of the Missing Persons Squad and Special Investigations to undergo training with respect to sexual orientation discrimination. Nor did any other official, supervisor, or agent of the City of New York or the NYPD.

The Defendants conspired and agreed, and acted in concert with each other, to discriminate against Salgado on the basis of sexual orientation. The Defendants were motivated in their conspiracy by their invidious and discriminatory animus towards homosexuals. Brown, Tobing, and Plata, who were Salgado's fellow detectives and co-workers, were motivated by personal interests and were acting in pursuit of those interests when acting in furtherance of the conspiracy. The Defendants either knew or showed reckless disregard for the fact that their conspiracy constituted a violation of Salgado's constitutional right to equal protection.

As a consequence of the Defendants' actions and repeated failure to properly investigate and address properly Salgado's complaints, Salgado has lost and continues to lose substantial income, including but not limited to wages, pension, and other employment-related benefits. Salgado has also suffered and continues to suffer emotional distress, humiliation, anxiety, damage to her professional reputation and career, and disruption of her professional and personal life.

*Discussion*

I. *The Standard Under* Rule 12(c)

**\*5** The standard applicable to a motion for judgment on the pleadings, pursuant to Rule 12(c), is the same as the standard for a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999), *cert. denied,* U.S. , 2000 WL 1577301 (Dec. 11, 2000). The allegations contained in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the nonmoving party. *Id.* Dismissal is warranted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

II. *The Claims For Conduct Arising Before May 15, 1997 Are Not Time-Barred*

A. *The Law Governing The Statute Of Limitations*

The statute of limitations for § 1983 and § 1985 claims is three years. *Harris v. City of New York,* 186 F.3d 243, 247-48 (2d Cir.1999); *Mian v. Donaldson, Lufkin & Jenrette,* 7 F.3d 1085, 1087 (2d Cir.1993). A claim accrues once the plaintiff "knew or had reason to know of the injury serving as the basis for his claim." *Harris,* 186 F.3d at 247.

Under the continuing violation doctrine, the existence of a continuous policy or practice delays the commencement of the statute of limitations period for a § 1983 or § 1985 claim until the last discriminatory act in furtherance of that policy or practice. *See Cornwell v. Robinson,* 23 F.3d 694, 703-04 (2d Cir.1994) (defining and applying continuing violation doctrine to Title VII, § 1983, and § 1985 claims); *see also Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996) (defining and applying continuing violation doctrine to Title VII claim).

The continuing violation rule is satisfied where "there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests," *Van Zant,* 80 F.3d at 713, or "where specific and related instance of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice," *Cornwell,* 23 F.3d at 704. However, "discrete incidents of discrimination that are not related to discriminatory policies or mechanisms may not amount to a continuing violation." *Id.* Moreover, it has been frequently noted that the continuing violation doctrine is disfavored in this circuit and will be applied only upon a showing of compelling circumstances. *See, e.g., Katz v. Beth Israel Med. Ctr.,* No. 95 Civ. 7183, 2001 WL 11064, at *8 (S.D.N.Y. Jan. 4, 2001); *Findlay v. Reynolds Metals Co., Inc.,* 82 F.Supp.2d 27, 37 (S.D.N.Y.2000) (collecting cases).

Some district courts in this circuit, including this one, have found consideration of the following factors,

articulated by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971 (5th Cir.1983), to be useful in applying the continuing violation doctrine:

**\*6** The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry,* 715 F.2d at 981; *see Johnson v. Nyack Hosp.,* 891 F.Supp. 155 (S.D.N.Y.1995), *aff'd on other grounds,* 86 F.3d 8 (2d Cir.1996) (applying *Berry* factors); *Buckvar v. City of New York,* No. 98 Civ. 3106, 2000 WL 274195, at *4 (S.D.N.Y. March 13, 2000) (following *Johnson* ).[FN2]

> FN2. The *Berry* analysis has been adopted by several Courts of Appeal. *See Johnson,* 891 F.Supp. at 163 n. 9 (citing decisions from Third, Seventh, Tenth, and Eleventh Circuits); *but see Morgan v. National R.R. Passenger Corp.,* 232 F.3d 1008, 1015 (9th Cir.2000) (rejecting *Berry* test, in particular third "trigger" factor). Contrary to the Defendants' contention, it has not yet been adopted by the Second Circuit.

B. *Salgado Has Alleged Sufficient Facts To Satisfy The Continuing Violation Doctrine*

The Defendants contend that Salgado's claims are time-barred to the extent they pertain to conduct occurring more than three years before the filing of the complaint on May 15, 2000, i.e., before May 15, 1997, and because the continuing violation doctrine does not apply. Relying primarily on *Johnson,* 891 F.Supp. 155, the Defendants maintain that: the alleged discriminatory acts are not sufficiently connected to each other or to discriminatory

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

acts occurring within the three-year statute of limitations, such as the theft of Salgado's guns from her locker; the allegations are not sufficiently specific, because in some instances she fails to provide dates or specific fact; and Salgado's duty to sue was triggered as far back as April 1996 because she had notice by that time of the Defendants' alleged discriminatory actions, so that application of the continuing violation doctrine would not be equitable.

The acts alleged-discriminatory treatment in work assignments, opportunities, and the ability to transfer, derogatory statements about Salgado's sexual orientation, and harassing signs and letters-are sufficiently connected to each other because they were similar in kind, perpetrated by many of the same actors, motivated by the same type of bias, and allowed to continue unremedied by supervisory personnel. *See Cornwell*, 23 F.3d at 704 (where plaintiff suffered race- and gender-based harassment during period outside of statute of limitations, and later "suffered the same kinds of harassment at the hands of some of the same [individuals] and under the aegis of some of the same supervisory personnel," discriminatory acts were sufficiently related to warrant application of continuing violation doctrine); *cf. Buckvar*, 2000 WL 274195, at *4 (alleged acts of discrimination did not involve same type of discrimination where included age, sex, and religion-based discrimination).

**\*7** Salgado's allegations are sufficiently specific. For example, with respect to the pre-May 15, 1997 period, she alleges numerous specific acts of discrimination and harassment by Negron, including discrimination in work assignments and derogatory comments; derogatory comments by Brown, Tobing, and Plata; knowledge by Davis, a supervisor, of the conduct by Negron, Brown, Tobing, and Plata, and Davis's failure to act; retaliation by Davis after she filed her April 24, 1996, complaint with the Commission on Human Rights; the harassing banners in July 1996; transfer requests in August, September, and December of 1996, and February and March of 1997, that were ignored; the harassing letter in her mailbox in February 1997; and knowledge of the situation and failure to act by the OEEO, Internal Affairs, First Deputy Commissioner Simonetti, and the Department Advocates's office. With respect to the period after May 15, 1997, Salgado alleges *inter alia* that she continued to be

discriminated against with respect to work assignments; continued to be subject to derogatory comments by Brown, Tobing, and Plata, among others; continued to request a transfer and to communicate to NYPD authorities regarding the discrimination she was suffering, and to have her requests and complaints ignored; had her guns stolen out of her locker in October 1997; was put on restricted duty and had her guns removed without explanation in November 1997; and, when she was finally granted a transfer it was to an undesirable unit and was conditioned on her resignation.

Finally, "[t]he question [of] when a plaintiff in a discrimination case 'has had enough' so as to warrant the commencement of litigation may be subtle and difficult .... [and] many employees who seek to hold on to their jobs in the face of a hostile environment face hard choices." *Johnson*, 891 F.Supp. at 166. Certainly Salgado did. It cannot be said as a matter of law, based on the pleadings, that Salgado's duty to sue was triggered before May 15, 1997-and certainly not as far back as April 1996-as she attempted to negotiate the treacherous terrain of her work environment. *Johnson*, 891 F.Supp. at 163 (*quoting Berry*, 715 F.2d at 981). Thus, she has made a sufficient showing of compelling circumstances to warrant application of the continuing violation doctrine.

In sum, the complaint sufficiently alleges specific and related instances of discrimination, which Salgado's employer permitted to continue for so long as to amount to an ongoing policy or practice of discrimination, to warrant application of the continuing violation doctrine. *See Cornwell*, 23 F.3d at 704. Therefore, Salgado's claims based on pre-May 15, 1997 conduct are not time-barred.

III. *Salgado Has Failed To State A Claim For Conspiracy Under § 1985(3)*

A. *The Legal Standard Under § 1985(3)*

Salgado alleges that the Defendants conspired to violate her right to equal protection, under the Fourteenth Amendment of the Constitution, in violation of 42 U.S.C.1985(3). Section 1985 provides a cause of action where:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

**\*8** two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United States....

> 42 U.S.C. § 1985(3).

In order to state a claim for conspiracy to violate an individual's constitutional rights, a plaintiff must show: (1) a conspiracy (2) for the purpose of depriving a person of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Smith v. Metro North Commuter R.R.,* No. 98 Civ. 2528, 2000 WL 1449865, at *6 (S.D.N.Y. Sept. 29, 2000) (*citing Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999)).

With respect to the first element, in order to prevail at trial the plaintiff must prove a mutual understanding or meeting of the minds to violate her civil rights. *Hickey-McAllister v. British Airways,* 978 F.Supp. 133, 139 (E.D.N.Y.1997). Proof of a "tacit understanding," rather than an explicit agreement, will suffice. *Smith,* 2000 WL 1449865, at *7 (*quoting Thomas,* 165 F.3d at 146) (quotation marks omitted). With respect to the second element, the plaintiff must show that the conspiracy was motivated by a discriminatory animus based on an invidious classification. *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 419 (2d Cir.1999).

Conclusory allegations of the defendants' alleged participation in a conspiracy are inadequate to make out a claim under § 1985. *X-Men Security, Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.2000). The plaintiff must allege sufficient facts so as to give rise to an inference that each of the four requisite elements is met. *Id.*

Under the "intracorporate conspiracy" doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together. *Hermann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978) (applying doctrine in § 1985(2) context); *Girard v. 94th St. and Fifth Ave. Corp.,* 530 F.2d 66, 71-72 (2d Cir.1976) (applying doctrine in § 1985(3) context).

There is a "personal interest" or "personal stake" exception to the intracorporate conspiracy doctrine, however, which permits a § 1985 claim where there are individuals who are "motivated by an independent personal stake in achieving the corporation's objective." *Girard,* 530 F.2d at 72; *see, e.g., Roniger v. McCall,* 22 F.Supp.2d 156, 168-69 (S.D.N.Y.2000) (defendant had " 'personal stake' in being reelected [to political office], and in downplaying his compromised political independence"); *Rini v. Zwirn,* 886 F.Supp. 270, 293 (E.D.N.Y.1995) (where "[n]one of the allegations regarding [a town employee] pertain[ed] to his duties as an employee of the Town," that town employee acted as an individual in conspiring with other town employees); *Yeadon v. New York City Transit Auth.,* 719 F.Supp. 204, 207, 212 (S.D.N.Y.1989) (police officers who engaged in race-based false arrests in order to "improve their arrest records in order to secure promotions and other benefits" had "independent, conspiratorial purpose").

**B.** *The § 1985(3) Claim Must Be Dismissed Under The Intracorporate Conspiracy Doctrine*

**\*9** All of the individual Defendants are officers, agents and employees of a single corporate entity, the City of New York. Therefore, the Defendants maintain, Salgado's § 1985(3) claim is barred under the intracorporate conspiracy doctrine.

Salgado objects that the personal stake exception to this doctrine applies because she has alleged that some of the defendants-her fellow detectives and officers, Brown, Tobing, and Plata-were motivated by personal interests and were pursuing those interests when they acted in furtherance of the conspiracy. This formulation, however, merely states the legal standard without alleging specific facts giving rise to an inference that the standard has been satisfied.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)

(Cite as: 2001 WL 290051 (S.D.N.Y.))

The complaint alleges that Brown, Tobing, and Plata made derogatory remarks about, and engaged in other abusive behavior towards, Salgado based on her sexual orientation. The only inference of a personal interest or stake to be drawn from those allegations is that these defendants were motivated by their individual prejudice. It has been noted in the case of a race-based § 1985 claim that, because invidiously discriminatory animus is required in order to give rise to § 1985(3) liability, *see Griffin,* 403 U.S. at 102, "[i]f personal racial bias were sufficient to defeat the intraenterprise conspiracy doctrine, the exception would swallow the rule...." *Johnson, M.D. v. Nyack Hosp.,* 954 F.Supp. 717, 723 (S.D.N.Y.1997). The same logic applies to Salgado's sexual orientation-based claim. There must be some personal stake alleged on the part these individual defendants other than the fact of bias itself. *But see McCraven v. City of Chicago,* 18 F.Supp.2d 877, 884 (N.D.Ill.1998) (stating that exception to intracorporate conspiracy doctrine met "where the employees were motivated solely by personal bias"). Therefore, Salgado's § 1985(3) claim, as pleaded, is barred by the intracorporate conspiracy doctrine, and must be dismissed.

In a footnote, Salgado requests that if the Court determines she has not met her pleading burden she be allowed to amend her complaint, pursuant to Federal Rule of Procedure 15(a). Although this is a motion for judgment on the pleadings, a court has discretion on such a motion to refrain from rendering judgment and to order dismissal with leave to amend. *See generally* Charles Alan Wright & Arthur R. Miller, 5A *Federal Practice and Procedure* § 1367 (Supp.2000). However, the Defendants not having responded to Salgado's request, and Salgado not having made a formal motion, it would be premature to grant the request at this juncture. Therefore, the claim is dismissed, but without entry of judgment, to permit further motion practice regarding this matter.

As Salgado's § 1985(3) claim is dismissed for the reasons set forth above, the Transit Authority's other contentions as to the sufficiency of that claim will not be addressed at this time.

*Conclusion*

Therefore, for the reasons set forth above, the motion for partial judgment on the pleadings is granted in part and denied in part.

**\*10** It is so ordered.

S.D.N.Y.,2001.

Salgado v. City of New York
Not Reported in F.Supp.2d, 2001 WL 290051 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants. [1]**

1   Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided**
**May 23, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P.*

*4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1)*.

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

> 2 Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

> 3 Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8] The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.
>
> 5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1) and 4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308, 311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Younquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The

state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332*. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a)*. Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of, occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25] of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8    Former Supreme Court Justice Harry A. Blackmun.
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d),* holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

### IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point

at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

### CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE